IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALAN GRAYSON,

      Plaintiff,

                                CASE NO.: 6:20-cv-01824-PGB-LRH

v.

NO LABELS, INC.;
PROGRESS TOMORROW,
INC.; UNITED TOGETHER, INC.;
NANCY JACOBSON, MARK PENN,
and JOHN DOE(S)

      Defendants.

_____/

**DEFENDANTS' MOTION TO STRIKE REPORT
AND PRECLUDE TESTIMONY OF PLAINTIFF'S
EXPERT NICHOLAS CARROLL AT TRIAL**

      Defendants No Labels, Inc., United Together, Inc., Nancy Jacobson, Mark Penn, and Progress Tomorrow, Inc. (together, the "Defendants") hereby file their Motion to Strike Report and Preclude Testimony of Plaintiff's Expert Nicholas Carroll ("Carroll") at Trial, stating as follows:

**PRELIMINARY STATEMENT**

      As the Court is aware, this is a defamation action arising from former congressman, Plaintiff Alan Grayson's, failed election bid in 2018 in the Democratic Primary for Florida's 9th congressional district. Two years after his defeat, Grayson is seeking others to blame including, *inter alia*, Defendant Progress Tomorrow, Inc., a political action committee. In essence, Plaintiff alleges that political ads published by

Defendant Progress Tomorrow, Inc. defamed him and caused him to lose the election. In support of his claim, Plaintiff has retained "defamation" expert Nicholas Carroll, who provides three types of opinions, all of which fail to survive *Daubert* scrutiny. First, he opines that "by mainstream reporting standards, the ads were written with reckless disregard for the truth, and it is unlikely the claims could have found venues willing to disseminate them other than mailhouses and online media." This opinion, in addition to being irrelevant, because it applies journalistic standards as opposed to political advertising standards, is a bald conclusion not based on any review of the underlying research or vetting process used to publish the ads, but rather Carroll's own subjective opinion. This type of subjective, non-scientific testimony is exactly the type of opinion that the *Daubert* standard was meant to prevent.

Second, Carroll opines that the harm to Grayson's reputation can only be repaired by presenting a new positive image. Again, this is not based on any study, research, or facts of this case, rather pure subjective opinion, and presupposes that Grayson's reputation sustained any harm.

Third, Carroll regurgitates the equally inadmissible opinion of Grayson's damages expert David Heller, and states that the cost to repair Grayson's reputation will exceed $16 million. This is simply impermissible under *Daubert.*

In sum, Carroll should be precluded from testifying at trial, as his report fails every prong of the *Daubert* standard: (1) he is not qualified to testify with respect to the standards for publishing political ads; (2) his testimony is unreliable insofar as it is based on nothing except his subjective, unscientific opinion that is not backed by

2

review of any underlying facts or any studies; (3) his testimony does not assist the trier of fact, because he is testifying on matters of common sense that can readily be determined by the jury without expert testimony; and (4) he impermissibly replies on another expert's opinion.

For all of these reasons, the Court should strike Carroll's report and preclude him from testifying at trial.

## CARROLL'S REPORT

Carroll's listed qualifications and experience appear to be primarily in performing libel reviews for books and newspapers, editing and journalism, as well as reputation repair. *See* Carroll Report at 4, attached hereto as Ex. 1.  However, his credentials do not reference any experience in political advertising or libel review for political ads. *See id.*

With respect to the materials reviewed by Carroll, he indicates that he reviewed invoices, Progress Tomorrow, Inc. Facebook ads and mailers, the Plaintiff's Second Amended Complaint, and the report of Plaintiff's damages expert David Heller. *See id.* at 3. He did not however review any underlying research performed by Progress Tomorrow, Inc. or its vendors prior to producing the political ads or any documents concerning the vetting process or approval for said ads. *See id.*

Carroll's report then proceeds to provide "editorial opinions on potential liability and whether to refer ads to legal counsel" *See id.* at 7. The following are some of the opinions offered by Carroll as to various different ads:

    a.  "potential liability is in my opinion too high to run this ad in print

media, simply based on publishing standards." *Id.*

b. "refer for legal opinion on potential false light portrayal, since Caymans equates with fraud for most U.S. readers who have heard of the islands . . ." *Id.* at 9.

