

**Nicholas Carroll** | **415-810-1966** | **expert@nicholascarroll.com**

**PO Box 579, Woodbridge, CA 95258**

# EXPERT REPORT OF NICHOLAS CARROLL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)

**CASE:**

ALAN GRAYSON v. NO LABELS, INC.; PROGRESS TOMORROW, INC.; UNITED TOGETHER, INC.; NANCY JACOBSON, MARK PENN, and JOHN DOE(S)

CASE NO: 6:20-cv-1824-Orl-40LRH,
in the United States District Court for the Middle District of Florida,
Orlando Division

# TABLE OF CONTENTS

Scope of Assignment ............................................................................................................ 2

Basis for Opinions................................................................................................................ 3

Qualifications....................................................................................................................... 4

Basis for Opinions................................................................................................................ 5

Specific Claims Addressed By This Report with Opinions – Introduction ........................ 6

    Specific editorial opinions on potential liability and whether to refer ads to legal counsel ................ 7

        Financial Irregularities, "Offshore," and "Hedge Fund" Campaign .................................... 7

        "Abuser" Campaign ........................................................................................... 10

        Other Negative Portrayals...................................................................................... 21

        Conclusionary Editorial Opinion ............................................................................. 23

    Opinion on Harm To the Reputation of Alan Grayson .................................................... 24

    Opinion on Cost of Repairing Reputation ..................................................................... 25

Expert's Testimony in Last Four Years ............................................................................. 26

Compensation ..................................................................................................................... 27

Expert's Signature .............................................................................................................. 27

Attachments ........................................................................................................................ 28

    Nicholas Carroll – Curriculum Vitae – 2021 ................................................................. 28

    Publications......................................................................................................... 31

# Scope of Assignment

I have been retained by the firm of Byrd Campbell, P.A. to address:

    a.   Editorial opinion on potential liability, and whether to refer ads to legal counsel.

    b.   Harm to the reputation of Alan Grayson by negative political advertising.

    c.   The costs of repairing that reputation.

# Basis for Opinions

This report was prepared based on my own independent online research and the following legal documents for the case:

**1. Second Amended Complaint and Demand for Jury Trial, Case 6:20-cv-01824-PGB-LRH**
Document 35, filed 04/21/21 United States District Court, Middle District of Florida, Orlando Division

**2. Exhibits of Advertising**

Mailers.pdf

Facebook Ads.pdf

**3. Advertising Expense Documents**

Expenditures Spreadsheet.pdf

Grayson Expenditures.pdf

Pivot Invoices.pdf

Landscape Media Invoices.pdf

Rising Tide Invoice.pdf

**4. Cost of repair report by David Heller**, draft dated 10/4/2021.

References to individual legal documents and my online research are more fully described in the individual sections on economic damages claims.

# Qualifications

Qualifications to opine in the following areas:

## 1. Unprofessional Reporting and Advertising Raising Red Flags for Libel

**Editing**
**1989-Present**. Twenty-eight years experience as a professional editor performing preliminary libel reviews of books and articles, and now of web content.

**Journalism**
**1998-2003**. Silicon Valley correspondent writing ecommerce and technical news for the *Chicago Tribune* (and KRTN newswire), *The Times* of London, the Toronto *Globe and Mail*, the Vancouver Sun, the *Oregonian*, and as a columnist for Southam syndicate.

**1998-2000**. Legal columnist for the Toronto *Globe and Mail*, Canada's newspaper of record.

**Pro Bono Activity**
**1995-2003**. Counseling writers on libel avoidance and publishing contracts, including members of the Author's Guild and the National Writers Union.

**2003-2018**. Providing practical (non-legal) advice to defamation victims.

## 2. Depth of the damage to plaintiff's reputation

**2003-Present**. Directly counseled defamed businesses and individual victims on non-legal reputation repair solutions, putting numbers to the costs of real-life solutions. I have analyzed the cost of reputational repair for both individuals and businesses.

