IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALAN GRAYSON,

      Plaintiff,

                                    CASE NO.: 6:20-cv-01824-PGB-LRH

v.

NO LABELS, INC.;
PROGRESS TOMORROW,
INC.; UNITED TOGETHER, INC.;
NANCY JACOBSON, MARK PENN,
and JOHN DOE(S)

      Defendants.

_____/

## DEFENDANTS' MOTION TO STRIKE TESTIMONY AND REPORT OF PLAINTIFF'S EXPERT DAVID HELLER AND TO PRECLUDE TESTIMONY AT TRIAL

Defendants No Labels, Inc., United Together, Inc., Nancy Jacobson, Mark Penn, and Progress Tomorrow, Inc. (together, the "Defendants") hereby file their Motion to Strike Testimony and Report of Plaintiff's Expert David Heller ("Heller") and to Preclude Testimony at Trial, stating as follows:

## PRELIMINARY STATEMENT

As the Court is aware, this is a defamation action arising from former congressman, Plaintiff Alan Grayson's, failed election bid in 2018 in the Democratic Primary for Florida's 9th congressional district. Two years after his defeat, Grayson is seeking others to blame including, *inter alia*, Defendant Progress Tomorrow, Inc., a political action committee. In essence, Plaintiff alleges that political ads published by

Defendant Progress Tomorrow, Inc. defamed him and caused him to lose the election. In support of his claim, Plaintiff has retained "damages" expert David Heller to provide an opinion as to "the approximate cost as of August 2022" to run television, internet, and direct mail advertising to undo the alleged damage done to Grayson's reputation. Through a series of unsubstantiated and unscientific calculations, Heller arrives at a mind-boggling figure of approximately $17 million in damages, which dwarfs the $272,020.74 amount spent by Progress Tomorrow, Inc. on its ads regarding Alan Grayson, by a magnitude of 62.5.

Setting aside the sheer absurdity of the proposed damages figure, Heller's report and testimony do not survive *Daubert* scrutiny for myriad reasons. First, Heller is not qualified to opine on reputational repair or damages, as his expertise is solely in political media consulting. Second, Heller's methodology is unreliable, in particular because he presupposes that Grayson sustained any reputational harm without conducting or reviewing any research or studies that establish same, and because he uses arbitrary multipliers to augment his damages figure, which are unsupported by any research, studies, or empirical data, rather they are pure *ipse dixit*. Third, Heller's opinions would not assist the jury and in fact, would mislead the jury by proffering a model of damages that is not cognizable as a matter of law.

For all of these reasons, the Court should strike Heller's report and testimony and preclude him from testifying at trial.

## HELLER'S REPORT AND TESTIMONY

Heller's report begins by stating that his expertise is as a "political media consultant" helping to elect politicians to Congress. *See* Heller Report at ¶3, attached hereto as Ex. 1. He testified that his "area of expertise is making political commercials, buying political airtime, and advising candidates on political campaigns." *See* Heller Dep. Tr. at 7:4-6, attached hereto as Ex. 2. He further testified that "political advertising in general would be a summarily nice way to say that's [his] area of expertise." *See id.* at 7:7-10. Nowhere in his report does Heller list any experience or qualifications as a reputational repair expert or as an expert in the calculation of damages. *See generally* Ex. 1. He essentially testified that his sole experience with respect to reputational repair is incidental, as he has handled political campaigns for candidates with bad reputations, but he is not an expert in reputational repair generally. *See* Ex. 2 at 10:10-14.

In this case, Heller was asked by Plaintiff to "appraise and form an opinion of the approximate cost as, of August 2022, for Mr. Grayson to run television, internet and direct mail advertising to undo the damage done to the reputation by the Defendant's web site, mailings and internet advertisements . . . and the damages sustained by Grayson as a result . . ." *See* Ex. 1 at ¶2.

When asked why August 2022 was used as the calculation date for his damages model, Heller testified "because August of 2022 is the next time that Florida is having a Democratic primary for Congress … the exercise was what it would cost to rehabilitate and repair Mr. Grayson's reputation in the event that he *were* to run for

3

Congress in 2022." (emphasis added). *See* Ex. 2 at 37:15-25, 38:1.

