UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALAN GRAYSON

    Plaintiff,

                                                  **CASE NO.: 6:20-cv-1824-Orl-40LRH**

    v.

NO LABELS, INC., PROGRESS TOMORROW, INC., ET AL,

    Defendant

_____/

**Expert Report of David Heller**

**Report Date: October 4, 2021**

*This report was prepared in connection with the above referenced matter and is to be used solely for the purposes of the subject litigation proceedings. Distribution of this report and the use of any information contained herein for any other purpose is strictly prohibited.*

Case Number: **6:20-cv-1824-Orl-40LRH**

**SCOPE OF ENGAGEMENT**

1. David Heller, president of Main Street Communications, LLC ("Main Street"), was retained by the law firm of Byrd Campbell, P.A. on behalf of its client, Alan Grayson ("Grayson"), the plaintiff in this action.

2. I was retained to develop findings, conclusions, and/or opinions of the damages suffered by Mr. Grayson as a result of the claims raised in the referenced proceedings. Specifically, I was asked to appraise and form an opinion of the approximate cost as, of August 2022, for Mr. Grayson to run television, Internet and direct mail advertising to undo the damage done to his reputation by the Defendant's web site, mailings and Internet advertisements (the "Attack Ads") and the damages sustained by Grayson as the result of the Attack Ads, as set forth in Grayson's Verified Complaint and Demand for Jury Trial.[1]

3. My expertise is as follows: I have worked as a political media consultant in the Democratic Party nationally since 1991. Over the course of my thirty years in this field, I compiled one of the best won-loss record in the Democratic Party in terms of helping my clients win election to Congress. Over the course of my career, I have helped elect or re-elect to federal office 25 different Members of Congress. In 2010, my clients won 4 out of 5 "toss-up" races for Congress – the best winning percentage in the Party. In 2012, my clients fared even better, winning 9 out of 10 House races, including two of the four Democrats who won in the "reddest" districts in the nation, Reps. Mike McIntyre (N.C.) and Collin Peterson

(Minn.). In 2014, 2016 and 2018, I helped re-elect Peterson with 52% of the vote – in a district so red Hillary Clinton garnered only 31% of the vote. I have helped elect and re-elect more African-Americans to Congress (10) than any other media consultant, including current and former U.S. Reps. Frank Ballance (N.C.), Sanford Bishop (Ga.), Corrine Brown (Fla.), Elijah Cummings (Md.), Marcia Fudge (Ohio), Jesse Jackson, Jr. (Ill.), John Lewis (Ga.), David Scott (Ga.), Maxine Waters (Calif.) and Al Wynn (Md.). I have also helped elect a number of the more progressive voices in our party, including U.S. Reps. Marcy Kaptur (D-Oh.), Alan Grayson (D-Fla.), and John Yarmuth (D-Ky.). Additionally, I have helped elect many of the "Blue Dog" Democrats, the party's most conservative voices, who have served or continue to serve in Congress, including the group's original co-founder, U.S. Rep. Collin Peterson (D-Minn.) and Reps. Sanford Bishop (D-Ga.), Allen Boyd (D-Fla.), Joe Donnelly (D-Ind.), Ken Lucas (D-Ky.), Mike McIntyre (D-N.C.), David Phelps (D-Ill.) and David Scott (D-Ga.). From the far left to the right, I have helped my clients win many of the party's toughest races. Over the years, I earned 18 Pollie Awards for my ads from his peers at the American Association of Political Consultants. In 1996, *Campaigns & Elections* magazine named me a "Rising Star in American Politics." I graduated *summa cum laude* and *Phi Beta Kappa* with honors from Brown University and earned a Master of Letters Degree (M.Litt.) in Politics from Oxford University (Nuffield College) after defending my thesis. I went on to Yale, where I taught my own undergraduate seminar on 20th century political protest movements.

