IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALAN GRAYSON,

     Plaintiff,

                                         CASE NO.: 6:20-cv-01824-PGB-LRH

v.

NO LABELS, INC.;
PROGRESS TOMORROW,
INC.; UNITED TOGETHER, INC.;
NANCY JACOBSON, MARK PENN,
and JOHN DOE(S)

     Defendants.

_____/

**DEFENDANT PROGRESS TOMORROW, INC.'S
MOTION FOR FINAL SUMMARY JUDGMENT**

Defendant Progress Tomorrow, Inc. ("PT") hereby files its Motion for Final

Summary Judgment pursuant to Fed. R. Civ. P. 56, stating as follows:

**PRELIMINARY STATEMENT**

Plaintiff Alan Grayson ("Grayson"), a former congressman, of all people,

should know that political advertising is a rough-and-tumble game. As the Supreme

Court noted in *New York Times v. Sullivan*, "debate on public issues should be

uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic,

and sometimes unpleasantly sharp attacks on government and public officials."

Indeed, Grayson himself has levied harsh attacks on his political opponents, accusing

them of domestic abuse and corruption (which they have disputed as false).

Unfortunately, Grayson does not abide by the old adage "what's good for the goose is good for the gander." Instead, when Grayson's political opponents run political ads against him, which are actually based on facts, he sues them for defamation to silence them. Now, as Grayson seeks election to the United States Senate in August 2022, he is attempting to sideline his old political opponents. He has sued PT, a political action committee that published ads against him in the 2018 election cycle; ads based on widely published facts by reputable sources regarding findings by the Office of Congressional Ethics that Grayson committed ethical violations while in office and allegations of domestic abuse by Grayson's ex-wife Lolita Grayson that circulated back in the 2016 election cycle, which have never been retracted or refuted.

The indisputable evidence establishes that PT is entitled to summary judgment dismissal of Plaintiff's defamation claims, because Plaintiff cannot establish with clear and convincing evidence that the publications were false, that PT acted with actual malice, or that Plaintiff sustained any cognizable damages. Further, Plaintiff's defamation by implication claims fail because they are belied by the facts and unsupported by Florida law. Setting these issues aside, more than half of the publications at issue were published beyond the statute of limitations period and are thus time-barred. Lastly, Plaintiff's conspiracy claim fails as a matter of law based on the single publication/single action rule and because there is no viable underlying wrong to support it. For all of these reasons, the Court should grant final summary judgment in favor of Defendant PT and dismiss Plaintiff's claims in their entirety.

## UNDISPUTED FACTS

*The Parties*

Plaintiff Alan Grayson is an attorney and former U.S. congressman, who started serving in the House of Representatives in 2013. *See* Pl.'s Dep. Tr. at 53:13-17 (Ex. 1). In 2016, Alan Grayson vacated his seat in the House to attempt to run for U.S. Senate in the Florida Democratic Primary against Patrick Murphy. *See id.* at 164:7-9. Grayson was defeated in that election garnering only 17.7% of the votes compared to Murphy's 58.95%. *See* FEC 2016 Certified Election Results at 75 (Ex. 2). Thereafter, Grayson attempted to return to the House and reclaim his seat from then incumbent Democrat Darren Soto in the 2018 Democratic Primary election for Florida's 9th Congressional District, where he was again defeated, garnering only 33.62% of the votes compared to Soto's 66.38%. *See* FEC 2018 Certified Election Results at 54 (Ex. 3). Plaintiff is currently running again for U.S. Senate in the 2022 election cycle against Marco Rubio. *See* Ex. 1 at 138:8-10.

Defendant PT was a political action committee ("PAC") formed for the purpose of running political campaign ads in support of moderate candidates of both political parties and against extremist candidates on both sides of the aisle. *See* Decl. of Margaret White at ¶ 6 (Ex. 4). PT was involved in publishing political ads during the 2018 Democratic Primary election in support of Democratic congressman Darren Soto and against Alan Grayson, among others. *See id.* at ¶ 9.

3

The remaining Defendants were not involved whatsoever in the publication, ordering, direction, procurement, creation, research, vetting, or approval of the political ads regarding Alan Grayson and their non-involvement is discussed further in their own separate motion for summary judgment. *See id.* at ¶¶ 10, 39; *see also* Decl. of Nancy Jacobson at ¶ 4 (Ex. 5); Decl. of Jerald S. Howe, Jr. at ¶ 9 (Ex. 6); Decl. of Mark Penn at ¶ 4 (Ex. 7).

