UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALAN GRAYSON,

    Plaintiff,

vs.

CASE NO.: 6:20-cv-1824-Orl-22LRH

NO LABELS, INC.; PROGRESS TOMORROW, INC.; UNITED TOGETHER, INC.; NANCY JACOBSON, MARK PENN, and JOHN DOE(S),

    Defendants.

**PLAINTIFF'S OPPOSITION TO *DAUBERT*
MOTION TO EXCLUDE TESTIMONY OF NICHOLAS CARROLL**

Plaintiff, Alan Grayson ("Grayson"), opposes the Defendants' motion to exclude the expert testimony of Nicholas Carroll ("Carroll"), on the following grounds:

Carroll has 28 years of experience regarding, in his own words, reviewing and checking "Advertising Raising Red Flags for Libel," and assessing "[e]conomic damages resulting from false and/or misleading . . . advertising," *inter alia.* Carroll Report at 4 ("Qualifications"). That experience has come as a "professional editor performing preliminary libel reviews . . . ." *Id.* He accumulated that experience working for the *Chicago Tribune,* the *Times of London* and the *Toronto Globe and*

*Mail,* and then by counseling members of the Author's Guild and the National Writers Union on libel avoidance, and later by providing nonlegal advice to defamation victims. *Id.* He also has counseled defamation victims on "the cost of reputational repair." *Id.* Also, as to defamation damages, Carroll says that he has 19 years of experience, as follows:

> For businesses, NGOs, public figures, and public officials I have analyzed and calculated financial harms in terms of lost sales and/or harm to reputation . . . . For private individuals I have assessed the costs of seeking a new job (if the defamation has not spread too far), unemployment, lost lifetime career earnings, post-career earnings, moving to a new town, selling a possibly distressed business or home at a loss, moving costs, and the price of relocating family and children.

*Id.* Carroll has four publications on libel, and six publications on altering public opinion as to reputation. *Id.* at 5. These are among three books and 22 articles that Carroll has authored on various defamation topics. *Id.* at 32-33. Carroll has testified as an expert witness in five other cases in the last four years. *Id.* at 26-27.[1]

---

[1] Carroll's experience thus is on par with that of the expert witness in the *Local Access* case:

> First, an expert must be "qualified to testify competently regarding the matters he intends to address." *Id.* at 1291 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998)). "[E]xperts may be qualified in various ways, including by . . . training, education, and experience." *Seamon v. Remington Arms Co.,* 813 F.3d 983, 988 (11th Cir. 2016) (quoting *United States v. Frazier,* 387 F.3d 1244, 1260-61 (11th Cir. 2004)) (internal quotation marks omitted). Other indicia of an expert's qualifications may include licenses held by the expert, publication in the pertinent field, and membership in relevant professional societies. *See Ferrara & DiMercurio v. St. Paul Mercury Ins.,* 240 F.3d 1, 8 (1st Cir. 2001) (considering expert's licenses in assessing qualifications); *Am. Tech. Res. v. United States,* 893 F.2d 651, 656 (3d Cir. 1990) (considering expert's publications and membership in professional societies in assessing qualifications).
>
> Peerless does not challenge Mr. Gaines' qualifications to assess and appraise business

Carroll carefully reviewed a substantial number of the Defendant's specific ads against Grayson. *Id.* at 6-23. In almost all cases, Carroll found that, in his professional opinion, these ads "raised red flags" for defamation. In other words, Carroll, reviewing the ads and exercising objective analysis and judgment as to defamation, reached these types of conclusions (regarding the first seven ads he reviewed):

- "Potential liability is in my opinion too high to run this ad . . . ."

- "I find no public[ly] available information that the HCE found improprieties in Grayson's finances."[2]

- "I would require the advertiser provide me with documentation from the HCE . . . ."

- "I would not run this ad unless there were both criminal charges and/or a conviction . . . ."[3]

---

assets. Indeed, Mr. Gaines has earned degrees in economics and business administration, holds a number of active brokerage, trading, and banking licenses, has published two articles on the sale of business entities, and has over twenty years of financial advisory experience, including in the areas of divestitures, leveraged buyouts, and mergers and acquisitions. The Court therefore finds Mr. Gaines sufficiently qualified to competently testify in the area of business asset valuation.

*Local Access, LLC v. Peerless Network, Inc.*, No. 6:14-cv-399-Orl-40TBS. (M.D. Fla. Aug. 24, 2016).

[2] There isn't any.
[3] There weren't.