c. "Refer advertiser to the newsroom, which has the investigative staff to vet this broad allegation if they want to." *Id.* at 11.

d. "do not run this ad – no legal opinion needed, this ad is too volatile. . . the blood-red background colors subliminally suggest violence or murder." *Id.* at 13.

e. "refer to legal counsel: 'ACCUSED SERIAL ABUSER…' in lower right can too-easily be remembered by readers as "CHARGED SERIAL ABUSER…" or "CONVICTED SERIAL ABUSER." *Id.* at 19.

f. "do not run this ad …Very few established print media venues would accept this advertisement. . . In the climate of the Me-Too movement . . . it is a litigation risk." *Id.* at 15

g. "Send for legal review: the wording appears to be pure opinion, but 'STAIN' superimposed on a blood red background suggests violence or murder, and might cross a legal line." *Id.* at 22.

Then in his "conclusionary editorial opinion" he states, without having analyzed the research performed or vetting process conducted by Progress Tomorrow, Inc. or its outside vendors, "by mainstream reporting standards, the ads were written with reckless disregard for the truth, and it is unlikely the claims could have found venues willing to disseminate them other than mail houses and online media." *See id.* at 23.

In his "opinion on harm to the reputation of Alan Grayson" section Carroll opines that the harm to Grayson's reputation can only be repaired by presenting a new positive image. *See id.* at 24.

Finally, in his "opinion on cost of repairing reputation" section Carroll regurgitates the opinion of Grayson's damages expert David Heller, and states that the cost to repair Grayson's reputation will exceed $16 million, without having done any analysis of his own. *See id.* at 25.

4

<u>**MEMORANDUM OF LAW**</u>

## I.  LEGAL STANDARD

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court explained that Rule 702 imposes an obligation on a trial court to act as gatekeeper, to ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable. District courts are charged with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies "expert testimony." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (2002). Thus, the party offering an expert opinion has the burden of establishing three criteria: qualification, reliability, and helpfulness. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

First, the witness must be "qualified to testify competently regarding the matters [s]he intends to address." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Indicia of an expert's qualifications may be evidenced by education, training, work experience, publication in the pertinent field, and membership in professional societies. *See Riverside Apartments of Cocoa, LLC v. Landmark Am. Ins. Co.*, No. 6:18-CV-1639-ORL-40-DCI, 2020 WL 8184710, at *2 (M.D. Fla. Dec. 4, 2020) citing *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990).

Second, the expert witness must employ "sufficiently reliable" scientific

methods or principles to form her opinions. *Rink*, 400 F.3d at 1291. The reliability of an expert's methodology can be evaluated by considering a wide range of factors, including: (1) whether the expert bases her opinion on sufficient facts or data, (2) whether the expert unjustifiably extrapolates her research to reach an unfounded conclusion, (3) whether the expert considers or accounts for contradictory studies or data, (4) the extent to which the methods used rely on the expert's subjective interpretations, and (5) whether the expert is being as careful as an expert in the same field would be in conducting professional work outside the context of paid litigation. *See Daubert*, 509 U.S. at 593–94; Fed. R. Evid. 702 advisory committee notes to 2000 amendments.

Third, the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. Expert testimony provides assistance where it concerns matters beyond the ken of the average juror and will allow the jury to understand the evidence or to resolve a factual dispute. *See Kumho Tire v. Carmichael*, 526 U.S. 137, 148–49 (1999). Conversely, there will be no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic in light of the evidence and testimony presented at trial. *See Riverside Apartments of Cocoa, LLC*, 2020 WL 8184710, at *2 citing *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must hold probative value that outweighs the concerns listed in Rule 403. *Daubert*, 509 U.S. at 591.