## 3. Economic damages resulting from false and/or misleading mainstream news, alternative news or blogging, and advertising.

**1992-2006**. Wrote, edited, laid out, and placed advertisements for hundreds of different services and products from fund-raising to consumer goods, becoming familiar with restrictions placed by advertising venues as well as advertising regulation by government bodies including the FTC and SEC.

**2003-Present**. For businesses, NGOs, public figures, and public officials I have analyzed and calculated financial harms in terms of lost sales and/or harm to reputation and presented my findings in numbers and infographics. For private individuals I have assessed the costs of seeking a new job (if the defamation has not spread too far), unemployment, lost lifetime career earnings, post-career earnings, moving to a new town, selling a possibly distressed business or home at a loss, moving costs, and the price of relocating family and children.

4

# Basis for Opinions

**1. Professional qualifications per page 4.**

**2. Publications on libel**

*The Associated Press Stylebook and Libel Manual 2021*
 www.apstylebook.com

*Sanford's Synopsis of Libel and Privacy*
Bruce W. Sanford, 1991

*Libel and Privacy*, 2nd Edition, Bruce W. Sanford,
https://lrus.wolterskluwer.com/store/product/libel-and-privacy-second-edition/

*Law of the Blog*. Nicholas Carroll, 2007. Defamation, copyright, trademark, and intellectual property
law in the U.S. and worldwide.

**3.  Publications on altering public opinion**

*Crystallizing Public Opinion*, Edward Bernays, 1934.
https://www.gutenberg.org/cache/epub/61364/pg61364-images.html

"The Zone of Indifference," Chester Barnard, 1923.

*Instincts of the Herd in Peace and War*, Wilfred Trotter, 1916.
https://www.gutenberg.org/cache/epub/53453/pg53453-images.html

*Novum Organum*, Francis Bacon, 1620.
https://www.gutenberg.org/cache/epub/45988/pg45988-images.html

"Spinning the Web: The Realities of Online Reputation Management," Nicholas Carroll. *Mindjack*.
February, 2003.

"Affirmation Bias vs. Confirmation Bias in Slander, Libel, and Online Defamation," Nicholas Carroll.
forthcoming January 2022.

# Specific Claims Addressed By This Report with Opinions – Introduction

**1. Editorial opinions on potential liability, and whether to refer ads to legal counsel.**

These are couched in terms of potential liability for established print venues.

They do not necessarily apply to the venues chosen by Alan Grayson's opponents, which were direct mail and online ads – but are indicative of the potential liability of those writing, designing, and placing the ads. As to the venues distributing the ads, I cannot express any legal opinion on their liability, to wit:

- **Facebook**, which attorneys inform me may or may not be fully protected by Section 230 of the Communications Decency Act (CDA).
- **Mailer printers, mailhouses, and the USPS**, all of whom have traditionally been immune to libel litigation under legal defenses of innocent dissemination or as common carriers – attorneys inform me that this is still true.

**2. Harm to the reputation of Alan Grayson by negative political advertising.**

In my opinion as an expert witness in many defamation lawsuits, and consultant to hundreds of individuals, businesses, NGOs, and government bodies, the two primary allegations against Alan Grayson are lethal to his reputation:

- **Allegations of spousal abuse against his ex-wife, "on a daily basis,"with imputations of sexually predatory behavior.** This was a hugely negative allegation in 2018 in the growing Me-Too movement, and remains a huge "hot-button" issue today.
- **Allegations of offshoring funds**, imputing fraud and possible money-laundering.

**3. The costs of repairing that reputation.**

The costs will be much higher than the costs of damaging Grayson's reputation, per page 25.

## Specific editorial opinions on potential liability and whether to refer ads to legal counsel

### Financial Irregularities, "Offshore," and "Hedge Fund" Campaign



From Facebook Ads.pdf, page 1.

Potential liability is in my opinion too high to run this ad in print media, simply based on publishing standards, on two counts:

1. The first sentence "... investigated Alan Grayson ..." and the second sentence "There's substantial evidence ..." seem to come from different sources, based on the writing style, even though they are typeset to suggest they come from one news source.