Despite the fact that Heller's opinion is based on the cost of Grayson running ads in a hypothetical House of Representative's election for the 9th Congressional District in Florida, Heller testified "as far as I understand, he's running for the United States Senate right now." *See id.* at 64:10-13. When asked if he was aware of any plans for Grayson to run for a House congressional district in August of 2022, he testified "I'm not aware of any." *See id.* at 64:15-17. Grayson himself confirmed at his deposition that he is running for Senate, as opposed to the House.  *See* Pl.'s Dep. Tr. at 138:8:10, attached hereto as Ex. 3.

As Heller's entire damages model is based on calculations as of August 2022, a point in the future, it is unsurprising that Grayson's own testimony and answers to interrogatories reveal that no money has actually been spent to repair his allegedly damaged reputation. *See id.* at 142:14-25, 143:1-21; Pl.'s Am. Ans. to Interrog. at 7, attached hereto as Ex. 4.

Ultimately, Heller concluded that "the economic damages sustained by Grayson equal $16.777 million . . . which is based on the cost of producing and purchasing enough mail, television and Internet advertising to reverse the impact upon Grayson's standing with residents of the 9th Congressional District and other voters in the greater Orlando area who were exposed to the defamatory statements contained within Defendant's mail, television and Internet ads and the Defendant's web site."[1]

---

[1] The record reflects that Progress Tomorrow, Inc. produced only mail and digital ads as opposed to television ads and thus Heller's conclusion is defective for this additional reason.

*See* Ex. 1 at ¶8.

Despite the fact that Heller's damages model is predicated on repairing Grayson's reputation, Heller testified that he did not undertake any effort to measure the reputation of Alan Grayson in 2018 before or after the ads were run, or even at present, and that he would not be able to know what Grayson's reputation would be in 2022, by any measure. *See* Ex. 2 at 38:11-17, 75:14-23. He is likewise unaware of any exit polling done with respect to Grayson's failed election in 2018. *See id.* at 35:7-19. Instead, he relies on a pre-election poll that he did not conduct and compares that poll to the raw election results and merely assumes that reputational damage occurred. *See* Ex. 1 at ¶9.

Among the ways, in which Heller arrived at the astronomical figure of $16.777 million is by applying a variety of multipliers, which are unsupported by any scientific or academic studies or empirical data, etc…just Heller's *ipse dixit* statements.

For instance, in calculating the cost to undo the alleged damage caused by the mailers sent by Progress Tomorrow, Inc., Heller arbitrarily determines that the cost of replicating the mailers sent by Progress Tomorrow, Inc. (which he calculates as $682,000) must be multiplied by *__3.5__* (for a total of $2,387,000), which he states with no scientific or empirical backing, is the impact of negative mailers. *See id.* at ¶13.p. In fact, at his deposition Heller conceded "I can't recall where I pulled that number from" and "I can't definitively say that is part of a study." *See* Ex. 2 at 71:11-12, 22-25, 72:1-4. Further, he conceded that he had not done any such studies himself to arrive at a multiplier of 3.5. *See id.* at 71:13-16.

5

Then, after calculating the amount it would cost Grayson to counteract the mailers and after already having applied a multiplier of 3.5 to that number, Heller again arbitrarily determines that sending out mailers would be insufficient to counteract the alleged defamatory messages, and that a costly television campaign would be necessary. *See* Ex. 1 at ¶13.u. He does not cite any data, study, or empirical analysis as to the need for a TV campaign in addition to mailers and digital ads, when Progress Tomorrow, Inc. only disseminated mailers and digital ads at a total cost of $272,020.74, as reflected in public FEC records. *See id.*

Heller then proceeds to inflate his damages numbers by applying an additional multiplier. He applies an arbitrary multiplier of 2 for the number of television ads needed to rebut each defamatory accusation, which he categorizes as three separate accusations, which, in turn, allows him to turn a cost per television ad of $2,395,000, multiply it by three different accusations, and then further multiply that number by 2 for a total cost of $14,370,000.00. *See id.* at ¶13.y.-aa.