4. The opinion(s) developed and disclosed herein are those of David Heller, President of Main Street Communications.

5. I have never before testified as an expert witness.

6.     The opinions and conclusions offered herein are based on the information and analysis disclosed and upon my education, experience, training and knowledge. This report was prepared based on my review and analysis of the documents and information provided as of the date of the report as enumerated below. I reserve the right update or amend my opinions should additional production be provided or should information become available that relates to or impacts my opinions.

7.     I am being compensated at a rate of $400 per hour for the study and testimony in this case.

**SUMMARY AND BASES OF OPINION(S)**

8.     **It is my opinion that the economic damages sustained by Grayson equal $16.777 million (the "Enterprise Value"), which is based on the cost of producing and purchasing enough mail, television and Internet advertising to reverse the impact upon Grayson's standing with residents of the 9th Congressional District of Florida and other voters in the greater Orlando area who were exposed to the defamatory statements contained within Defendant's mail, television and Internet ads and the Defendant's web site.**

9.     The amount of damage done to Grayson's reputation in this case is relatively clear. For instance, Defendants hired a Democratic polling firm in June 2018, to survey 504 likely Democratic primary voters in Florida's 9th Congressional District. The survey had a margin of error of about 4%. The firm found in its initial trial heat that Grayson led his opponent, first-term incumbent Congressman Darren Soto ("Soto"), by a margin of 45% -

38%, with 27% of the likely Democratic primary electorate undecided. By August, after Defendant unleashed its barrage of Attack Ads against him, Grayson's lead had evaporated, with Soto leading him 40% - 30%. On Election Day, Soto received two votes for every one Grayson garnered.

10. It is not surprising that Grayson would have led in the initial poll. Even though Soto was the incumbent, Grayson had represented the 9th Congressional District for four years in Congress, from January 2013 - January 2017. Additionally, Grayson had also represented some of the voters in Florida's 9th Congressional District during his one term as the Congressman from the Eighth Congressional District, from January 2009-January 2011. This term took place before Florida's congressional districts were redistricted by the Republicans in 2011. During that process, some voters, such as those in Conway and Meadows Woods, were moved from the 8th Congressional District into the 9th Congressional District, so Grayson likely enjoyed particularly high name recognition among those voters relative to other voters in the redrawn 9th Congressional District. Soto, by contrast, had only represented 9th Congressional District voters in Congress for 17 months at the time of the survey.[2]

11. On Election Day, Grayson lost to Soto 66.38% -33.62%, a margin of two-to-one. If the initial polling is assumed to be accurate (and I see no reason to think otherwise), that would mean that Grayson not only was unable to persuade undecided voters to get behind his candidacy, he was even unable to retain the support many of those who initially expressed support for him in Defendants' poll.

12. My opinion is based on the cost of writing, producing and placing television advertising, Internet advertising and direct mail advertising and assumes the trier of fact finds that the Defendants did knowingly make false statements of fact regarding Grayson, published those false statements in thirteen direct mail pieces, a web site and various Internet advertisements, and did so in such a way as to ensure that those false statements of fact were viewed, read and/or received by likely Democratic primary voters in the 9th Congressional District of Florida, where Grayson was at the time pursuing federal public office.

13. The Enterprise Value is derived as follows:

   a. There were 55,114 votes cast in the 2018 Democratic primary in Florida's 9th Congressional District.

   b. Defendant ordered the production of six direct mail pieces sized 13" x 8.5" with a print run of 49,855 each (approximately the total number of Democrats who might have been expected to vote in the August Democratic primary). According to the invoices sent from Defendant's direct mail producer, The Pivot Group, Inc. ("Pivot"), Defendant was billed for copywriting, art and design, pre-press, printing, bindery and mail shop; a separate line on each invoice was for "Postage & Shipping." The above leads me to conclude that the direct mail pieces were indeed mailed to likely Democratic primary voters. Tellingly, each invoice stated that the mailers were either "negative" or "slants negative" and that each "targets Grayson."