**The Facts**

On December 18, 2015, during Alan Grayson's final term in office as a congressman, after an extensive investigation, the Office of Congressional Ethics ("OCE") of the House of Representatives issued a nearly 1000-page report (including exhibits), which concluded that Grayson committed ethical violations while a member of Congress. *See* OCE Report (Ex. 8). In its conclusions, the OCE Board found that there was substantial reason to believe that Grayson committed, *inter alia*, the following violations:

> permitted the use of his name by four entities [one of which was located in the Cayman Islands] connected to Representative Grayson's hedge fund and Grayson Consulting, Inc. of Virginia that provided professional services involving a fiduciary responsibility, and received compensation through management fees from the Grayson Fund Management Company, LLC…omitted required information from his annual financial disclosure statements related to reportable assets, income, agreements, and positions…[and] Grayson's congressional staffer used official resources for unofficial purposes, including the use of staff time and resources to perform work for Representative Grayson's hedge fund. *See id.* at ¶¶ 31-75, 251, 253-254.

The OCE's conclusions are tantamount to official findings that Plaintiff committed these violations and can be relied upon. *See* Decl. of Melanie Sloan at ¶ 42 (Ex. 9).

4

As such, in early 2016, national media publications, including *The New York Times*, reported on Grayson's ethical violations in the run up to his 2016 Democratic primary election for Senate against Patrick Murphy. *See The New York Times*, "Alan Grayson Double Life: Congressman and Hedge Fund Manager", Feb. 11, 2016 (Ex. 10). Even prior to the OCE Report, the national media had published articles regarding Grayson's ethical violations. *See Politico*, "Grayson's Hedge Fund Skirts Ethics Rule," June 30, 2015 (Ex. 11).

A few months later in 2016, national media publications including *Politico*, reported on allegations by Lolita Grayson, Plaintiff's ex-wife, who claimed domestic abuse by Alan Grayson over the course of two decades, including specific incidents in 1994, 1999, 2005, and 2014 that occurred in Florida and Virginia. *See Politico*, "Grayson's Ex-wife Claimed Domestic Abuse Over Two Decades", July 26, 2016 (Ex. 12). Police reports and medical records provided by Lolita Grayson to *Politico*, corroborating her allegations, were published as part of its article. *See id.*; *see also* Police Reports and Medical Records (Composite Ex. 13).

In the police reports and medical records, Lolita Grayson alleged, *inter alia*, that in 1994, Alan Grayson beat her and caused the left side of her face to become swollen, which resulted in her seeking treatment at McLean Immediate Care Center in Virginia (*see id.* at 041); she also alleged that in 1994, Alan Grayson struck her on the arm and threw her to the floor at their home, which she reported to the Fairfax County Police Department (*see id.* at 002); she alleged that in 1999, she was physically abused by Alan

Grayson, when he hit her in the back of the head with a large book at their home, which she also reported to the Fairfax County Police Department (*see id.* at 006); she alleged that in 2005, he pushed her onto a wall and then hit her in the back of the head with his hand and told her "I'm going to kill you bitch" (*see id.* at 008); she alleged that she sustained bruising on her chest and reported this incident to the Orange County Sheriff's Office (*see id.*); and she alleged that in 2014, Alan Grayson hit her at their home and caused her to suffer bruising on her back and left shoulder, which she reported to the Orange County Sheriff's Office (*see id.* at 024).

Ironically, *Politico* reported in that same article, that Grayson had previously falsely accused his previous political opponent Todd Long of abusing his wife, despite the fact that Long's wife had recanted her accusations. *See* Ex. 12 at 6.

Here, there is no evidence of any adjudication that the allegations levied by Lolita Grayson against Alan Grayson are untrue and there is no evidence that these allegations have ever been retracted. In fact, Lolita Grayson maintains all allegations of abuse against Plaintiff to this day and affirmed at her deposition and in her declaration that each and every report of abuse she previously made to the police was true. *See* Composite Ex. 14 at Dep. Tr. of Lolita Grayson at 7:6-13, 9:17-25, 10:1-18, 11:7-25, 12:15-25, 13:1-16, 14:4-20, 15:8-11, 15:15-25, 16:1-25, 17:1-25, 18:1-25, 19:1-25, 20:1-25, 21:1-6, Decl. of Lolita Grayson at ¶¶ 1-15.

Thereafter, various reputable publications including *The Washington Post*, *Politico*, *Vanity Fair*, and *Orlando Weekly* reported that on July 26, 2016, a journalist

questioned Alan Grayson regarding the above domestic abuse allegations and Plaintiff became physical with the reporter, which was documented on a widely circulated video. *See Politico*, "Video: Grayson Threatens to Have Politico Reporter Arrested," July 26, 2016 (Ex. 15); *The Washington Post*, "Alan Grayson Said He Never Hit His Wife, Then He Got Physical With A Reporter," July 26, 2016 (Ex. 16); *Orlando Weekly*, "Grayson Threatens Reporter With Arrest After Questions on Domestic Abuse Allegations," July 26, 2016 (Ex. 17); *Vanity Fair*, "Alan Grayson Just Made His Domestic Abuse Scandal Even Worse," July 26, 2016 (Ex. 18).