3

- "RED FLAG: That the allegation of assault is in a police report [and] does not automatically protect the advertising department from liability for repeating defamation . . .."[4]

- "Do not run this ad – no legal opinion needed: 1. Alleges a crime with no supporting facts, citations, or documentation."[5]

- "To run this ad I would require: . . . 2. Evidence of whether this was a report in the sense of police responding to a call and then leaving, or making a charge."[6]

- "Do not run this ad – no legal opinion needed, the ad is too volatile: 1. This is a potpourri of unsourced statements alleging a crime, under a heading implying they are all transcribed from a 911 call recording [because that is what the image shows],[7] when at least one [is sourced from a newspaper article].  2. The blood-red background colors subliminally suggest violence or murder."

*Id.* at 7-13.  After reviewing more anti-Grayson ads, and reaching the same conclusions, Carroll continued:

> **As a consultant to the groups designing and placing the ads:** I would have advised them that a lawsuit was almost certain, regardless of what their legal counsel advised them about the merits of their position. . . .

---

[4] The Defendants were, in fact, repeating defamation.
[5] And no crime.
[6] There were never any charges.
[7] There was no 911 call recording.

4

> **By mainstream reporting standards, the ads were written with reckless disregard for the truth, and it is unlikely the claims could have found venues willing to disseminate them other than mail[]houses and online media.**

*Id.* at 23 (emphasis in original).[8]

Carroll then draws on his substantial experience in reputational repair and outlines his own view of the proper strategy for such an effort, which is similar to the strategy outlined in the Heller Report. *Id.* at 24. Carroll concludes:

> **Opinion on Cost of Repairing Reputation**
>
> Because of Grayson's necessity for rebutting the negative advertising and supplanting the current negative image with a new, positive image, costs of reputational repair will be far higher than the approximately $500,000 in advertising expenses for mailers and Facebook ads as described in the PR agency invoices and FEC filings.
>
> I have relied on the cost of repair estimated by David Heller, dated 10/4/2021, for a quantification of repairing Grayson's reputation, which Heller estimates at in excess of $16 million.
>
> <u>This is consistent with my three decades in advertising</u>, in which the cost of reputation repair for a consumer product or service is often so high that the reasonable business decision is to "rebrand" the product rather than attempt to restore its reputation . . . .
>
> <u>This is also consistent with nearly two decades of counseling defamation victims/targets on reputation repair</u>, in which I have routinely advised them to strongly reconsider moving to a different geographic or demographic area, possibly changing careers or even their names.

---

[8] The Defendants dismiss this opinion as "supported by nothing whatsoever," Motion at 9, when in fact it derived directly from the scrupulous and detailed analysis of Carroll's entire report. Motion Ex. 1 at 5-25.

5

> **Since Alan Grayson's reputation is unalterably attached to his name, this places him in the same position as a charitable organization or other NGO: his only option is to repair his reputation.**

*Id.* at 25 (underscoring added).

The Defendants' attack on Carroll is succinctly summarized at the beginning of their motion, as follows:

> This opinion, in addition to being irrelevant, because it applies journalistic standards as opposed to political advertising standards, is a bald conclusion not based on any review of the underlying research or vetting process used to publish the ads, but rather Carroll's own subjective opinion. . . .
>
> Second, Carroll opines that the harm to Grayson's reputation can only be repaired by presenting a new positive image. Again, this is not based on any study, research, or facts of this case, rather pure subjective opinion, and presupposes that Grayson's reputation sustained any harm.
>
> Third, Carroll regurgitates the equally inadmissible opinion of Grayson's damages expert David Heller, and states that the cost to repair Grayson's reputation will exceed $16 million.

Motion at 2.

The Defendants' *Daubert* motion regarding Carroll essentially "regurgitates" (to use their term), in the form of a legal brief, the arguments that the Defendants' would-be expert Mark Mellman sought to make, in the form of putative expert opinions. Carroll, unlike Mellman, has served as an expert in dozens of cases like this one, and has authored numerous books and articles about defamation. Tellingly, Mellman does not attempt to critique Carroll by offering any "competing principles

or methods in the same field of expertise," *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 160 (3d Cir. 1999), because Mellman *cannot* – Mellman does not have the expertise to do so. Instead, Mellman offers the precise nonexpert "talking points" that are reiterated in the Defendants' motion. For example, Mellman:

- Argues that Carroll "seeks to apply his personal publishing standards" (Mellman Report at 5). Not true, as the Carroll Report establishes in detail.
- Argues that Carroll's "standards are not widely shared, even in the journalistic community," although there is no way that Mellman would even know this.

In their motion, at least, the Defendants do not purport to be employing any "specialized knowledge" when they ring the same chimes here.