6

The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

## II. CARROLL IS NOT QUALIFIED TO TESTIFY REGARDING PUBLISHING STANDARDS FOR POLITICAL ADVERTISEMENTS

It is well settled that the subject matter of an expert's opinion must fall within his area of expertise in order to be admissible. *See Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, No. 10-61532-CIV, 2011 WL 4055391, at *1 n.2 (S.D. Fla. Sept. 13, 2011) (excluding portions of expert testimony that were "outside his area of expertise"); *In re Trasylol Products Liab. Litig.*, No. 08-MD-01928, 2010 WL 4052141, at *7 (S.D. Fla. May 12, 2010) (finding expert opinions inadmissible under Rule 702 and *Daubert* in part because they fell "outside of his area of expertise"). A cursory review of Carroll's report quickly sheds light on the fact that Carroll is not qualified to opine on the publishing standards applicable to political advertisements that are disseminated by political action committees. Instead, Carroll's listed qualifications make obvious that his experience is in editing and libel review for books and media such as newspapers. *See* Ex. 1 at 3. Further, his opinions themselves emphasize this fact. For instance, for one ad he opines that "potential liability is in my opinion too high to run this ad in **print media**, simply based on publishing standards" (emphasis added) and for others he refers to "mainstream reporting standards" and referring matters to the "newsroom" and recommends against publishing certain ads on the basis that they are "too volatile" or that they would be a "litigation risk." *See id.* at 7, 11, 13, 23. All of these opinions clearly indicate that Carroll's expertise, if any, is in

7

print media editing. *See id.* His opinions are essentially framed in terms of "would a mainstream print media outlet face a risk of litigation" if it published these ads. He is not however, an expert in determining whether a political action committee, which by its nature is less concerned with issues facing media outlets, such as pleasing advertisers or losing readership, etc…would be justified in publishing the subject ads. Surely, the editors of the *New York Times* and *Wall Street Journal* have different thresholds for controversy in publishing than a political action committee, such that "volatility" may not be tolerated by a newspaper but would be inconsequential for a political action committee. Carroll's own conclusion that: ". . . it is unlikely the claims could have found venues willing to disseminate them other than mail houses and online media" highlights the discrepancy between Carroll's expertise and the opinions he is attempting to offer. *See id.* at 23.

Here, the political ads regarding Grayson were, in fact, disseminated via mail and the internet, not print media, thus it is completely immaterial whether other "venues" would have published the ads. *See* Progress Tomorrow, Inc.'s Motion for Summary Judgment. Carroll is trying to impose his own expertise, newspaper article editing standards, on political ads, an area which he does not have expertise. This is simply impermissible as a matter of law. *See Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, No. 10-61532-CIV, 2011 WL 4055391.

For these reasons alone, the Court should exclude Carroll's report and proposed testimony at trial.

### III.   CARROLL'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Even assuming, *arguendo*, that Carroll possessed the requisite expertise to provide opinions on the publishing standards for political ads, his opinions are unreliable in that they are completely subjective and based on nothing but Carroll's whims. It is well-settled that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *See id.* Methodologically flawed expert reports may be excluded under *Daubert* including flawed expert reports on damages. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250–51 (11th Cir.2007); *Gastaldi v. Sunvest Resort Communities, LC*, 709 F. Supp. 2d 1299, 1304 (S.D. Fla. 2010).

Here, for instance, Carroll's conclusion that "by mainstream reporting standards, the ads were written with reckless disregard for the truth" is supported by nothing whatsoever. *See* Ex. 1 at 23. Carroll's report reflects the fact that he did not review the facts or sources relied upon by Progress Tomorrow, Inc. and its vendors and he did not review any documentation as to the vetting process for the ads. *See id.* at 3. For instance, Carroll repeatedly opines for certain ads that he would have referred the ad to "legal" for review. *See id.* at 9, 19, 22. If Carroll, had reviewed any documentation regarding Progress Tomorrow, Inc.'s vetting process, he would have seen that all ads were, in fact, referred to law firm, Blank Rome, LLP for review. *See*

Progress Tomorrow, Inc.'s Motion for Summary Judgment.

In addition, Heller impermissibly opines, that Grayson sustained harm to his reputation as a result of the Progress Tomorrow, Inc. ads, without having conducted or reviewed any study or research performed with respect to Grayson's reputation before or after the publication of the subject ads. *See* Ex. 1 at 3; *see also Greater Hall Temple Church of God v. Southern Mut. Church Ins. Co.*, 820 F. App'x 915 (11th Cir. 2020) ("Moreover, Brown's visual examination of the building, without any knowledge of the buildings prior condition or knowledge of the wind speeds the building was subjected to, is not a sufficiently reliable methodology to allow Brown to provide an expert opinion as to the cause of the roof damage.").