2. While the OCE (Office of Congressional Ethics) did investigate Grayson – it is required to investigate all complaints – the matter was passed to the HCE (House Committee on Ethics), and I find no publically available information that the HCE found improprieties in Grayson's finances.

3. I would require the advertiser provide me with documentation from the HCE describing Grayson using his office for personal profit before running this ad.



From mailers.pdf, page 3-4.

I would not run this ad unless there were both criminal charges and/or a conviction for illegal offshoring of cash, *and* approval from legal counsel, based on:

**1**. Moving more than US$10,000 in cash or negotiable financial instruments out of the U.S.A. is a federal crime (known to most court reporters).

Citation: 31 U.S. Code § 5332 - Bulk cash smuggling into or out of the United States https://www.law.cornell.edu/uscode/text/31/5332

**2**. The briefcase appears to contain at least $150,000 in U.S. one-hundred-dollar bills, if bills are wrapped in bricks of 100, as the wrappings suggest. Also, the photo appears "Photoshopped" and is not credible support for the claims.



From mailers.pdf, page 18-19.

Refer for legal opinion on potential false light portrayal, since "Caymans" equates with "fraud" for most U.S. readers who have heard of the islands, ever since they came to prominence in the Wall St. financial scandals of the 1980s.

     (U.S. citizens are easily shocked by "offshore" accounts, far more than Europeans or Southeast Asians. Switzerland was a hot-button location long after it had started complying with U.S. law enforcement, and far more secretive locations are unknown to most U.S. readers – so "Caymans" is currently the hot-button location to Americans.)

**"Abuser" Campaign**



From Facebook Ads.pdf, page 11.

Do not run this ad without copies of the claimed police reports, including the one that his wife "advised that [Grayson] has assaulted her daily".

RED FLAG: That the allegation of assault is in a police report does not automatically protect the advertising department from liability for repeating defamation, as we are not the newsroom. Check this with legal counsel for ALL ads containing assault allegations.



From Facebook Ads.pdf, page 16.

Do not run this ad – no legal opinion needed:

1. Alleges a crime with no supporting facts, citations, or documentation.

2. Refer advertiser to the newsroom, which has the investigative staff to vet this broad allegation if they want to.

SEE RED FLAG ON P. 10.

9/27/21, 5:33 PM



From Facebook Ads.pdf, page 25.

To run this ad I would require:

1. The name of the specific police department.

2. Evidence of whether this was a report in the sense of police responding to a call and then leaving, or making a charge.

3. Support for a "history of abuse."

4. Documentation for the (second?) report mentioned.

SEE RED FLAG ON P. 10.



From mailers.pdf, page 5.

Do not run this ad – no legal opinion needed, the ad is too volatile:

1. This is a potpourri of unsourced statements alleging a crime, under a heading implying they are all transcribed from a 911 call recording, when at least one ("... threatens reporter ...") appears to be sourced from the *Washington Post* or *Orlando Sentinel*.

2. The blood-red background colors subliminally suggest violence or murder.

SEE RED FLAG ON P. 10.



From mailers.pdf, page 6.

Do not run this ad – no legal opinion needed: this ad alleges a crime (homicide), fails to name a specific police department, or state whether this was a report in the sense of police responding to a call and then leaving, or making a charge. "... he threatened to kill her ..." – homicide – is not specifically supported.

SEE RED FLAG ON P. 10.



From mailers.pdf, page 9.

Do not run this ad – no legal opinion needed. (Very few established print media venues would accept this advertisement, *even with a go-ahead from legal counsel*.) In the climate of the Me-Too movement and resignations of numerous prominent men from politics, media, and sports, some of them accompanied by criminal charges and convictions, it is a litigation risk on three counts:

1. It imputes criminal assault.

2. With four different women pictured, it imputes a pattern of abuses (e.g., "serial abuser").

3. Grayson says he does not know any of the four women; if this is correct, the photos may have been acquired online at random, which opens the door to litigation from the women in the images.