## MEMORANDUM OF LAW

### I.    LEGAL STANDARD

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court explained that Rule 702 imposes an obligation on a trial court to act as gatekeeper, to ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable. District courts are charged with this gatekeeping

function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies "expert testimony." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (2002). Thus, the party offering an expert opinion has the burden of establishing three criteria: qualification, reliability, and helpfulness. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

First, the witness must be "qualified to testify competently regarding the matters [s]he intends to address." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Indicia of an expert's qualifications may be evidenced by education, training, work experience, publication in the pertinent field, and membership in professional societies. *See Riverside Apartments of Cocoa, LLC v. Landmark Am. Ins. Co.*, No. 6:18-CV-1639-ORL-40-DCI, 2020 WL 8184710, at *2 (M.D. Fla. Dec. 4, 2020) citing *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990).

Second, the expert witness must employ "sufficiently reliable" scientific methods or principles to form her opinions. *Rink*, 400 F.3d at 1291. The reliability of an expert's methodology can be evaluated by considering a wide range of factors, including (1) whether the expert bases her opinion on sufficient facts or data, (2) whether the expert unjustifiably extrapolates her research to reach an unfounded conclusion, (3) whether the expert considers or accounts for contradictory studies or data, (4) the extent to which the methods used rely on the expert's subjective interpretations, and (5) whether the expert is being as careful as an expert in the same field would be in conducting professional work outside the context of paid litigation. *See Daubert*, 509 U.S. at 593–94; Fed. R. Evid. 702 advisory committee notes to 2000

amendments.

Third, the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. Expert testimony provides assistance where it concerns matters beyond the ken of the average juror and will allow the jury to understand the evidence or to resolve a factual dispute. *See Kumho Tire v. Carmichael*, 526 U.S. 137, 148–49 (1999). Conversely, there will be no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic in light of the evidence and testimony presented at trial. *See Riverside Apartments of Cocoa, LLC*, 2020 WL 8184710, at *2 citing *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must hold probative value that outweighs the concerns listed in Rule 403. *Daubert*, 509 U.S. at 591.

The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

## II.   HELLER IS NOT QUALIFIED TO OPINE ON REPUTATION REPAIR OR DAMAGES

It is well settled that the subject matter of an expert's opinion must fall within his area of expertise in order to be admissible. *See Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, No. 10-61532-CIV, 2011 WL 4055391, at *1 n.2 (S.D. Fla. Sept. 13, 2011) (excluding portions of expert testimony that were "outside his area of expertise"); *In re Trasylol Products Liab. Litig.*, No. 08-MD-01928, 2010 WL 4052141,

at *7 (S.D. Fla. May 12, 2010) (finding expert opinions inadmissible under Rule 702 and Daubert in part because they fell "outside of his area of expertise").

Here, Heller's opinion on damages is that it would cost Grayson close to $17 million to repair the damage done by Progress Tomorrow, Inc. to Plaintiff's reputation, *if* Plaintiff was to run his own political ad campaign in August 2022, the next election cycle. *See* Ex. 1 at ¶¶2,8; Ex. 2 at 37:15-25, 38:1. However, Heller's expertise is not in reputation repair or damages calculation. *See generally* Ex. 1. He is a self-described expert in political media consulting. *See* Ex. 1 at ¶3.

In fact, Heller testified that his sole experience with respect to reputation repair is from occasionally running political campaigns for candidates with bad reputations, not as a general reputational repair expert. *See* Ex. 2 at 10:10-14. It is unsurprising then, that Heller's opinion is completely predicated on Grayson running a political campaign in a hypothetical election for the U.S. House of Representatives in Florida's 9th congressional district in August 2022. *See id.* at 37:15-25, 38:1. This is despite the fact that Heller himself testified that he is unaware of any plans of Grayson to run for a House seat in 2022 and that Grayson is instead running for the Senate, a statewide election, which Grayson confirmed at his deposition. *See id.* at 64:10-13, 15-17; Ex. 3 at 138:8:10.