c. In addition, Defendant ordered the production of six direct mail pieces sized 13" x 8.5," each with a print run of 14,871. Each of these six invoices also stated that Pivot included the cost of copywriting, art and design, pre-press, printing, bindery and mail shop; a separate line on each invoice similarly was labeled "Postage & Shipping." Once again, each invoice stated that the mailers were either "negative" or "slants negative" and that each "targets Grayson." Finally, a 13th invoice shows that Defendant ordered the production of one additional direct mail piece, also sized 13" x 8.5", with a print run of 12,537. Like the others, that invoice states that Pivot again included the cost of copywriting, art and design, pre-press, printing, bindery and mail shop; a separate line is labeled "Postage & Shipping." Once again, the invoice states that the mailer was "negative" and that it "targets Grayson." All totaled, Pivot, at Defendant's request, wrote, produced and mailed 401,073 pieces of mail distributed in the form of 13 unique pieces of mail, each of which was characterized by the firm that produced them as "negative" or "slants negative" and each of which targeted Grayson.[3]

d. In my expert opinion, negative advertising typically has much greater impact on voters than does positive advertising – and, as a result, is that much more difficult to undo. As Ms. Jill Buckley, a pioneer among women political consultants, noted "People say they hate negative advertising. But it works. They hate it and remember it at the same time. The problem with positive is you have to run it again and again and again to make it stick. With negative, the poll numbers move within three or four days."[4]

e. This sentiment is one shared by political consultants on both sides of the aisle. As Roger Stone, political advisor to President Trump, said, "Voters will tell you in focus groups that they don't like negative ads, but they retain the information so much better than the positive ones. The point is: People like dirty laundry. Why do you think the tabloids sell?"[5]

f. In my expert opinion, professionally written and produced direct mail can have a major impact on a political campaign. According to a 2018 study commissioned by the United States Post Office, **68% of surveyed voters ranked direct mail first among their three most credible forms of political outreach**. This number outpaced competing forms of political outreach, including television ads (59%), in home visits (47%), and digital ads (26%).[6]

g. Pivot produces extraordinarily effective political direct mail. Their firm boasts an in-house data analytics team and a group of mail designers each with more than twenty years of experience producing political materials. They are not a small firm; they have more than two dozen people on staff, including the firm's partners, and have helped elect dozens and dozens of candidates to federal office. They are among the best at what they do.

h. Professionally produced direct mail can have an enormous impact in a congressional primary race where the electorate is relatively small. In Florida's 9th Congressional Race, only 51,114 people cast ballots in 2018. By comparison, in the 2020 general election in Florida's 9th Congressional District, 429,638 people cast ballots – nearly eight times the total who voted in the 2018 primary.

i. Direct mail is still the primary building block of successful audience growth. Even incremental improvements can make a big difference in a political campaign. A Direct Marketing Association study of response rates for postal mail and e-mail showed that responses to direct mail were 30 times greater than those for e-mail marketing, digital banners, and social media.[10]

j. The Pivot mail pieces were mailed at an average price of about thirty cents apiece ($14,956.50/49,855). Today, with the cost of postage having increased since 2018 and Grayson not entitled to bulk mailing discounts, the cost of sending out similar 13" x 8.5" mailers could run as much as $1.16 each (the cost of a flat large envelope for a mailer of one ounce or less). Such mail would not qualify for the postcard rate since, according to the U.S. Post Office, a postcard is defined as "no more than 4-1/4" high x 6" long x 0.016" thick." Clearly, a 13.5" x 8.5" piece is markedly larger than that. The cost for Grayson to send out the same number of mailings (401,073) could be as much as $465,244.68. That figure does not include the cost of producing the mailers; that number is just the postage.

k. Each of the six mailers sent to 49,855 homes cost $10,469.55 in 2018; the mail pieces sent to the smaller universe cost $6,097.11 even though all of the mailers were identically sized. The total cost of the 13 mail pieces attacking Grayson was $104,540.13. The average cost per mailer, then, was approximately $8,041.55. However, we do not know what upfront cost or "retainer" fee was charged by Pivot; in my expert opinion, such fees typically run anywhere from $5,000 - $15,000. Nor do we know how many other campaigns Pivot worked on in

service to the Defendant (though we do know Pivot produced at least six direct mailings on behalf of Congressman Soto). In my expert opinion, the more campaigns in which a direct mail firm such as Pivot is deployed, the larger the per-piece discount would be. Lacking any kind of "volume discount," Grayson would likely be charged between $10,000 and $15,000 per direct mail piece for design work, copy writing and production, depending on the number of copies ordered for each piece. Ordering 13 pieces, then, would likely cost Grayson between $130,000 - $180,000.