All of the aforementioned media publications, are reputable sources that abide by stringent editorial standards, and the subject articles mentioned above, are no exception, as each was based on proper sourcing, and therefore, could be relied upon as accurate. *See* Decl. of A.B. Stoddard at ¶¶ 6-16 (Ex.19). Additionally, there is no evidence that any of the aforementioned publications have been retracted and in fact all remain available online to date.

Thereafter, Alan Grayson ultimately lost the 2016 Senate Democratic primary election to Patrick Murphy by a wide margin. *See* Ex. 2 at 75.

In 2018, Alan Grayson decided to run for the House of Representatives again, and entered the Democratic primary for Florida's 9th Congressional District to face the incumbent, current congressman Darren Soto. *See* Ex. 3 at 54.

Thereafter, PT decided to become involved in publishing political ads in support of Darren Soto, Alan Grayson's opponent for the 2018 Democratic primary. *See* Ex. 4

at ¶ 9. To that end, PT hired a team of outside independent vendors, including, but not limited to, strategy consultants, opposition researchers, mailing houses, digital ad creators, and legal consultants, which together produced and vetted ads both in support of Soto and in opposition to Grayson. *See id.* at ¶ 11.

Each of the ads that was published by PT regarding Alan Grayson, underwent a thorough vetting process between PT's outside vendors to ensure that each ad was truthful, supported by research, and that it passed legal scrutiny with respect to the standard for defamation. *See id.* at ¶¶ 15-16.

Specifically, PT's outside researcher Edward Chapman of Spiros Consulting vetted each publication for factual accuracy and gave written research approval before each ad was published, ensuring that there was factual backing for each statement being published, which is reflected in his emails. *See id.* at ¶¶ 20-36.

PT's outside legal counsel, Scott Thomas, of the international law firm, Blank Rome also vetted each publication and gave legal approval for same, ensuring that each ad could not be construed as defamatory under the law and was supported by the facts, which is also reflected in his emails. *See id.* at ¶ 37; *see also* Decl. of Scott Thomas at ¶¶ 1-27 (Ex. 20).

Each PT publication regarding Alan Grayson received written research and legal approval before it was published. *See id.*; Ex. 4 at ¶¶ 20-38.

Each and every PT publication published regarding Grayson relied upon and cited to the aforementioned source materials including: the OCE Report, the 2016

national media publications by *Politico, The New York Times, Vanity Fair, The Washington Post*, and *Orlando Weekly*, and the police reports and medical records submitted by Lolita Grayson to *Politico*, so that readers could make their own independent analysis of the published statements. *See* PT Ads (Exs. 21-37); *see also* Ex. 4 at ¶ 17.

PT acted with due care and diligence in publishing the ads and even went so far as to comply with the textbook ethical standards for political advertising. *See* Decl. of Mark Mellman at ¶¶ 1-105 (Ex. 38).

The publications attached as Exhibits 21 through 29 hereto were all published over two years before the Complaint in this action was filed on August 19, 2020. *See* Ex. 4 at ¶ 13. Specifically, Ex. 21 was published on August 1, 2018, Ex. 22 on August 2, 2018, Ex. 23 on August 6, 2018,  Ex. 24 on August 7, 2018, Ex. 25 on August 9, 2018, Ex. 26 on August 10, 2018, Ex. 27 on August 16, 2018, Ex. 28 on August 17, 2018, and Ex. 29 on August 17, 2018. *See id.* at ¶ 14.

Alan Grayson ultimately lost the 2018 Democratic primary to Darren Soto by a wide margin and approximately two years after his defeat, Grayson decided to seek others to blame for his defeat. *See* Ex. 3 at 54. For instance, on August 4, 2020, he filed a lawsuit against Thomas Ubl a former legal client of his (the "Ubl Complaint") claiming *inter alia* that Ubl defamed him and ruined his reputation before the 2018 election. *See* Ubl Compl. at ¶¶ 9-11 (Ex. 39).

Thereafter, on August 19, 2020, Plaintiff filed his original complaint in this matter, which was twice dismissed [D.E. 28, 34] and amended, with Plaintiff's Second Amended Complaint asserting claims for defamation, defamation by implication, and civil conspiracy against all Defendants. *See* Compl. (Ex. 40); Second Am. Compl. at ¶¶ 43-73 (Ex. 41). Plaintiff alleges in his Amended Answers to Interrogatories that the following statements published by PT were defamatory:

    a. "Congressional Ethics Investigation Found Alan Grayson Abused His Office for Financial Gain."

    b. "A Congressional Ethics Investigation found evidence that Alan Grayson Abused His Position in Congress to enrich himself."

    c. ". . . as a congressman, he . . . Hid income on his public disclosures."

    d. ". . . as a congressman, he . . . Used taxpayer resources to conduct his highrisk investor scheme."

    e. "Alan Grayson Used His Congressional [sic] Office For His Own Financial Gain."

    f. "Her husband [Grayson] came up behind her and hit her on the back of the head with a large book."

    g. "Mr. Grayson . . . hit her in the back of her head . . . and told her 'I'm gonna kill you."

    h. "Alan Grayson's ex-wife repeatedly reported Grayson to police for verbally and physically abusing her over two decades."

    i. "Two decades of reported abuse. Alan Grayson: enough is enough."

    j. "Alan Grayson, serial abuser."

    k. A mailer depicting a figure purporting to be Grayson, insinuating that Grayson packed at least $150,000 in cash into a suitcase and flew to the Cayman Islands, committing the crime of money laundering.