In essence, both the Defendant's motion and Mellman's report suffer from the same flaw: they argue that Carroll is not an expert by assuming that Carroll is not an expert. This argument flies in the face of the actual governing legal standard on an expert's qualifications:

> the district court must analyze the expert's credentials "in light of the subject matter" and "consider whether [the] expert is qualified to testify competently regarding the matters he intends to address." *Galarza v. Carnival Corp.*, No. 15-24380-CIV, 2016 WL 7507883, *6 (S.D. Fla. Aug. 8, 2016) (citations omitted). This is not a stringent standard, and "so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to the credibility and weight, not admissibility." *Id.*

*Woienski v. United Airlines, Inc.,* 383 F. Supp. 3d 1342, 1347-48 (M.D. Fla. 2019).

And far from Carroll being merely "minimally qualified" (which would be enough),

7

the Defendants ignore the fact that Carroll has decades of experience reviewing hundreds if not thousands of statements, and objectively deciding whether they, on their face, "raise red flags" for defamation – in other words, what the Defendants should have done, but clearly did not do properly.[9]

The Defendants' three arguments against Carroll are addressed in turn below, but the real question for the Court is something different.  As the Advisory Committee for Rule 702 noted:

> Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common[-]sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore §1918.

Advisory Committee Notes to 2000 Amendments to Rule 702.  Grayson submits that the Carroll testimony will be *helpful.*  It is conducive to "[a]n intelligent evaluation of facts."  *Id.* Notes to Proposed Rule 702.  As noted, Carroll has spent

---

[9] "Of particular relevance to an expert proffered for his experience, the court notes that neither *Daubert* nor its progeny preclude experience-based testimony ...." *Butler v. First Acceptance Ins. Co., Inc.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. Aug. 17, 2009) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999)).
.
*Woienski v. United Airlines, Inc.*, 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019).

decades making judgments about which statements pose an undue risk of defamation liability, and which do not. To do so, he has formulated certain *heuristics,* i.e., practical thought-processes that allow him to make such judgments quickly, efficiently, and reliably. For instance, regarding one of the Defendant ads addressed above, Carroll asked:

- Does this ad state or imply that a crime has been committed?
- If so, is there information in the ad that demonstrates that this is true?
- If not, is there information that might be obtained that might establish truth with sufficient certainty, or are there simply too many "red flags" to allow the ad at all?

This is an analytical framework that "is properly grounded, well-reasoned, and not speculative." *Id.* Grayson submits that Carroll's heuristic rules help to put meat on the bones of what would otherwise be a somewhat abstract concept, *i.e.,* whether the Defendants acted in reckless disregard of the truth. In the words of the Advisory Committee, the Carroll testimony provides "enlightenment from [someone] having a specialized understanding of the subject involved in the dispute." The Carroll Report makes it clear that Carroll is such a "someone."[10]

As noted, the Defendants' first argument against Carroll is as follows:

---

[10] In their motions for summary judgment, the Defendants claim that their anti-Grayson *opposition researcher* is such a person. The jury at least should hear both sides of story, from a more objective source.

> This opinion, in addition to being irrelevant, because it applies journalistic standards as opposed to political advertising standards, is a bald conclusion not based on any review of the underlying research or vetting process used to publish the ads, but rather Carroll's own subjective opinion. . ..

This argument misses the mark. There are no "political advertising standards,"[11] nor (for purposes of this case) are there "journalistic standards"; there are only "defamation standards," which reflects the judgments that Carroll has had to make. Carroll's report makes it clear that when he reviews these ads, he is assessing them for their risk of being defamatory, period.

In any event, the actual legal requirement is not that Carroll be an expert in "political advertising standards," if there were such a thing, but rather that Carroll have helpful "specialized knowledge" (Rule 702(a)), which he does. As the Rule 702 Advisory Committee observed:

> The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education." Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.

---

[11] Notably, the Defendants completely fails to cite any legal authority that would establish that there even is such a thing. And revealingly, the Defendants posit that concern about committing defamation "may not be tolerated by a newspaper but would be inconsequential for a political action committee" -- a very good definition of reckless disregard for the truth. Motion at 8.

Advisory Committee Notes on Proposed Rule 702. Carroll is like a banker or landowner, testifying to land values. They don't need to be narrow "experts on land values" *per se* in order to offer their specialized knowledge that will help the trier of fact to determine a fact at issue. The same thing is true of Carroll.[12]

The second part of the Defendants' argument, *i.e.,* that Carroll is making "bald conclusion[s]" based on nothing but "Carroll's own subjective opinion," is simply wrong. What Carroll is doing, *as his report says,* is explaining how one who is experienced in such matters identifies defamation "red flags," and attempts to avoid republication of defamation, and reckless disregard of the truth. If one actually reads through Carroll's analysis of the sixteen (16) individual ads that he reviews, one is struck, on the contrary, with the consistency and analytical utility of Carroll's methods. In other words, if one actually did want to avoid committing defamation, these are exactly the tools that one would want to use. They are the opposite of "*ipse dixit.*" *Cf.* Motion at 10.