Further, his opinions regarding many, if not all of the ads are pure *ipse dixit* opinions. For example, with respect to one ad he states that he would "refer for legal opinion on potential false light portrayal, since Caymans equates with fraud for most U.S. readers who have heard of the islands . . ." *See* Ex. 1 at 9. For another, he states "do not run this ad – no legal opinion needed, this ad is too volatile. . . the blood-red background colors subliminally suggest violence or murder." *See id.* at 13. For another, he opines "refer to legal counsel: 'ACCUSED SERIAL ABUSER…' in lower right can too-easily be remembered by readers as "CHARGED SERIAL ABUSER…" or "CONVICTED SERIAL ABUSER." *See id.* at 19. For another he states, "Send for legal review: the wording appears to be pure opinion, but 'STAIN' superimposed on a blood red background suggests violence or murder, and might cross a legal line." *See id.* at 22. He does not cite a single study, research, or empirical data to support any of

these opinions. *See generally id.* Setting aside the fact that the Office of Congressional ethics found substantial reason to believe that Grayson had a hedge fund based in the Cayman Islands (*see* Progress Tomorrow, Inc.'s Motion for Summary Judgment), there is simply no scientific or academic basis other than Carroll's subjective opinion, for him to conclude that "Caymans equates with fraud." Similarly, there is no study or empirical data offered by Carroll to support the opinion that the color red "subliminally suggests violence or murder." Likewise, Carroll's subjective and speculative opinion that readers *might* interpret "accused serial abuser" as "charged serial abuser" or "convicted serial abuser" is not based on any type of study or research regarding the effect of certain language on the minds of readers. These are just some examples of the subjective and unfounded opinions of Carroll, which render his analysis unreliable.

Indeed, the only way for any person to replicate Carroll's analysis, would be to ask Carroll himself what he opines on any individual ad before running it. These types of opinions are inadmissible under *Daubert*. *See Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result"); *United States v. Montgomery*, 635 F.3d 1074, 1083 (8th Cir. 2011) (affirming exclusion of testimony as unreliable in part because data produced by expert did not permit opposing expert to replicate calculations).

11

For all of these reasons, Carroll's proposed testimony is unreliable and he should be excluded as an expert.

## IV.  CARROLL'S OPINIONS DO NOT ASSIST THE JURY

Setting aside the above deficiencies in Carroll's report, his opinions should likewise be excluded because they do not assist the jury and in fact, invade the province of the jury. The final requirement for admissibility of expert testimony is that it "assist the trier of fact." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). In other words, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.* citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985). Expert testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Retirement Sys.*, 50 F.3d 908, 917 (11th Cir.1995) (citations omitted).

Here, the issues which Carroll opines on, i.e., whether the ads were published with "actual malice" are well within the ken of the jury. Stated differently, it is for the jury decide whether a given publication regarding Alan Grayson is true and if not whether it was published with knowledge or reckless disregard of its falsity. That Carroll opines, that he, as a newspaper or book editor would or would not have published a certain political ad, or would have referred an ad for legal review, does not assist the jury, as no expertise is required to make a determination of actual malice, or the lack thereof.

This is not, for example, a medical malpractice case, in which an expert is

needed to instruct the jury on the medical standard of care for performing an appendectomy, information which the average person would not know without the assistance of a medical expert. In such a case, a jury would not know without expert testimony, for instance whether a patient's symptomology warranted further testing or indicated that a physician should have ordered an emergency appendectomy or whether the failure to do so constituted malpractice. *See McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004) (noting that in medical malpractice cases "expert testimony is usually required to establish the standard of care").