SEE RED FLAG ON P. 10.

15



From mailers.pdf, page 10.

Police bar lights impute that police made an emergency response rather than a routine response – unsupported. To run this ad, require the advertiser to provide:

1. A verifiable copy of the police report.

2. A verifiable copy of a medical report clearly attributing the ex-wife's injuries to that specific reported abuse.

SEE RED FLAG ON P. 10.

16



From mailers.pdf, page 11.

Containing no news detail, this is a "mobbing"-style ad exhorting readers to the emotional thrill of pursuit.

Refer to legal counsel for potential portrayal in a false light, because the "TWO DECADES OF REPORTED ABUSE" is insufficiently supported by the grab-bag of quotes.

SEE RED FLAG ON P. 10.

17



From mailers.pdf, page 11.

If running this ad, do so with an extra-large caption of "PAID ADVERTISEMENT" above it, to clarify that The Florida Citizen is not a real newspaper.

SEE RED FLAG ON P. 10.

18



From mailers.pdf, page 16.

Refer to legal counsel: "ACCUSED SERIAL ABUSER ..." in lower right can too-easily be remembered by readers as "CHARGED SERIAL ABUSER ..." or "CONVICTED SERIAL ABUSER."

SEE RED FLAG ON P. 10.



From mailers.pdf, page 19-20.

Refer to legal counsel with comments below:

1.  The file folders are clearly meant to suggest that these are police or district attorney's office folders, when it is not known that such folders exist.

2.  In an era when almost all police files are kept electronically, it is unlikely that such file folders even exist.


SEE RED FLAG ON P. 10.

20

**Other Negative Portrayals**



From mailers.pdf, page 13.

The copy is acceptable, since it quotes an established magazine's article written by a full-time political reporter.

The full ad with the image should be sent for legal review, because it evokes thoughts of a split personality, or "Jekyll and Hyde," a term listed among hot-button words in the journalist's guide *Sanford's Synopsis of Libel and Privacy*, Bruce W. Sanford, 1991.



From mailers.pdf, page 15.

Send for legal review: the wording appears to be pure opinion, but "STAIN" superimposed on a blood-red background suggests violence or murder, and might cross a legal line.

SEE RED FLAG ON P. 10.

22

## Conclusionary Editorial Opinion

Thinking defensively about forestalling or preventing a libel lawsuit would depend on a person's role. Opining on roles and ways I might have responded if retained for this negative campaign:

**As a consultant to the groups designing and placing the ads:**

I would have advised them that a lawsuit was almost certain, regardless of what their legal counsel advised them about the merits of their position.

**As a copywriter or editor working for the groups placing the ads:**

I would have consulted with my own legal counsel on whether "work for hire" completely shielded me personally from a defamation lawsuit. If not – and my only shield was liability insurance – I would have refused to write or edit such ads on liability concerns alone, without even reaching the moral issues.

**As an advertising manager for a print publication being asked to run these ads:**

Most of the single ads I would have referred to legal counsel for opinion, or simply refused to accept based on experience. If I was presented with the entire "flight" (group) of ads, I would have taken them directly to the publisher and left the decision to them, stating that my professional opinion was overwhelmingly to refuse the ad campaign regardless of legal advice, simply on the statistical likelihood of being sued.

**By mainstream reporting standards, the ads were written with reckless disregard for the truth, and it is unlikely the claims could have found venues willing to disseminate them other than mailhouses and online media.**

23

## Opinion on Harm To the Reputation of Alan Grayson

The two main attacks on Grayson's integrity – spousal abuse on a daily basis and corruption – move close to irreparable harm.

Denial is a useless strategy, since:

- Readers/viewers tend to me more excited or titillated by negative claims, and give them more attention, so they are centerpieces of short-term memory long enough for them to be crystallized in long-term memory.

- Each denial necessarily repeats the original allegation; the reader then forgets the new set of facts presented, while the original allegation is confirmed in their mind.