Essentially, Heller's opinion is based only on what he knows, running political campaigns, not repairing reputations. Otherwise, his opinions would not have been couched in terms of running ads in the next election cycle, August 2022, but simply repairing Grayson's reputation today, tomorrow, or even within the last two years,

9

given the fact that the subject ads were published in August 2018.

Heller should not be permitted to explain to the jury what it would cost to repair Grayson's reputation, when he truly has no experience in this area. His experience is in political campaigning. *See* Ex. 2 at 7:4-6. The cost of running political campaign ads during an election is vastly different than the cost of simply repairing someone's reputation and therefore Heller is not qualified to offer an opinion on the cost of repairing Grayson's reputation.

For this reason alone, Heller should be disqualified as an expert.

## II.   HELLER'S METHODOLOGY IS UNRELIABLE

Even if Heller possessed the requisite expertise to opine on how much it would cost to repair Grayson's reputation, the methodology he employs is completely unreliable. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir.1988) ("[T]estimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation.") (alteration added). Methodologically flawed expert reports may be excluded under *Daubert* including flawed expert reports on damages. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250–51 (11th Cir.2007); *Gastaldi v. Sunvest Resort Communities, LC*, 709 F. Supp. 2d 1299, 1304 (S.D. Fla. 2010).

From a foundational standpoint, Heller concedes that that he did not undertake any effort to measure the reputation of Alan Grayson in 2018 before or after the ads were run, or even at present, and that he would not be able to know what Grayson's reputation would be in 2022, by any measure. *See* Ex. 2 at 38:11-17, 75:14-23. He is

likewise unaware of any exit polling done with respect to Grayson's failed election in 2018. *See id.* at 35:7-19. Thus, there is no baseline from which Heller could possibly measure the amount of damage to Grayson's reputation. *See Dias v. GeoVera Specialty Ins. Co.*, No. 3:19-CV-1303-TJC-JRK, 2021 WL 2417010, at *5 (M.D. Fla. June 14, 2021) citing *Greater Hall Church of God v. Southern Mut. Church Ins. Co.*, 820 F. App'x 915 (11th Cir. 2020) ("Moreover, Brown's visual examination of the building, without any knowledge of the buildings prior condition or knowledge of the wind speeds the building was subjected to, is not a sufficiently reliable methodology to allow Brown to provide an expert opinion as to the cause of the roof damage.").

Even if one was to compare, as Heller has done, pre-election polling figures to election results, this would be an unreliable method to determine the amount of reputational harm sustained by Grayson. *See* Ex. 1 at ¶9. As the court stated in *Peer v. Lewis*, "because there are 'not less than a thousand factors which enter into the vagaries of an election,' it is impossible for [a mayoral candidate] to establish that [defendant] actually caused his loss in the primary election, *a fortiori* he can never prove actual damages." *Peer v. Lewis*, No. 06-60146-CIV, 2008 WL 2047978, at *10 (S.D. Fla. May 13, 2008), *aff'd*, No. 08-13465, 2009 WL 323104 (11th Cir. Feb. 10, 2009) (citing Florida law). It is for this very reason that damages predicated on a lost election, such as those being claimed here, are not recoverable as a matter of law. *See id*. Here, Heller's comparison of pre-election polls to election results cannot be used as a reliable measure of reputational harm, which he is unable to quantify and thus, he is unable to

11

determine how much reputational repair is required, if any. *See* Ex. 2 at 38:11-17, 75:14-23. The mere fact that Grayson purportedly led in a poll prior to the election and lost the election does not establish that Grayson's reputation was tarnished in the mind of any single voter. For example, a voter may have determined during the intervening time period, that he simply liked Grayson's opponent Darren Soto more, or that he opposed one of Grayson's policies, or that he was going to arbitrarily cast his vote because he was unfamiliar with either candidate. Without a baseline determination of whether any reputational harm was suffered with respect to any single voter or even a sampling of voters, the entire damages model is flawed. *See Dias v. GeoVera Specialty Ins. Co.*, 2021 WL 2417010, at *5.