l.  Adding the cost of production ($130,000 - $180,000) together with the cost of shipping and postage ($465,244.68) and a modest $10,000 retainer fee, it would cost Grayson approximately $620,000 simply to replicate what Pivot did against him on Defendant's behalf. But that number is not nearly enough.

m. In my expert opinion, Grayson would have to send out far more direct mail pieces than that to undo the damage done by Defendant's mailings. First, the average size of a congressional district in Florida has grown because of reapportionment. In 2018, the average congressional district contained about 700,028 people; in 2022, each district will have approximately 770,376 people – an increase of roughly ten percent.[7]

n.  Second, turnout in federal elections has increased steadily as a percentage of the electorate in recent years. In 2014, just 36% of registered voters participated in congressional elections. By 2018, that number had jumped to 49.14%. In 2020, a presidential year, 66.2% of eligible voters participated in the general election; in

Florida, that number was markedly higher – 77%.[8] In my expert opinion, were Grayson to seek federal public office again in a congressional district, he would almost certainly be running in a district with a markedly larger electorate – which would in turn require a larger number of mailings.

o. Moreover, as was noted earlier, negative advertising tends to have a significantly larger impact than positive advertising; the 13 pieces produced by Pivot in question were all negative. From a historical perspective, it is worth considering, as George W. Bush's ad-maker, Mark McKinnon, points out, that "increased news media focus on negative advertising itself has helped accelerate this trend, creating a vicious cycle of attack politics driven by political consultants and journalists." McKinnon goes on to add that "consultants now know that attacks can draw significant attention in the free media, which gives them more incentive to produce and to air negative ads than they had 25 years ago."[9] It follows, then, in my expert opinion, that local TV news and newspapers would have been more apt to report negative allegations against Grayson as a result of Defendant's actions.

p. Given that the electorate in 2022 in Florida congressional districts will be approximately ten percent larger than in 2018 and that the negative mailers have a much greater impact – as much as three or four times the impact – of positive mailers, it would likely cost Grayson ten percent more than what it would cost to replicate Defendant's mailers ($620,000 +$62,000), a total of $682,000. Multiply that by the impact of negative mailers (x 3.5) and the cost for Grayson to at least begin to undo the damage done by the Defendant's direct mail pieces alone is

$2,387,000 ($682,000 x 3.5), plus an additional $10,000 retainer or creative fee to the mail firm, for a total of $2,397,000.

q. Defendant's actions were not limited to the 13 negative mail pieces. Defendant also hired a political media consulting firm to produce multiple ads for the Internet that were intended to do tremendous damage to Grayson's reputation. These ads, aired on Facebook, Instagram, Twitter, and perhaps other social media, were, according to Facebook, viewed at least 383,000 times and as many as 453,000 times on Facebook alone. These ads included accusations against Grayson which were so heinous that, in my expert opinion, few (if any) candidates for Congress could have survived them. Charges of two decades of spousal abuse and domestic violence (on a *daily* basis), multiple ethics violations, soliciting others while serving in Congress to invest in his Cayman Islands hedge fund, violating federal laws, and "making money off of a company in Africa that promotes slave labor" are all among the most defamatory allegations that I have seen in my thirty years of making political commercials.

r. There is no comprehensive evidence at this time as to how much advertising time on various social media channels Defendant bought to air its ads attacking Grayson. Nor has there been any evidence provided as to how much money Landscape Media LLC ("Landscape") was paid to produce Defendant's ads. We just know the total amount paid to Landscape was $83,197.17 and that sum included both the cost of producing the ads for Defendant and the cost of purchasing the time to air them.