*See* Am. Ans. to Interrogs. at Resp. 3 (Ex. 42).

He further alleges in his Second Amended Complaint that the following statements were defamatory by implication:

    a. … Defendants published statements regarding Lolita Carson-Grayson's false allegations of abuse, omitting all of the information demonstrating that they were false, including (but not limited to) her recanting of those statements

    b. … Defendants published a statement that Grayson "used Congressional staff to work for the fund," omitting the fact that a Congressional staffer worked for the fund when Grayson was not in Congress and

    c. … Defendants published a statement that Grayson had called for the arrest of a reporter "after" the reporter had asked Grayson some questions, omitting the fact that Grayson had called for the reporter's arrest because the reporter repeatedly chest-bumped Grayson.

*See* Ex. 41 at ¶ 57.[1]

By Plaintiff's own admission in his Second Amended Complaint, his civil conspiracy claims are based on the same publications as the defamation and defamation by implication claims. *See id.* at ¶¶ 70-73.

Grayson asserts two theories of damages: (1) that the alleged defamation caused him to lose the 2018 election, which in turn caused him to lose his congressional salary and benefits and post-congressional business opportunities in the amount of approximately $3,000,000 and (2) that he **would have to** spend approximately $17,000,000 in the future to run ad campaigns to repair his reputation. *See* Ex. 1 at 127:7-25; Ex. 42 at Resp. 7. Although Grayson seeks $17 million in damages to repair his reputation, he has not actually spent any money to do so. *See id.*; Ex.1 at 143:14-21. Grayson and his damages expert David Heller concede that no money has actually been spent. *See id.*; David Heller Dep. Tr. at 37:11-25, 38:1 (Ex. 43). Grayson also claims a loss of post-congressional business opportunities, but testified that he has no evidence of same. *See* Ex. 1 at 135:15-25, 136:1-7; Ex. 42 at Resp. 7.[2]

---

[1] Plaintiff also alleges in his Amended Answers to Interrogatories, that any publications produced by Defendants in discovery are also defamatory. *See* Ex. 42 at Resp. 3-5. All PT ads produced in discovery have been attached hereto in an abundance of caution.

[2] While PT disputes and explicitly denies the facts alleged in Plaintiff's pleadings and answers to

It also bears noting that Plaintiff is currently a candidate once again for the U.S. Senate, seeking the nomination to run against Marco Rubio in 2022. *See* Ex. 1 at 138:8-10. Ironically, as part of his current campaign against Rubio, Plaintiff has published statements against his opponent accusing him of corruption. *See id.* at 163:22-25; *see also* Pl.'s Twitter Ad (Ex. 45).

## ARGUMENT

### I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S.  317, 322 (1986), citing Fed. R. Civ. P. 56(c). When the nonmoving party has the burden of proof at trial, the moving party is not required to "support its motion with affidavits or other similar material negating the opponent's claim." *Id.* Instead, it may merely point out that there is an absence of evidence to support the non-moving party's case. *Id.* at 324. Alternatively, the moving party may support its motion with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties in the State of Ala.*, 941 F.2d 1428, 1438 (11th Cir.1991). Under either method, if the nonmoving party fails to

---

interrogatories, it is undisputed that these are Plaintiff's allegations. *See generally* Ans. to Second Am. Compl. (Ex. 44).

make a sufficient showing on an essential element of the case, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Further, "[f]or factual issues to be considered genuine, they must have a real basis in the record." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir.1993). The party opposing summary judgment must adduce some evidence showing material facts are at issue. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

## II.   DEFENDANT PT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DEFAMATION CLAIM

In "an action for libel by a public official, the plaintiff has the burden of showing by **clear and convincing** evidence that the defamatory statement was (1) a statement of fact, (2) which was false, and (3) made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Shiver v. Apalachee Pub. Co.*, 425 So. 2d 1173, 1175 (Fla. 1st DCA 1983) (emphasis added).