The Defendants' second and third arguments attack Carroll's damages analysis as "pure subjective opinion." Here again, the best disproof of this argument is simply reading the Carroll Report. As Carroll states, he has 19 years of experience

---

[12] "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes on 2000 Amendments to Rule 702. "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1178 (1999).

in reputation restoration, applied to a wide variety of cases. This certainly qualifies Carroll to scope out what kind of campaign would be necessary to neutralize the damage done by the Defendants. As to the specifics of the cost of postage and printing, the price of television spots in Orlando, and so on, Carroll saw no need to duplicate David Heller's meticulous work in the Heller Report, so Carroll did not. As this Honorable Court has noted, "an expert is permitted to form conclusions by extrapolating from existing data." *Woienski v. United Airlines, Inc.*, 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). And according to the American Bar Association, at least: "Under Rule 703, courts routinely let experts testify based on otherwise inadmissible evidence, including the hearsay opinions of other experts . . . ." ABA Litigation Committee, "Experts May Rely Upon Hearsay, Except When They May Not" (May 28, 2018).[13]

---

[13] On this issue, the Defendants rely upon (and miscite) a nearly 40-year-old decision that appears no longer to be good law. Motion at 14, citing *American Key Corp. v. Cole Nat'l Corp,* 762 F.2d 1569, 1580 (11th Cir. 1985) (improperly substituting "normally" for "ordinarily"). This decision predated the wholesale rewrite of Rules 702 and 703 in the year 2000. Shortly after that rewrite, the Eleventh Circuit held as follows:

> [W]e hold that hearsay evidence relied upon by an expert in forming his opinion, as long as it is of a type regularly relied upon by experts in that field, is a "firmly rooted" exception to the general rule of exclusion of hearsay statements . . ..

*United States v. Brown,* 299 F.3d 1252, 1258 (11th Cir. 2002). The Heller Report is such evidence. *See* Carroll Report at 25. Given that *Brown* appears to supersede *American Key,* no court has even cited the *American Key* decision for the past seven years. Moreover, Carroll is always free to adopt the "factual material, not opinions" in the Heller Report, which is what Carroll did. *Kuithe v. Gulf Caribe Maritime, Inc.,* Civil Action No. 08-0458-WS-C. (S.D. Ala. Nov. 25, 2009).

The Defendants' attack on Carroll is contrary to every genuinely applicable legal standard, most notably Rule 702 itself. As to Rule 702, Carroll is qualified as an expert in the review of advertising for defamation risk, and the cost of reputation repair, by his knowledge, skill, and experience. Rule 702. As explained above, Carroll's "specialized knowledge" will help the trier of fact to determine facts in issue in this case, *e.g.,* reckless disregard of the truth, and damages. Rule 702(a). His testimony is based on "sufficient facts and data" not only because he has reviewed sixteen (16) of the individual ads that the Defendants launched against Grayson, but he also bases his opinions on the myriad of other statements that he has had to review, for decades, to judge their defamation risk. Rule 702(b). The tests that Carroll articulates and applies to such statements are reliable; if they were not, then they would have exposed the *Times of London,* the numerous authors whom Carroll has advised, and all of Carroll's clients to massive defamation liability. Rule 702(c). Finally, Carroll has consistently and reliably applied those tests to the Defendants' statements. Rule 702(d).

Under the controlling legal authority, the Defendants' attack on Carroll falls well short of establishing that his testimony is *inadmissible.* These arguments are the stuff of "vigorous cross-examination" at trial, not a valid *Daubert* motion (even if it were directed against "shaky" evidence here, which it is not):

> A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a

13

"seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595.

Advisory Committee Notes on 2000 Amendments to Rule 702. As this Honorable Court has ruled:

> In determining the admissibility of expert evidence, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation marks omitted). Indeed, cross-examination, contrary evidence, and instruction on the burden of proof are the proper tools for challenging questionable expert evidence.

*Woienski v. United Airlines, Inc.*, 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019).

Therefore, and for all the reasons enumerated above, the Defendants' *Daubert* motion against Nicholas Carroll's expert testimony is without merit and should be denied.

<CERTIFICATE OF SERVICE ON FOLLOWING PAGE>

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 18, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which furnished a copy of the foregoing via electronic mail to all counsel of record.

*s/ Tucker H. Byrd*
-----------------------------------------
**Tucker H. Byrd**
Florida Bar No. 381632
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Secondary Email: mmanley@ByrdCampbell.com
*Attorneys for Plaintiff*