Here, whether a given political ad could be deemed false or was published with knowledge of falsity or reckless disregard of the truth requires no expert testimony. The jury need only review the ads, review the source material for said ads, and review the vetting process for the ads to determine first whether the statements were true and second whether the publisher of the ads was reckless or not, in light of the vetting process that was conducted.  An opinion that the ads do not meet Carroll's subjective publishing standards for books and newspaper articles does not assist the jury in any way in determining whether Progress Tomorrow, Inc.'s publication of political ads constituted defamation. In fact, Carroll's proffered opinions would be prejudicial and likely to confuse the jury, as the jury would be deceived into believing that publishing standards for books or newspapers have any bearing on the "actual malice" standard as applied to political ads. This likelihood of confusion is readily apparent in Carroll's opinion that an ad should not be published merely because it is "volatile." *See* Ex. 1 at 13. As discussed above, a newspaper may have good reasons for avoiding publishing

13

volatile material, which may not apply to a political action committee. "Volatility" however, is not a standard that a jury should be permitted to apply in this case.

Moreover, some of the very opinions offered by Carroll, such as "the color red subliminally suggests violence" or "Caymans equates with fraud" are exactly the types of opinions that a jury should be entitled to evaluate (and disregard) for itself without being prejudiced by Carroll's lay opinions on same. *See id.* at 9, 13.

For all of these reasons, Carroll's opinions are likely to mislead the jury instead of assisting it, and Carroll should therefore be precluded from presenting his opinions at trial.

## V. CARROLL'S ADOPTION OF DAVID HELLER'S DAMAGES OPINION IS IMPROPER AS A MATTER OF LAW

Lastly, to the extent that Carroll's report cites and incorporates David Heller's opinion on damages, without having done any independent analysis of damages on his own, his opinions should likewise be excluded. *See id.* at 25.

It is well-settled that an expert may not blindly rely on the conclusions of another and still meet the reliability requirements of Rule 702 and *Daubert*. *See American Key Corp. v. Cole Natl' Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985) (holding that expert opinions based upon opinions of others are normally inadmissible); *In re TMI Litigation*, 193 F.3d 613, 715 (3rd Cir.1999) (holding that expert's "failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to

produce reliable results"); *see also United States v. Batchelor-Robjohns*, No. 03-20164-CIV, 2005 WL 1761429, at *5 (S.D. Fla. June 3, 2005) (expert precluded from testifying as to opinions based on other experts).

Here, Carroll completely relies on and adopts Heller's opinion on damages without performing any analysis of his own. *See* Ex. 1 at 25. This is impermissible as a matter of law.

For this reason, Carroll's opinion regarding damages, which merely adopts another expert's report (which is, in any case, also inadmissible), should be stricken.

## CONCLUSION

The *Daubert* standard was implemented "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies "expert testimony." Carroll's opinions are exactly the type of testimony that *Daubert* was meant to prevent from reaching the jury. Carroll is unqualified to give his proffered opinions, his methodology is unreliable and completely subjective, his opinions do not assist and would only confuse the jury, and he impermissibly adopts another expert's report. For all of these reasons, the Court should exercise its gatekeeping function and strike Carroll's report and preclude him from testifying at trial.

WHEREFORE, Defendants respectfully request that the Court enter an Order striking the report of Nicholas Carroll and precluding him from testifying at trial, and granting Defendants any relief deemed just and proper.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Under Local Rule 3.01(g), counsel for Defendants conferred via telephone with Plaintiff's counsel on January 3, 2022 and the parties were unable to resolve the instant dispute.

Dated:  January 3, 2022

> Respectfully submitted,
>
> **LEGON FODIMAN & SUDDUTH, P.A.**
> *Counsel for Defendants No Labels, Inc., Progress Tomorrow, Inc., United Together, Inc., Nancy Jacobson, and Mark Penn*
> 3225 Aviation Avenue, Suite 301
> Miami, Florida 33133
> Telephone:  (305) 444-9991
> Facsimile:  (305) 444-9937
> Primary e-mail:  tlegon@lpflaw.com
> Secondary e-mail:  respinosa@lpflaw.com
> Secondary e-mail:  eservice@lpflaw.com
>
> By:____/s/ Todd R. Legon_____
>         TODD R. LEGON
>         Florida Bar No. 814415

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 3rd day of January, 2022, I served the foregoing via electronic mail to:

> Tucker H. Byrd
> Byrd Campbell, P.A.
> 180 Park Avenue North, Suite 2A
> Winter Park, Florida 32789
> TByrd@ByrdCampbell.com
> *Counsel for Plaintiff*
>
> By:____/s/ Todd R. Legon
>         TODD R. LEGON