**By default this presses Grayson toward presenting a new positive image that can supplant the already-embedded negatives.**

24

## Opinion on Cost of Repairing Reputation

Because of Grayson's necessity for rebutting the negative advertising and supplanting the current negative image with a new, positive image, costs of reputational repair will be far higher than the approximately $500,000 in advertising expenses for mailers and Facebook ads as described in the PR agencies invoices and FEC filings.

I have relied on the cost of repair estimated by David Heller, dated 10/4/2021, for a quantification of repairing Grayson's reputation, which Heller estimates at in excess of $16 million.

This is consistent with my three decades in advertising, in which the cost of reputation repair for a consumer product or service is often so high that the reasonable business decision is to "rebrand" the product rather than attempt to restore its reputation, sometimes reforming and renaming the company as well as the product or service.

This is also consistent with nearly two decades of counseling defamation victims/targets on reputation repair, in which I have routinely advised them to strongly consider moving to a different geographic or demographic area, possibly changing careers and even their names.

**Since Alan Grayson's reputation is unalterably attached to his name, this places him in the same position as a charitable organization or other NGO: his only option is to repair his reputation.**

# Expert's Testimony in Last Four Years

**12/16/2020 – Deposition**
Case: Keith Booth vs. Baltimore City Board of Commissioners, Case 1:20-cv-01281-LMB
Retained by: defendant
Firm: Baltimore City Board counsel
Court: United States District Court for the District of Maryland
Claims addressed: Deprivation of Due Process, Defamation Per Se and Per Quod, Negligent Hiring
Retained as: expert witness on defamation claim
Duties: delivered report, deposition

**12/8/2020 – Hearing/Inquest**
Case: Joseph W. West vs. Paul Lo Duca, Case 160250/2019
Retained by: plaintiff firm
Firm: Murphy Landen Jones PLLC
Court: Supreme Court of the State of New York, New York County
Claims addressed: Harm to reputation, reputation repair, and economic damages
Retained as: expert witness
Duties: delivered analysis, Hon. John J. Kelley presiding

**9/18/2020 – Deposition**
Case: Hosseinzadeh v. Bellevue Park Homeowners Ass'n, CASE NO. C18-1385-JCC
Retained by: plaintiff firm
Firm: Guidance To Justice Law Firm, PLLC
Court: United States District Court for the Western District of Washington
Claims addressed: libel per se, economic damages and emotional distress due to defamation
Expert retained as: Designated expert witness
Duties: Case preparation, expert report, deposition

**2/26/2020 – Deposition**
Case: Laura Haber, an individual and Colorado resident, v. Travelers Casualty Insurance Company Of America, a Connecticut corporation, Case 2017CV31303
Retained by: plaintiff firm
Firm: Furtado Law P.C.
Court: District Court, City and County of Denver, State of Colorado
Claims addressed: libel per se – private matter where plaintiff is a private person; tortious interference with contractual relations)
Expert retained as: Designated expert witness
Duties: Case preparation, expert report, deposition

**9/19/2019 – Deposition**

Case: Fortress Secure Solutions, LLC, A Washington Limited Liability Company
v. AlarmSIM, LLC., et al., Case 4:17-cv-05058-TOR, ECF No. 74

Retained by: defendant firm

Firm: Lexero Law

Court: United States District Court for the Eastern District of Washington

Claims addressed: unfair competition and false advertising, defamation

Expert retained as: Designated expert witness

Duties: Case preparation, expert report, deposition

# Compensation

For this report I am being compensated at the rate of $400/hour for reading court documents, research, and writing.

# Expert's Signature

I reserve the right to amend this report. Signed and respectfully submitted this 4th day of October 2021, in Woodbridge, California.