Setting this fundamental issue aside, the rest of Heller's methodology is equally flawed. For instance, in calculating the cost to undo the alleged damage caused by the mailers sent by Progress Tomorrow, Inc., Heller arbitrarily determines that the cost of replicating the mailers sent by Progress Tomorrow, Inc. (which he calculates as $682,000) must be multiplied by 3.5 (for a total of $2,387,000), which he states with no scientific or empirical backing is the impact of negative mailers. *See* Ex. 1 at ¶13.p.

In fact, at his deposition Heller conceded "I can't recall where I pulled that number from" and "I can't definitively say that is part of a study." *See* Ex. 2 at 71:11-12, 22-25, 72:1-4. Further, he conceded that he had not done any such studies himself to arrive at a multiplier of 3.5. *See id.* at 71:13-16.

Then, after calculating the amount it would cost Grayson to counteract the mailers and after already having applied a multiplier of 3.5 to that number, Heller

again arbitrarily determines that sending out mailers would be insufficient to counteract the alleged defamatory messages, and that a costly television campaign would be necessary. *See* Ex. 1 at ¶13.u. He does not cite any data, study, or empirical analysis as to the need for a TV campaign in addition to mailers and digital ads, when Progress Tomorrow, Inc. only disseminated mailers and digital ads at a total cost of $272,020.74, as reflected in public FEC records. *See id.*

Heller then proceeds to inflate his damages numbers further by applying an additional multiplier. He applies an arbitrary multiplier of 2 for the number of television ads needed to rebut each defamatory accusation, which he categorizes as three separate accusations, which, in turn, allows him to turn a cost per television ad of $2,395,000, multiply it by three different accusations, and then further multiply that number by 2 for a total cost of $14,370,000.00. *See id.* at ¶13.y.-aa. Again he cites no study or research as to the need for two positive ads to counteract each allegedly defamatory accusation.  *See id.*

Heller's use of multipliers that have no backing in research studies or empirical data, renders his entire opinion flawed. Although Heller may have experience running political ad campaigns, the use of the above multipliers, which are for all intents and purposes, arbitrary numbers, is without a sufficient foundation. As the Eleventh Circuit noted in *Frazier*, although "an expert may be qualified by experience," it does not follow "that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir.2004) ("If admissibility could be established merely by the

13

ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.").

The court in *Edmonson v. Caliente Resorts, LLC*, faced a similar issue and excluded an expert's opinion to the extent it employed such speculative multipliers. *See Edmondson v. Caliente Resorts, LLC*, No. 8:15-CV-2672-T-23TBM, 2017 WL 10591833, at *6 (M.D. Fla. Aug. 31, 2017) ("the three-times across-the-board multiplier to each Model lacks the necessary indicia of reliability . . . he provides little to no explanation for a 3X Multiplier, and, more significantly, little to no support in the proffered evidence from a given Model or from industry precedents. . . In large part, it appears a speculative formula . . . In sum, I find the high-end damages calculation speculative, unsupported, and unreliable, and Plaintiffs should not be permitted to submit the same to the jury.")

Each of the above flaws in Heller's methodology render his report and testimony unreliable and they should therefore be excluded.

### III. HELLER'S OPINION DOES NOT ASSIST THE JURY BECAUSE HIS DAMAGES MODEL SEEKS DAMAGES THAT ARE NOT COGNIZABLE OR RECOVERABLE AS A MATTER OF LAW AND WOULD ONLY MISLEAD THE JURY

Lastly, and perhaps most importantly, Heller's opinions will not assist the jury, rather they are likely to mislead and confuse the jury, insofar as all of his opinions are based on a theory of damages that is not cognizable as a matter of law. *See Corwin*, 475 F.3d at 1250-51 (affirming exclusion of portion of expert report based upon ideas and placement of stock elements not subject to copyright protection).