s. As with Pivot, we know Landscape produced ads on Defendant's behalf for many of Defendant's chosen candidates – and against their opponents. Once again, it is, in my expert opinion, likely that because of the volume of business Defendant gave to Landscape, that Landscape a) likely waived any sort of creative or retainer fee; and b) discounted the percentage of the media buy it charged Defendant (e.g., instead of Defendant paying a typical 15% commission to Landscape, Defendant likely paid some number less than 15%). It is, in my expert opinion, wholly unlikely that Grayson would be able to enjoy the same sort of preferential treatment from any media consultant he might hire – no retainer fees, volume discounts on production costs, and a reduced percentage of the buy. He simply would not have a volume of business comparable to Defendant's business to entice a professional political media or mail firm to bestow upon him the same advantages they gave to Defendant.

t. Based on all of the above, it is my conclusion as an expert witness that Grayson simply could not send out the same number of similar-sized mailers and run the same number of television ads on social media and expect his reputation to be cleared. Negative ads, as has been noted above, do far more damage than positive ads can undo. Additionally, the larger size of congressional districts in Florida requires more voters to receive mail pieces and watch television ads, whether deployed on television or through social media. And the cost of advertising, as well as the cost of postage, has increased significantly since the summer of 2018.

u. For all of these reasons, I believe that the only way Grayson could reasonably expect to clear his name and run for political office as if Defendant's attacks had never occurred would be for him to run ads on television. There simply is no way for Grayson to know which voters actually viewed Defendant's Attack Ad mail pieces and/or watched Defendant's Attack Ads on Facebook or other social media channels. For Grayson to have the best opportunity to reach those who were unduly influenced by Defendant's defamatory allegations, he would need to run television ads across the Orlando media market.

v. In 2020, I saw television rates double and, in some instances, triple what was charged in 2018. For instance, 30-second ads on Minneapolis television stations that cost $600 in the last week of October of 2018 were selling for $1800 during the same week in 2020. I would expect rates to be similarly high in 2022, particularly in Florida since the state is likely to have both a hotly contested gubernatorial race and a hotly contested U.S. Senate race; both campaigns in each instance should be extremely well funded. Moreover, with population growth being strongest in and around the greater Orlando area, it is entirely possible (if not probable) that reapportionment will lead to at least one open seat (a seat with no incumbent) in the Orlando media market. U.S. Rep. Val Demings' decision to run for the U.S. Senate means there are likely to be at least two open House seats in Orlando in 2022. Those two open House seats, together with the aforementioned hotly contested U.S. Senate and gubernatorial races, as well as advertising aired by candidates for down-ballot statewide positions (who will assuredly seek to buy time in the Orlando market, as that market contains a

disproportionately large number of "swing" or unaligned voters in the state) will likely all combine to make Orlando television advertising more costly than ever before in 2022. It is, in my expert opinion, likely that political television advertising in the State of Florida will exceed more than $250 million in 2022 – making the cost of purchasing television time in 2022 extraordinarily expensive.

w. In 2018, a 30-second ad on Orlando's WESH-TV 6 pm news cost $3,000 in the last week of August of 2018. For all of the aforementioned reasons, I would expect such an ad to cost at least twice as much in 2022. That newscast drew a 2.1 rating among viewers 35 and older – a typical target in a political campaign.

x. Most political media consultants measure the amount of television bought in terms of "Cost Per Point" or CPP. The CPP is calculated by dividing the cost of an advertisement by its gross ratings points (GRPs) among the campaign's target audience. For instance, the 6 pm WESH-TV newscast cited above cost $3,000 per spot and had a 2.1 rating; it's CPP was $1,427.58. By the latter part of 2022, such a program would, according to my best projections, have a CPP of close to $3,000.  In my expert opinion, a typical hotly contested congressional campaign might run between 1,200 and 1,500 GRPs per week. In 2018, such a campaign in Orlando would have cost approximately $800 per point (the more ads a campaign buys, the higher the CPP generally rises, as most campaigns buy cheaper daytime and weekend programming first and the more expensive evening and prime time programming later). By 2022, in my expert opinion, I would envision a hotly contested congressional campaign in the greater Orlando area costing between $1,500 and $1,900 per point (CPP). For Grayson to air an