## A. PLAINTIFF CANNOT ESTABLISH THE FALSITY OF THE PUBLICATIONS

The first element of a defamation claim is falsity. The Supreme Court has held that when a statement treats a matter of public concern, such as here, the plaintiff in a defamation action has the burden of proving that the statement is false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986). Further, it is black letter law that "true statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018); *see also Colodny*

*v. Iverson, Yoakum, Papiano & Hatch*, 936 F.Supp. 917, 923 (M.D. Fla. 1996) ("[W]hether the alleged defamatory word is a non-actionable expression of pure opinion or an actionable expression of pure fact ... is a question of law for the Court.") (citing Florida cases). In evaluating a publication, the full context of the ad must be considered. *See Byrd v. Hustler Mag., Inc.*, 433 So. 2d 593 (Fla. 4th DCA 1983) (retouched photograph had to be considered with its caption, and thus did not convey false impression and was not defamatory).

Here, PT's publication of statements such as "Congressional Ethics Investigation Found Alan Grayson Abused His Office for Financial Gain; A Congressional Ethics Investigation found evidence that Alan Grayson Abused His Position in Congress to enrich himself; . . . as a congressman, he . . . Hid income on his public disclosures; . . . as a congressman, he . . . Used taxpayer resources to conduct his highrisk investor scheme; Alan Grayson Used His Congressional [sic] Office For His Own Financial Gain" are all based on the OCE report which found substantial reason to believe that Grayson committed these ethical violations. *Compare* Ex. 8 at ¶¶ 31-75, 251, 253-254 *with* Exs. 21, 23, 27, 29, 30, 36, 37. As stated by Defendants' congressional investigations expert, such conclusions are tantamount to an official finding and thus these OCE reports can be and are frequently relied upon. *See* Ex. 9 at ¶ 42. In fact, in this case, the OCE reports were relied upon by *The New York Times*, which was in turn also justifiably relied upon by PT. *See* Ex. 10.

Further, the publication of statements such as: "Her husband [Grayson] came

14

up behind her and hit her on the back of the head with a large book", "Mr. Grayson . . . hit her in the back of her head . . . and told her 'I'm gonna kill you'", "Alan Grayson's ex-wife repeatedly reported Grayson to police for verbally and physically abusing her over two decades", "Two decades of reported abuse. Alan Grayson: enough is enough", all come directly from Lolita Grayson's police reports and the *Politico* article reporting on same. *Compare* Exs. 22, 24, 25, 26, 28, 31, 32, 33, 34, 35 *with* Exs. 12, 13. There is no evidence that these allegations have been recanted or adjudicated to be false and in fact, Lolita Grayson maintains these allegations to this day. *See* Composite Ex. 14 at Lolita Grayson Depo Tr. 7:6-13, 9:17-25, 10:1-18, 11:7-25, 12:15-25, 13:1-16, 14:4-20, 15:8-11, 15:15-25, 16:1-25, 17:1-25, 18:1-25, 19:1-25, 20:1-25, 21:1-6, Decl. of Lolita Grayson at ¶¶ 1-15.

Statements such as "Alan Grayson, serial abuser" are clearly opinion and characterizations as opposed to statement of facts. *See Turner v. Wells*, 198 F. Supp. 3d 1355, 1372 (S.D. Fla. 2016) ("Defendants' characterization of the various taunting incidents as 'abusive ... behavior' is also pure opinion."*), aff'd*, 879 F.3d 1254 (11th Cir. 2018). Further, the "mailer depicting a figure purporting to be Grayson, insinuating that Grayson packed at least $150,000 in cash into a suitcase and flew to the Cayman Islands, committing the crime of money laundering" as characterized by Grayson, is clear parody, making light of the OCE's clear findings that Grayson operated a hedge fund in the Cayman Islands. *Compare* Ex. 8 at ¶¶ 31-75 *with* Ex. 21. The image is so clearly over the top: a passport open to the photo page, inside of an

15

attaché filled with cash, perfectly placed on a beach, that no reasonable person could deem it to be a statement of fact. *See id*; *see also Byrd*, 433 So. 2d at 593 (retouched photograph was not defamatory based on context).

Indeed, every PT publication, is based on the same OCE findings and media reports regarding same, as well as publicized reports of domestic abuse against Lolita Grayson, corroborated with police reports, medical records, and her own testimony affirming that she maintains the truth of all allegations to date, and thus they are not actionable. *See* Ex. 4 at ¶ 17; Exs. 21-37.

Therefore, Plaintiff cannot establish "falsity" by clear and convincing evidence and his defamation claim cannot survive summary judgment.