Nicholas Carroll

# Attachments



## Nicholas Carroll – Curriculum Vitae – 2021

### 415-810-1966 • expert@nicholascarroll.com • Woodbridge, CA 95258

I am an independent expert witness. As an internet analyst and author of *Fighting Slander* (2003, 5th Ed. published July 2021) as well as dozens of papers on defamation and reputation management over the past 18 years, I act as expert witness or non-testifying litigation consultant for online/internet/mainstream/social media libel, slander, economic damages, emotional distress, false light and right to privacy cases, and reputation management.

I address both pure defamation cases and situations where defamation becomes part of broader litigation such as harassment, malicious prosecution or contract/employment cases.

## Experience in Harm to Reputation, Economic Damages, Emotional Distress, and Media Publication Standards

### *Harm to Reputation Through Social Media, Websites, and Posts*

**1995-Present**. Worked for hundreds of clients in promoting people, products, and issues through search engines, social media, and mainstream media. In the same period I have actively practiced reputation management in all those venues to counteract both intentional and unintentional libel.

**2008-Present**. Provided clients with analysis of reputational harm occurring on social media forums, in mainstream media, and email. This includes locating posts and comments that contained potentially defamatory remarks, infringed on the clients' right to privacy, or portrayed a client in a false light. Also made estimates of the total number of people who viewed or were capable of viewing the negative posts or comments.

**2011-2016**. Worked as adviser to reputation management firms, primarily dealing with defamation against businesses.

**2008**. Consulting Senior Web Analyst, IBM. Analyzed Internet traffic from search engines and social media venues, and was responsible for extracting and analyzing social media data as well as making multi-million dollar decisions on purchasing additional social media services

**2000-2003**. Bootstrap Institute-Stanford Research Institute. Worked directly with Dr. Douglas Engelbart in the development of a collaborative social media platform for the WWW. Subjects included advanced hyperlinking, worldwide information distribution and retrieval, and human-computer interaction. (Dr. Engelbart's lab invented the computer mouse and online collaboration, and was the first internet node to send an email and use monitors for online communication.)

**2001**. Technical lead for Library of Congress project on how online users access information.

**2000**. Lecturer on online search, UCLA Dept. of Information Studies (GSEIS), graduate level.

## Economic Damages Analysis

**2003-Present**. Directly counseled defamed groups and individual victims on non-legal reputation repair solutions, putting numbers to the costs of real-life solutions. For businesses, public figures, and public officials I have analyzed and calculated financial harms in terms of lost sales and/or harm to reputation and presented my findings in numbers and infographics. For private individuals I have assessed the costs of seeking a new job (if the defamation has not spread too far), unemployment, lost lifetime career earnings, post-career earnings, moving to a new town, selling a possibly distressed business or home at a loss, moving costs, and the price of relocating family and children. I have analyzed the cost of reputational repair for both individuals and groups.

## Emotional Distress

**2003-Present**. Have consulted with over 700 individual victims on practical solutions to defamation (moving, job change, school change, etc.), reviewed dozens of reports from psychiatrists, psychologists and emergency rooms on conditions resulting from defamation including anxiety, PTSD, panic attacks, and temporary amnesia, and also developed a long-standing familiarity with the anti-anxiety and anti-depressant medications prescribed to defamation victims.

## Libel Reviewing (preliminary)

### Editing
**1989-Present**. Twenty-eight years experience as a professional editor performing libel reviews of books and articles, and now of web content.

### Journalism
**1998-2003**.  Silicon Valley correspondent writing ecommerce and technical news for the *Chicago Tribune* (and KRTN newswire), *The Times* of London, the Toronto *Globe and Mail*, the Vancouver Sun, the *Oregonian*, and as a columnist for Southam syndicate.

**1998-2000**. Legal columnist for the Toronto *Globe and Mail*, Canada's newspaper of record.

### Pro Bono Activity
**1995-2003**. Counseling writers on libel avoidance and publishing contracts, including members of the Author's Guild and the National Writers Union.

**2003-2018**. Providing practical (non-legal) advice to defamation victims.

## Non-Testifying Litigation Consulting

I have worked with the legal basics and fine details of defamation law with dozens of law firms since 2003 as a litigation consultant. Major media cases usually hinge on points of law – and while libel attorneys in major metropolitan areas know mainstream libel law, they are rarely familiar with gossip campaigns, Web/internet/social media, business/political defamation, or emotional distress. I also routinely work with business litigators and employment attorneys.