14

As the court held in *Daniels v. HSN, Inc.*, special damages for the amount of money it would cost to repair a reputation as opposed to the amount actually spent are not recoverable, because they are not actual out of pocket losses. *See Daniels v. HSN, Inc.*, No. 818CV3088T24JSS, 2020 WL 533927, at *7 (M.D. Fla. Feb. 3, 2020) (plaintiff was precluded from claiming special damages in a defamation action for the amount it would cost (rather than the amount actually spent) to counteract an allegedly false publication); *see also Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp.2d 1260, 1268 (S.D. Fla. 2004) (stating that "[s]pecial damages are actual, out of pocket losses"); *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA) (rejecting the plaintiffs' contention that they sufficiently alleged special damages by alleging that their stock had declined in the value, because such was not a realized loss given that they had not sold the stock).

In *Daniels*, as here, the Court found that the plaintiff's expert's opinion that "… that the cost of a digital campaign to correct the defamatory statement would be at least $3,748,015" was insufficient to establish special damages as there was no evidence that "he *has actually spent* over $3 million to repair his reputation." *See Daniels*, 2020 WL 533927, at *7

Here, Plaintiff testified at his deposition and affirmed in his answers to interrogatories that he has not actually spent any money to repair his reputation and thus the damages proffered by Heller are not cognizable as a matter of law. *See* Ex. 3 at 142:14-25, 143:1-21; Ex. 4 at 7. The fact that Heller's damages model is all predicated on Grayson running ads in a House of Representatives election for the 9th

Congressional District of Florida in 2022, shows exactly how speculative his model is. *See Kallas v. Carnival Corp.*, No.06-20115-CIV, 2009 WL 901507, at *8 (S.D. Fla. Mar. 30, 2009) (finding that an expert's opinion is speculative when "the opinion is premised on an event that has not even had the chance to occur yet ..."). Heller testified that he had no knowledge of Grayson running for the House of Representatives in August 2022 and further, Grayson himself testified that he is running for Senate, a statewide race, in 2022, as opposed to the House. *See* Ex. 2 at 64:10-13; 15-17; Ex.3 at 138:8:10.

Thus, it is clear that Heller's damages model would not only fail to assist the jury, but it would, in fact, mislead the jury into applying a speculative measure of damages that is not cognizable under Florida law.

## CONCLUSION

The *Daubert* standard was implemented "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies "expert testimony." Heller's opinions are exactly the type of testimony that *Daubert* was meant to prevent from reaching the jury. Heller is unqualified to give his proffered opinions, his methodology is unreliable and completely speculative, and his opinions are likely to mislead the jury into applying a damages model that is not cognizable under Florida law. For all of these reasons, the Court should exercise its gatekeeping function and strike Heller's report and testimony and preclude him from testifying at trial.

WHEREFORE, Defendants respectfully request that the Court enter an Order striking the testimony and report of David Heller and precluding him from testifying

at trial and granting Defendants any relief deemed just and proper.

## LOCAL RULE 3.01(g) CERTIFICATION

Under Local Rule 3.01(g), counsel for Defendants conferred via telephone with Plaintiff's counsel on January 3, 2022 and the parties were unable to resolve the instant dispute.

Dated:  January 3, 2022

Respectfully submitted,

**LEGON FODIMAN & SUDDUTH, P.A.**
*Counsel for Defendants No Labels, Inc., Progress Tomorrow, Inc., United Together, Inc., Nancy Jacobson, and Mark Penn*
3225 Aviation Avenue, Suite 301
Miami, Florida 33133
Telephone:  (305) 444-9991
Facsimile:  (305) 444-9937
Primary e-mail:  tlegon@lpflaw.com
Secondary e-mail:  respinosa@lpflaw.com
Secondary e-mail:  eservice@lpflaw.com

By:     /s/ Todd R. Legon
        TODD R. LEGON
        Florida Bar No. 814415

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of January, 2022, I served the foregoing via electronic mail to Tucker H. Byrd, Esq.,  Byrd Campbell, P.A., 180 Park Avenue North, Suite 2A Winter Park, Florida 32789 TByrd@ByrdCampbell.com.

By:     /s/ Todd R. Legon
        TODD R. LEGON