*average* week of television ads in the greater Orlando area in 2022, he would likely purchase approximately 1,400 GRPs per week at an average cost of about $1,700 per point. That would make the cost of an average week of television ads about $2,380,000.00 – excluding the cost of production (between $10,000 and $20,000 per ad) and the cost of whatever retainer or creative fee the political media firm might charge Grayson (likely between $5,000 and $15,000).

y. If one believes, as I do, that negative ads have, as political media consultant Jill Buckley said, three or four times the impact of positive ads and, as George W. Bush's ad-maker, Mark McKinnon said, that those negative ads are typically amplified by the news media, it is simply not realistic to believe that direct mail alone can restore Grayson's reputation to what it was before the Attack Ads were unleashed on an unsuspecting electorate. In my expert opinion, the only way for Grayson to undo the damage wrought by the Attack Ads would be by supplementing his direct mail pieces with the production and airing of a series of television advertisements – at least two separate advertisements rebutting each false claim. So, when Defendant accuses Grayson of more than two decades of spousal abuse occurring on a daily basis, Grayson would need two different ads to rebut that defamatory accusation. Each ad would then have to have between 1,200 and 1,500 GRPs behind it – an approximate cost of $2,380,000.00 per ad plus the cost of production (approximately $15,000). Each pair of ads would cost $2,395,000 x 2, or $4,790,000.

z. Similarly, were Grayson to clear his name against the charges of corruption, he would need two different ads to rebut that defamatory accusation. Each ad would

then have to have between 1,200 and 1,500 GRPs behind it – once again, an approximate cost of $2,380,000.00 per ad plus the cost of production (approximately $15,000). Each pair of ads would cost $2,395,000 x 2, or $4,790,000.

aa. And were Grayson to clear his name against charges of his family profiting from slave labor, he would need two different ads to rebut that defamatory accusation. Each ad would then have to have between 1,200 and 1,500 GRPs behind it – once again, an approximate cost of $2,380,000.00 per ad plus the cost of production (approximately $15,000). Each pair of ads would cost $2,395,000 x 2, or $4,790,000.

bb. My final conclusion is that the cost of television ads in order for Grayson to undo the damage caused by Defendant's Attack Ads (incorporated here by reference) would be $4,790,000 x 3, or $14,370,000, plus the cost of a retainer fee for the advertising firm (approximately $10,000), a total of $14,380,000, plus the cost of replicating Defendant's direct mail program, which is an additional $2,397,000. **It is my expert opinion that, all together, the cost for Grayson to undo the damage done by Defendant's Attack Ads would be $16,777,000.**

**FOOTNOTES**

[1] Filed on April 12, 2021, in the United States District Court, Middle District of Florida, Orlando Division.

[2] Defendants' poll of 504 Democratic primary voters in Florida's Ninth Congressional District.

[3] Pivot Invoices #15925, 15949, 15950, 15951, 15979, 15980, 15981, 15990, 15991, 16000.

[4] Alan Ehrenhalt, "Technology, Strategy Brings New Campaign Era," *Congressional Quarterly*, December 7, 1985.

[5] Steven W. Colford, "Polls Accentuated Negative," *Advertising Age,* November 10, 1986.

[6] Elana Neely, "New Research Reveals Direct Mail to be Most Credible Form of Media Outreach Among Voters," *Campaigns & Elections, January 31, 2018.*

[7] https://ballotpedia.org/Redistricting_in_Florida_after_the_2020_census

[8] https://www.dos.myflorida.com/elections/data-statistics/elections-data/voter-turnout/

[9] John G. Geer, "Fanning the Flames: The News Media's Role in the Rise of Negativity in Presidential Campaigns," Joan Shorenstein Center on the Press, Politics and Public Policy, February 2010.

[10] Stephen Belth, "Why Does Direct Mail Fail?" Direct Marketing Association Blog, March 20, 2013.

RESPECTFULLY SUBMITTED,

*[signature]*

DAVID HELLER