## B. PLAINTIFF CANNOT ESTABLISH "ACTUAL MALICE"

Setting aside the fact that Plaintiff cannot establish the falsity of any of these publications, Plaintiff cannot establish, as he must, that PT acted with "actual malice" under *New York Times v. Sullivan*. It is well-settled that a public figure cannot prevail in a defamation claim unless he proves that the statement was made with "actual malice" that is, with knowledge of its falsity or with reckless disregard for the truth. *See New York Times v. Sullivan*, 376 U.S. 254, 280 (1964). A candidate for public office, such as Plaintiff, is considered a public figure subject to the "actual malice" standard. *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971). "Under Florida's law regarding summary judgments, when a motion for summary judgment is brought by a defendant against a public-figure plaintiff . . . in a defamation action in which the actual malice

16

test applies, summary judgments are to be more liberally granted. A public-figure plaintiff . . . must present record evidence sufficient to satisfy the court that a genuine issue of material fact exists which would allow a jury to find by clear and convincing evidence the existence of actual malice on the part of the defendant." *Dockery v. Fla. Democratic Party*, 799 So. 2d 291, 294 (Fla. 2d DCA 2001) (internal citations omitted).

Here, Plaintiff cannot establish at all, much less with ***clear and convincing*** evidence, that PT published the subject ads with knowledge of their falsity or reckless disregard for the truth. PT used a thorough vetting process for each publication, which included multiple rounds of review by its opposition researcher, Spiros Consulting and its legal counsel, Scott Thomas of the reputable law firm, Blank Rome, to ensure that each publication was based on facts and not defamatory, as well as written approval from both its outside researcher and its counsel. *See* Ex. 4 at ¶¶ 15-38; Ex. 20 at ¶¶ 1-27.

In *Berisha v. Lawson*, similar to here, the court held that where the *New York Times* first broke a story that was relied upon and re-published by defendants and deemed by the *New York Times* as news fit to print, Defendant was entitled to rely on that "previously published report[ ]" from a "reputable source[ ]." *Berisha v. Lawson*, 378 F.Supp.3d 1145, 1162 (S.D. Fla. 2018) (internal citations omitted); *see also Berisha v. Lawson*, 973 F.3d 1304, 1313 (11th Cir. 2020) ("Lawson's reliance on these many independent sources, alone, should defeat any claim of actual malice"). Reliance upon a reliable source insulates a defendant from a finding of actual malice as a matter of

17

law. *See Dockery*, 799 So.2d at 296 ("Moreover, FDP's reliance upon the IRS's position that Dockery owed taxes is reliance upon a reliable source.") (internal citations omitted); *Clarke v. Phelan*, Case No. 16-25217-CIV-SCOLA, 2018 WL 1064699 (S.D. Fla. Feb. 22, 2018) (publication of information from police report could not constitute basis for defamation claim) citing *Gregory v. City of Tarpon Springs*, Case No. 8:16-cv-237-T-33AEP, 2016 WL 7157554, at *9 (M.D. Fla. Dec. 8, 2016).

Here, the PT ads rely upon information published in *Politico, The New York Times, Vanity Fair, The Washington Post*, and *Orlando Weekly*, over two years earlier, which have not been retracted and remain available online today. *See* Ex. 4 at ¶ 17; Exs. 10-12, 15-18; Exs. 21-37. All of these national media sources are reputable sources and their specific articles were properly vetted. *See* Ex. 19 at ¶¶ 6-16. PT also relied upon police reports and medical records published by *Politico*. *See* Ex. 4 at ¶ 17; Exs. 12, 13, 22, 24, 25, 26, 28, 31, 32, 33, 34, 35. In addition, PT relied upon findings of the OCE, a governmental body, which issued a nearly 1000 page report (with supporting exhibits) after a thorough investigation. *See* Ex. 4 at ¶ 17; Ex. 8 at ¶¶ 31-75, 251, 253-254; Exs. 21, 23, 27, 29, 30, 36, 37. PT's reliance on these reliable sources establishes a lack of actual malice as a matter of law.

Further, "where a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016); *Klayman v. City Pages*, 650 F.

18

App'x 744, 751 (11th Cir. 2016) (holding that internet news articles that gave readers sufficient information to weigh likelihood of articles' veracity were not defamatory, noting that "if the defendants actually had been highly aware of the publications' falsity, it is unlikely they would have included source information that refuted any defamatory claims or implications"). Here, every PT ad cited links to the source material so that readers could make their own determinations regarding the facts. *See* Ex. 4 at ¶ 17; Exs. 21-37. This also establishes a lack of actual malice as a matter of law.

Indeed, as set forth in the Declaration of Defendants' political advertising expert Mark Mellman, because PT:

> (1) based each of its ads on news articles published by multiple reporters at prestigious news outlets as well as on the investigation by the OCE, and police reports and medical records published by those news outlets; (2) sought pre-approval of the ads from its research firm, which approval was provided; (3) sought pre-approval of the ads from legal counsel, which approval was also provided; and (4) provided readers with links and citations for the research relied upon so they could obtain more information; PT acted with due care and diligence in publishing the ads. *See* Ex. 38 at ¶¶ 1-105.

For all of these reasons, Plaintiff cannot establish actual malice with clear and convincing evidence and summary judgment dismissal of Plaintiff's defamation claim should therefore be granted to PT.