# Education

**U. of Maryland, B.S. Technology Management, 1987**
Information systems, ethnology, strategic planning, financials, and computer science.

**UCLA GSEIS (Graduate School of Education and Information Science), 2000-2001**.
Lectured on search engine design, search engine optimization, and social media.

# Publications

## Books

*Fighting Slander*. 2003. Defamation law and recourse; includes jury verdict research. 5th edition published July 2021; hardcopy/Kindle editions at www.amazon.com/dp/1737322528 .

*Law of the Blog*. 2007. Defamation, copyright, trademark, and intellectual property law in the U.S. and worldwide.

*Dancing with Lawyers: How to Take Charge and Get Results* (1st edition *Royce Baker Publishing*, 1992; 2nd edition *Random House*, 1997.).

## *Online/Internet/Social Media Defamation – Related Papers , Articles, and Reports*

- "A Survey of Social Media Sites and Defamatory Behavior." November, 2016.

- "Search Engine Optimization and User Behavior." *Encyclopedia of Library and Information Sciences (ELIS)*, 3rd Ed. *Francis & Taylor*. 2010. (Reprinted in *Understanding Information Retrieval Systems: Management, Types, and Standards*. *CRC Press*. 2011.)

- "The Future of End Users and Info Professionals in Information Retrieval." *Searcher: the Magazine for Database Professionals*. June, 2003.

- "Deconstructing Knowledge: Content Management Replaces Social Engineering." *Mindjack*. October, 2003.

- "Spinning the Web: The Realities of Online Reputation Management." *Mindjack*. February, 2003.

- "The Anti-Thesaurus: A Proposal For Improving Internet Search While Reducing Unnecessary Traffic Loads." (The proposal was endorsed by ICANN, *Search Engine Watch*, *Usability News* and *LISNews*.) November, 2001.

- *Wireless Usability Report 2001-2002*, 55pp. *Network World* magazine cover story. October, 2001.

- *Mousetraps on the Web*. April, 1997.

## *Psychology, Demographics, and Emotional Distress of Defamation*

   *Papers written from ethnographic study conducted since 2003.*

- "The Cultural Semantics of Defamation: How Culture Can Mean Everything In Deciding Whether a Word Is Defamatory." September, 2017.

- "Defamation of Character: The Road to Emotional Meltdown." *Huffington Post*. March, 2016.

- "Defamation In the Workplace: Blue-Collar vs. White-Collar Jobs." May, 2013.

- "Demographics of Defamation in the United States by Geographic Region." May, 2013.
- "The Psychology of Defamation Victims: How Slander and Libel Affects Victims' Thinking, Moods, and Behavior." May, 2013.

## General Articles on Defamation-Related Law and Practice

- "Emotional Distress Damages in Defamation Cases: Defamation is no longer a "rich man's tort," but neither has it become the poor person's surefire lottery ticket." *American Bar Association Journal*. April, 2019.
- "Winning Defamation Lawsuits." July 25, 2015.
- "Finding a Slander Lawyer." September, 2014.
- "The Right to Privacy." (per Warren and Brandeis, "The Right To Privacy", 1890; *Olmstead vs. United States, SCOTUS,* 1928.) August, 2013.
- "Libel and Slander Misinformation." December, 2012.
- "Libel and Slander Per Se vs. Per Quod." (50 states, with commentary). June, 2012.
- "Statutes of Limitations for Libel and Slander." (50 states, with commentary). August, 2011.
- "Libel, Slander, and Defamation of Character." April, 2003.

*Most papers listed on this page are accessible at*

*www.nicholascarroll.com//defamation-resources.html*

*Samples of other writing — journalism, encyclopedia articles, etc.—*

*Are linked from www.nicholascarroll.com/portfolio/writing.html*