## III.   DEFENDANT PT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DEFAMATION BY IMPLICATION CLAIM

Under Florida law, whether a "defendant's statements constitute defamation by implication is a question of law for the court to determine." *Turner*, 879 F.3d at 1269.

19

The inquiry turns on whether the "gist" of the publication is false. *See id.* citing *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1107-08 (Fla. 2008) ("[Publishers] have no legal obligation to present a balanced view of what led up to [the publicized event]."). "The law of defamation is concerned with whether a publisher reports a story truthfully, not generously." *Turner v. Wells*, 198 F. Supp. 3d 1355, 1371 (S.D. Fla. 2016), aff'd, 879 F.3d 1254 (11th Cir. 2018); *see also Dockery*, 799 So.2d at 296 ("At best, Plaintiff's evidence establishes only the issue of whether FDP deliberately chose not to publish the fact that Dockery had disputed the Internal Revenue Service's determination. This, though, does not create a genuine issue of material fact. As a matter of law, FDP's failure to print Dockery's denials that he owed the taxes does not constitute actual malice.").

Here, Plaintiff's defamation by implication claims are belied by the facts and/or unactionable as a matter of law pursuant to the above legal authorities. In the first instance, contrary to Plaintiff's bald assertions, there has been no adjudication that the domestic abuse allegations of Lolita Grayson are false or any retraction of same. In fact, she maintains all allegations to date. *See* Composite Ex. 14 at Dep. Tr. of Lolita Grayson at 7:6-13, 9:17-25, 10:1-18, 11:7-25, 12:15-25, 13:1-16, 14:4-20, 15:8-11, 15:15-25, 16:1-25, 17:1-25, 18:1-25, 19:1-25, 20:1-25, 21:1-6, Decl. of Lolita Grayson at ¶¶ 1-15. Moreover, as in *Dockery*, PT's alleged failure to publish Plaintiff's denials of the abuse allegations is immaterial as a matter of law. Similarly, PT's alleged failure to publish the facts leading up to the event where Grayson pushed a reporter is likewise

not actionable. *Jews For Jesus, Inc.*, 997 So.2d at 1107-08 ("[Publishers] have no legal obligation to present a balanced view of what led up to [the publicized event]."). Moreover, the ads did actually provide links to the articles and video which showed the full sequence of events. *See* Exs. 15-18, 22, 24, 26, 28, 33, 34. Lastly, PT's alleged failure to publish Grayson's unsupported contention that his staffer worked for his hedge fund while he was not in office, is not only belied by the facts, but also not required under Florida law. *See Dockery*, 799 So.2d at 291. The OCE found that "Grayson's staffer used official resources for unofficial purposes, including the use of staff time and resources to perform work for Representative Grayson's hedge fund." *See* Ex. 8 at ¶ 254. The OCE Report is replete with evidence that his staffer did in fact perform work for the hedge fund while he was in office.

Thus, Plaintiff's claims for defamation by implication should likewise be subject to summary judgment dismissal.

## IV.   PLAINTIFF'S DEFAMATION CLAIMS ARE ALSO BARRED, IN PART, BY FLORIDA'S STATUTE OF LIMITATIONS

Florida has a two-year statute of limitations for libel or slander. *See* Fla. Stat. § 95.11(4)(g). The limitations period begins running from the time the cause of action accrues. Fla. Stat. § 95.031. A cause of action for defamation accrues on the date of publication, not the date of discovery. *Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So.2d 113 (Fla. 1993). Where an alleged defamatory statement was continuously published multiple times by mere virtue of being on an internet website, the first publication date starts the statute of limitations clock. *See*

21

*Norkin v. The Fla. Bar*, 311 F. Supp. 3d 1299, 1303–04 (S.D. Fla. 2018).

Here, it is undisputed that the publications attached as Exhibits 21-29 hereto were all published over two years before the Complaint in this action was filed on August 19, 2020. *See* Ex. 4 at ¶¶ 13-14; Ex. 40. Thus, any defamation or defamation by implication claims based on these publications are time-barred under Florida's statute of limitations.

## V.   PLAINTIFF'S CIVIL CONSPIRACY CLAIM FAILS AS A MATTER OF LAW

Plaintiff's civil conspiracy claim also fails as a matter of law. A single publication cannot form the basis for a conspiracy claim where it also forms the basis for a defamation claim. *See Maletta v. Woodle*, No. 2:20-CV-1004-JES-MRM, 2021 WL 1894023, at *6 (M.D. Fla. May 11, 2021) ("However, the allegedly defamatory statements . . . cannot form the basis for the conspiracy claim because they also form the basis for the defamation and defamation per se claims. Accordingly, the civil conspiracy claim violates Florida's single action rule and . . . will be dismissed") (citing Florida law).

Here, the publications that form the basis for Plaintiff's defamation and defamation by implication claims are the same as those that form the basis of its civil conspiracy claims and thus the conspiracy claims should be dismissed on this basis alone. *Compare* Ex. 41 at ¶¶ 43-68 *with* ¶¶ 69-73.

Further, the gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the plaintiff. *See*

22

*Liappas v. Augoustis*, 47 So.2d 582 (Fla. 1950); *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1027 (Fla. 3d DCA 1981) ("The civil conspiracy count is also dismissed due to the failure of the complaint to support the underlying tort of libel...").

Here, for the reasons set forth above, there is no legally viable underlying wrong, *i.e.*, defamation or defamation by implication, that would support the civil conspiracy claim. Thus, it should be dismissed for this additional reason.

For all of these reasons, the Court should grant summary judgment dismissal of Plaintiff's civil conspiracy claim.

## V.   PLAINTIFF HAS SUSTAINED NO DAMAGES AND DEFENDANT IS THEREFORE ENTITLED TO SUMMARY JUDGMENT

Lastly, even assuming, *arguendo*, that Plaintiff could prevail on liability as to any of his claims--which he cannot--as a matter of law, he has sustained no cognizable damages. "[T]he general attitude of courts asked to consider election disputes ... has been one of great caution. Intervention has come only in rare and extraordinary circumstances ... [and] has never included the grant to defeated candidates of monetary compensation." *Peer v. Lewis*, No. 06-60146-CIV, 2008 WL 2047978, at *10 (S.D. Fla. May 13, 2008), *aff'd*, No. 08-13465, 2009 WL 323104 (11th Cir. Feb. 10, 2009) (citing Florida law). "Damages for a lost election are considered 'too speculative and conjectural' and thus cannot be awarded by a court." *See id.* In *Peer v. Lewis*, the court held that "because there are 'not less than a thousand factors which enter into the vagaries of an election,' it is impossible for *Lewis* [a mayoral candidate] to establish that *Peer* actually caused his loss in the primary election, *a fortiori* he can never prove

actual damages." *See id.*

Here, Plaintiff testified and stated in his Amended Answers to Interrogatories that his damages arise from a lost election, *i.e.* his lost congressional salary and benefits, thus he is precluded from claiming these damages as a matter of law. *See* Ex. 1 at 127:7-25; Ex. 42 at Resp. 7. He also claims a loss of post-congressional business opportunities but testified that he has no evidence of same. *See* Ex. 1 at 135:15-25, 136:1-7; Ex. 42 at Resp. 7.

Additionally, to the extent Plaintiff is claiming that he sustained special damages for the amount it ***would cost*** (rather than the amount actually spent) to counteract the subject publications and repair his reputation, such damages are not recoverable as a matter of law. *See Daniels v. HSN, Inc.*, No. 818CV3088T24JSS, 2020 WL 533927, at *7 (M.D. Fla. Feb. 3, 2020) (citing Florida law) (plaintiff was precluded from claiming special damages in a defamation action for the amount it ***would cost*** (rather than the amount actually spent) to counteract an allegedly false publication).

Here, Plaintiff testified that he has not actually spent money to repair his reputation. *See* Ex.1 at 143:14-21. Further his expert confirmed that the $17 million being claimed had not actually been spent but constituted an estimate of what it would cost in the future, specifically August 2022, to repair Plaintiff's reputation. *See* Ex. 43 at 37:11-25, 38:1.

For this final reason, the Court should grant summary judgment dismissing all of Defendants claims for lack of damages, or at a minimum, grant summary judgment

with respect to the issue of special damages.

## CONCLUSION

Plaintiff should not be permitted to abuse the judicial process any longer to silence his political opponents with factually and legally meritless defamation claims. For all of the reasons set forth above, the Court should grant PT final summary judgment and dismiss Plaintiff's claims in their entirety.

WHEREFORE, Defendant Progress Tomorrow, Inc. respectfully requests that the Court grant summary judgment in its favor and dismiss Plaintiff's claims in their entirety, and grant Defendant any relief deemed just and proper.

Dated:  January 3, 2022          Respectfully submitted,

**LEGON FODIMAN & SUDDUTH, P.A.**
*Counsel for Defendants*
3225 Aviation Avenue, Suite 301
Miami, Florida 33133
Telephone:  (305) 444-9991
Facsimile:  (305) 444-9937
Primary e-mail:  tlegon@lpflaw.com
Secondary e-mail:  respinosa@lpflaw.com
Secondary e-mail:  eservice@lpflaw.com

By:____/s/ Todd R. Legon_____
TODD R. LEGON
Florida Bar No. 814415

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of January, 2022, I served the foregoing via electronic mail to *Counsel for Plaintiff:* Tucker H. Byrd, Byrd Campbell, P.A., 180 Park Avenue North, Suite 2A, Winter Park, Florida 32789, TByrd@ByrdCampbell.com.

By:____/s/ Todd R. Legon_____
TODD R. LEGON