# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

ALAN GRAYSON,

    Plaintiff,

vs.                              CASE NO.: 6:20-cv-1824-Orl-22LRH

NO LABELS, INC.; PROGRESS TOMORROW, INC.; UNITED TOGETHER, INC.; NANCY JACOBSON, MARK PENN, and JOHN DOE(S),

    Defendants.

## PLAINTIFF'S OPPOSITION TO *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF DAVID HELLER

Plaintiff, Alan Grayson ("Grayson"), opposes the Defendants' motion to exclude the expert testimony of David Heller, on the following grounds:

The subject of this motion is the Heller Report. As Heller explains:

> I have worked as a political media consultant in the Democratic Party nationally since 1991. Over the course of my thirty years in this field, I compiled one of the best won-loss record in the Democratic Party in terms of helping my clients win election to Congress. Over the course of my career, I have helped elect or re-elect to federal office 25 different Members of Congress.

Heller Report at 2 ¶ 3. In this work, Heller has designed and executed media campaigns to promote these candidates to the public, formulating the ads and then selecting the advertising placements to disseminate them. Motion Ex. 2 at 10. Heller summarizes his expert opinion as follows:

> It is my opinion that the economic damages sustained by Grayson equal $16.777 million (the "Enterprise Value"), which is based on the cost of producing and purchasing enough mail, television and Internet advertising to reverse the impact upon Grayson's standing with residents of the 9th Congressional District of Florida and other voters in the greater Orlando area who were exposed to the defamatory statements contained within Defendant's mail, television and Internet ads and the Defendant's website.
>
> My opinion is based on the cost of writing, producing and placing television advertising, Internet advertising and direct mail advertising and assumes the trier of fact finds that the Defendants did knowingly make false statements of fact regarding Grayson, published those false statements in thirteen direct mail pieces, a web site and various Internet advertisements, and did so in such a way as to ensure that those false statements of fact were viewed, read and/or received by likely Democratic primary voters in the 9th Congressional District of Florida, where Grayson was at the time pursuing federal public office.

Heller Report at 4 ¶ 8 & 6 ¶ 12. The Heller Report then continues with 28 paragraphs of extremely detailed, particularized, comprehensive and nuanced information about the design and cost of this remedial advertising campaign, explaining the need for each component, and "costing it out" down to the cost of each ad. This is highly specialized knowledge that no trier of fact would have any reason to possess. It is not only "helpful" but critical in reliably assessing Grayson's damages. *See* Fed. R. Evid. ("Rule") 702.[1]

The Defendants' motion does not really attack David Heller's expert report; it attacks a straw man that it attempts to substitute for David Heller's report. This

---

[1] "Of particular relevance to an expert proffered for his experience, the court notes that neither *Daubert* nor its progeny preclude experience-based testimony ...." *Butler v. First Acceptance Ins. Co., Inc.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. Aug. 17, 2009) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Additionally, an expert is permitted to form conclusions by extrapolating from existing data. *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)) *Woienski v. United Airlines, Inc.*, 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019).

*Daubert* motion is largely untethered from the succinct legal requirements of Rule 702, standards that the motion barely even acknowledges:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.* If the Defendants had referred to these governing standards, they would have had no choice but to concede that David Heller is an expert in the field of reputational advertising (and its subset, political candidate advertising) by knowledge, skill, experience, training and education; that he possesses specialized knowledge (*i.e.,* how to structure a reputational campaign and what it costs) that will help the trier of fact to understand the evidence and determine the amount of damages; that his testimony is based on ample and copious facts and data regarding the structuring and cost of reputational advertising in Central Florida and elsewhere; that Heller's testimony is the product of reliable principles and methods that he has employed in countless candidate advertising campaigns; and that Heller has reliably applied those principles and methods to the facts of this case. The Defendants' real gripe is that it will take an enormous amount of money to undo the damage that they did to Grayson's reputation, a sad but true fact that in no way diminishes the validity of Heller's

3

testimony.

The "bottom line" regarding the Heller testimony is that the "triers of fact" here will come to this case with absolutely no idea how to design a remedial advertising campaign, or what it would cost (other than, perhaps, the cost of a postage stamp). The Heller Report is replete with such information, based on Heller's decades of experience in designing and buying media for advertising campaigns. David Heller's testimony is not only an appropriate way to inform the trier of fact of what kind of advertising campaign is necessary, and what it would cost; it is *the most* appropriate way of doing so. Every single attack by the Defendants on it is one to be made, if at all, on cross-examination, they go (at best) to weight rather than admissibility, and they do not constitute any valid basis for excluding Heller's testimony.

### The 'Grand Canyon' Between Heller's Report and the Defendants' Mischaracterization of It

Time and time again, the Defendants' *Daubert* motion attacks what amounts to a cartoonish caricature of the Heller Report, rather than the report itself. For instance:

| Defendants' *Daubert* Motion | Heller Report |
|---|---|
| "Heller is not qualified to opine on reputational repair or damages, as his expertise is solely in political media consulting." (p. 2) | Designing ad campaigns, formulating ads, and buying media for political candidates is, in essence, reputational advertising. (pp. 2-4). Heller testified to this. Dep. at 10:10-14. |
| Heller did not "conduct[] or review any research or studies that establish that . . . Grayson sustained any harm." (p. 2). Heller is "unaware of any exit polling." (p. 5). Heller "merely assumes that | Heller reviewed the anti-Grayson ads themselves [calling them "among the most defamatory allegations that I have seen in my thirty years of making political commercials" (p. 12)], each of |

4

| | |
|---|---|
| reputational damage occurred." (*id.*) | the Defendants' ad buys publishing those ads (pp. 6-13), the Defendants' own pre-smear poll showing Grayson well ahead, and the post-smear election results (pp. 4-5).[2] |
| Heller uses "arbitrary multipliers" (p. 2) | Heller's multipliers are not "arbitrary"; they are based on the widely recognized principle that "negative advertising typically has much greater impact on voters than does positive advertising – and, as a result, is that much more difficult to undo." (p. 7) |
| Heller's "model of damages [] is not cognizable as a matter of law." (p. 2) | Heller has formulated and calculated the cost of a remedial advertising campaign. This is precisely the model of defamation compensatory damages that is "cognizable" by law. |
| "Heller's entire damages model is based on calculations as of August 2022." (p. 4) | The jury will have to assess damages at the time of trial. August 2022 is a good estimate of the time of trial. As it happens, there also will be a primary election in August 2022, as there was in August 2018. This provides "real world" circumstances for which Heller can make his calculations. (*see* p. 2) |
| Grayson is presently running in the August election for the U.S. Senate, not the U.S. House (p. 4) | Heller is calculating the cost "for Mr. Grayson to run . . . advertising to undo the damage done to his reputation by the Defendants['] . . . advertisements." (p. 2). For the purpose of making that calculation, it doesn't matter whether Grayson runs for the Senate, the House, something else, or nothing at all. |
| Heller doesn't "know what Grayson's reputation would be in 2022." (p. 5) | This is irrelevant to the cost of undoing the damage that the Defendants did in 2018. |

Even if these "talking points" were valid, they would merely be "efforts to impeach"

---

[2] The Defendants' notion that a defamation damages expert would have to do "exit polling" as a precondition to testifying is simply bizarre, and noticeably bereft of any legal authority.

5

Heller "on every tiny detail," that amount to nothing but "nitpicking," *Strianese v. Secretary,* Case No. 2:08-cv-159-FtM-36DNF. (M.D. Fla. 2011); indeed, they are an ignoble attempt to "nitpick" the Heller Report "into oblivion." *Granfinanciera, SA v. Nordberg*, 492 US 33, 85 (1989) (White, J., dissenting). They go (at best) to weight, not admissibility.

The Defendants' constant carping about Heller's supposedly "astronomical" figure of $16.777 million[3] as the cost to "undo the damage done to [Grayson's reputation by the Defendants['] . . . advertisements" (Heller Report at 2) is, as Heller explains, a direct result of manner in which the Defendants conducted their anti-Grayson campaign. For instance, as Heller notes:

- "In my expert opinion, negative advertising typically has much greater impact on voters than does positive advertising – and, as a result, is that much more difficult to undo. As Ms. Jill Buckley, a pioneer among women political consultants, noted 'People say they hate negative advertising. But it works. They hate it and remember it at the same time. The problem with positive is you have to run it again and again and again to make it stick. With negative, the poll numbers move within three or four days.'" Heller Report at 7. Therefore, Grayson would have to send 3.5 times as many reputation restoration mail pieces "to at least begin to undo the damage done by the Defendants['] direct mail pieces alone . . . ." *Id.* at 11.

- Postage alone would cost four times as much today. *Id.* at 9.

- We do not know to whom in Florida Congressional District 9 ("FL-9") the

---

[3] In the context of expenditures by political candidates, for positive "reputation restoration" and otherwise, this amount is not astronomical at all. There have been ten U.S. House of Representatives races in which more than $30 million was spent. https://www.opensecrets.org/news/2020/12/house-races-four-of-10/

- Defendants sent their mailers,[4] so remedial mailers would require a wider spread. *Id.* at 10-11.

- Heller says that the Defendants' specific defamatory statements "are all among the most defamatory allegations that I have seen in my thirty years of making political commercials." *Id.* at 12.

- "There is no comprehensive evidence at this time as to how much advertising on various social media channels Defendant bought to air its ads attacking Grayson." *Id.* at 12.[5] Nor have the Defendants produced any information on the targeting of their online ads. Hence, once again, remedial advertising would require a wider spread.

- Heller continues: "For all of these reasons, I believe that the only way Grayson could reasonably expect to clear his name and run for political office as if Defendant's attacks had never occurred would be for him to run ads on television. There simply is no way for Grayson to know which voters actually viewed Defendant's Attack Ad mail pieces and/or watched Defendant's Attack Ads on Facebook or other social media channels. For Grayson to have the best opportunity to reach those who were unduly influenced by Defendant's defamatory allegations, he would need to run television ads across the Orlando media market." *Id.* at 14.

- Television advertising costs are already double or triple what they were in 2018. *Id.* Heller projects that the "cost per point" of television advertising later this year in Orlando (generally, the cost of reaching one percent of the audience with one ad) will be between $1500 and $1900. *Id.* at 15.

- Heller then adds: "If one believes, as I do, that negative ads have, as political media consultant Jill Buckley said, three or four times the impact of positive ads and, as George W. Bush's ad-maker, Mark McKinnon said, that those negative ads are typically amplified by the news media, it is simply not realistic to believe that direct mail alone can restore Grayson's reputation to what it was before the Attack Ads were unleashed on an unsuspecting electorate. In my expert opinion, the only way for Grayson to undo the damage wrought by the Attack Ads would be by supplementing his direct mail pieces with the production and airing of a series of television advertisements – at least two separate advertisements rebutting each false claim." *Id.* at 16. This requires a total of six ads, each with "between 1,200 and 1,500 GRPs [Gross Rating Points]

---

[4] This is one subject of the current Grayson objections to the Magistrate's order denying Grayson's motion to compel the production of vendor documents.
[5] Because, here again, the Defendants failed to produce it.

behind it." *Id.* at 16.

Therefore, according to Heller's meticulous analysis, it is entirely understandable why it would be very expensive to undo the damage that the Defendants have caused – much like restoring a city destroyed by a nuclear weapon would cost a lot more than what the weapon costs.[6]

Also notable, for present purposes, is these facts and judgments about advertising campaign design and cost are "beyond the ken of the average juror," as the Defendants put it. Motion at 8.

> "There is no more certain test for determining when experts may be used than the common[-]sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952).

Advisory Committee Notes to Proposed Rule 702. Heller's testimony passes this acid test.

Although the Defendants' factual challenges to the Heller Report are not well-taken, they formulate them into three specific arguments, addressed in turn below:

**Heller is, in fact, qualified to opine on reputational repair or damages.** The governing legal standard on an expert's qualifications is as follows:

> [T]he district court must analyze the expert's credentials "in light of the subject matter" and "consider whether [the] expert is qualified to testify competently

---

[6] The Defendants also are being less than candid with the Court when they state that they spent $272,020.74 here. Motion at 2 & 6. A *partial, interim* tally from the Defendants' own files puts the figure at $540,366.94. **Ex. A**. Nancy Jacobson estimated that the two anti-Grayson campaigns cost "over $1.5 million." **Ex. B**. And this figure is obviously incomplete; for instance, it lists the cost of only one anti-Grayson poll, and there were at least two.

8

> regarding the matters he intends to address." *Galarza v. Carnival Corp.*, No. 15-24380-CIV, 2016 WL 7507883, *6 (S.D. Fla. Aug. 8, 2016) (citations omitted). This is not a stringent standard, and "so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to the credibility and weight, not admissibility." *Id.*

*Woienski v. United Airlines, Inc.,* 383 F. Supp. 3d 1342, 1347-48 (M.D. Fla. 2019).

In their legal discussion on this issue (Motion at 10-14), the Defendants simply posit that Heller is not qualified to testify as to "reputational repair." Hitting on all of their erroneous "talking points" again, they fail to identify even one legal precedent where an expert witness like Heller was ruled unqualified.

The Defendants have not formulated the legal issue properly. The issue is not whether David Heller is an expert on "reputational repair" *per se* (if there even is such a thing)[7]; the issue under Rule 702 is whether Heller possesses "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702(a). In other words, it is the usefulness of the knowledge that matters, not how the expert is pigeonholed – quite simply, the requirement is that "the testimony [should] address a subject matter on which the factfinder can be assisted by an expert." Advisory Committee Notes on 2000 Amendments to Rule 702. As the Rule 702 Advisory Committee observed:

> The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education." Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large

---

[7] The Defendants have not identified a single legal precedent that even uses the term "reputational repair," much less judges whether one is an "expert" in that "field."

group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.

Advisory Committee Notes on Proposed Rule 702. Heller is like a banker or landowner, testifying to land values. They do not need to be narrow "experts on land values" *per se* in order to offer their specialized knowledge that will help the trier of fact to determine damages, and neither does Heller.

The Advisory Committee for Rule 702 also provides this pertinent example:

> For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations.

*Id.* No one suggests (as the Defendants do here) that only an "expert on drug transaction code words," rather than a law enforcement agent, can testify to such; the only issue is whether the expert has "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702(a).

Heller's wide-ranging relevant experience is similar to that of the damages expert in the *Local Access* case:

> First, an expert must be "qualified to testify competently regarding the matters he intends to address." *Id.* at 1291 (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). "[E]xperts may be qualified in various ways, including by . . . training, education, and experience." Seamon v. Remington Arms Co., 813 F.3d 983, 988 (11th Cir. 2016) (quoting United States v. Frazier, 387 F.3d 1244, 1260-61 (11th Cir. 2004)) (internal quotation marks omitted). Other indicia of an expert's qualifications may include licenses held by the expert, publication in the pertinent field, and membership in relevant professional societies. *See* Ferrara & DiMercurio v. St. Paul Mercury Ins., 240 F.3d 1, 8 (1st Cir. 2001) (considering expert's licenses in assessing qualifications); Am. Tech. Res. v. United States, 893 F.2d 651, 656 (3d Cir. 1990) (considering expert's publications and membership in professional societies in assessing qualifications).

> Peerless does not challenge Mr. Gaines' qualifications to assess and appraise business assets. Indeed, Mr. Gaines has earned degrees in economics and business administration, holds a number of active brokerage, trading, and banking licenses, has published two articles on the sale of business entities, and has over twenty years of financial advisory experience, including in the areas of divestitures, leveraged buyouts, and mergers and acquisitions. The Court therefore finds Mr. Gaines sufficiently qualified to competently testify in the area of business asset valuation.

*Local Access, LLC v. Peerless Network, Inc.*, No. 6:14-cv-399-Orl-40TBS. (M.D. Fla. Aug. 24, 2016). Just as Stephen Gaines did not have to have spent his career exclusively valuing business assets in order to have specialized damages knowledge of value to the jury, David Heller does not need to have worked exclusively and narrowly on "reputation repair" in order to testify competently about how to design and price out a reputational advertising campaign.

**Heller's methodology is reliable.**  David Heller has spent the last thirty years designing and executing successful regional advertising campaigns that elevate the reputation of individuals to the point that they are elected to public office. The notion that Heller's "methodology" to design and price out such a campaign here is "unreliable" (Motion at 10-14) verges on frivolous.

Noticeably absent from the Defendants' attacks on Heller is any *evidence* that Heller's methodology is unreliable. Instead, we have the spectacle of the Defendant's attorneys posing as experts, "testifying" about how *they think* that Heller should have conducted his analysis. This kind of "woulda-coulda-shoulda" thinkspeak does not impeach Heller's methodology at all.

Here again, although the Defendants complain that Heller did not "measure the

reputation of Alan Grayson in 2018 and . . . in 2022," the Defendants fail to identify a single case, among the 100,000+ reported cases on defamation, where expert testimony on defamation damages was excluded because the expert failed to take such measurements. On the contrary, such measurements could be tainted by all sorts of extraneous variables, whereas Heller's testimony is laser-focused on quantifying "the damages suffered by Mr. Grayson <u>as a result of the claims raised in the referenced proceedings.</u>" Heller Report at 2 (emphasis added).[8] The Heller Report expressly focuses on the Defendants' specific defamatory messaging and their dissemination of it, and what it would take to neutralize it, rather than making back-of-the-envelope calculations based on "exit polls" and the like.

The Defendants' citation to *Peer v. Lewis*, No. 06-60146-CIV, 2008 WL 2047978, at *10 (S.D. Fla. May 13, 2008), *aff'd*, No. 08-13465, 2009 WL 323104 (11th Cir. Feb. 10, 2009), first, has nothing to do with evaluating the methodology of the Heller Report and, second, has nothing to do with this case. In *Peer,* a competing political candidate improperly pulled a credit report on the plaintiff, who filed a complaint under the Fair Credit Reporting Act. His only evidence in support of damages was his own testimony that he felt that he had had a "good chance" of winning the election. *Id.* at 16. Needless to say, the court was not impressed with that argument. In any event, what this has to do with the validity of Heller's analysis is impossible to discern.

---

[8] The same thing would be true if, as the Defendants urge, David Heller had based his calculations merely on their own pre-smearing polling (showing Grayson well ahead) and the election results (showing Grayson losing). Motion at 11.

As the Heller Report clearly states, Heller is evaluating what it would cost to reverse the impact of the Defendants' attacks on Grayson's reputation, not how much money Grayson would have earned if he had won the election.

The Defendants' citation to *Edmondson v. Caliente Resorts, LLC,* No. 8:15-CV-2672 (M.D. Fla. Aug. 31, 2017) is equally unavailing. That was not a defamation case, either. In *Edmonston,* models sued for the unauthorized use of their images, and they offered a model's agent as an expert witness on damages. The agent was allowed to testify as to the fair market value of the models' images, but he was not allowed to testify as to a "multiplier" for "reputational harm." *Id.,* slip op at 5. There was no evidence in that case of "reputational harm," nor was that the basis of the models' claims. *Edmonston,* like *Peer,* has absolutely no bearing on the reliability of Heller's methodology.

Without delving into every erroneous argument proffered by Defendants' counsel, it is enough to say that these are, in fact, nothing more than arguments by Defendants' counsel. This is the stuff of "vigorous cross-examination" at trial, not a valid *Daubert* motion (even if it were directed against "shaky" evidence):

> A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595.

13

Advisory Committee Notes on 2000 Amendments to Rule 702.[9]

**<u>Heller's damages are "cognizable" and "recoverable" as a matter of law.</u>**

The Defendants' last-ditch argument is that Heller is testifying to damages that are not "cognizable" or "recoverable," as a matter of law, on the theory that a defamation victim cannot recover damages for loss of reputation unless he spends the money to repair his reputation first. Motion at 14-16. This argument finds no support in the law. The Defendants simply conflate and confuse *an inapplicable pleading rule under different causes of action* with compensatory damages for defamation.

Florida's standard jury instruction for defamation damages, as promulgated by the Florida Supreme Court, provides as follows:

> 405.10 DEFAMATION DAMAGES
>
> If you find for (defendant), you will not consider the matter of damages. But, if you find for (claimant), you should award (claimant) an amount of money that will fairly and adequately compensate (claimant) for such [loss] [injury] [or] [damage] as the greater weight of the evidence shows was caused by the [statement] [publication] in question. You shall consider the following elements of damage:
>
> a. *Injury to reputation or health; shame, humiliation, mental anguish, hurt feelings:*
>
> Any injury to reputation or health and any shame, humiliation, mental anguish, and hurt feelings experienced in the past [or to be experienced in the future]. **There is no exact standard for fixing the compensation to be awarded**

---

[9] *Accord Woienski v. United Airlines, Inc.*, 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019):

> In determining the admissibility of expert evidence, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation marks omitted). Indeed, cross-examination, contrary evidence, and instruction on the burden of proof are the proper tools for challenging questionable expert evidence.

> **on account of such elements of damage.** Any award should be fair and just in the light of the evidence.

*In re Standard Jury Inst. Civ. Cases*-09-01, 35 So. 3d 666 (Fla. 2010) (emphasis added).[10]

In other words, under Florida law, the victim of defamation is entitled to *compensatory damages for the injury caused by the defamation. This is exactly what the Heller Report calculates.*

Compensatory damages are a form of "general damages."[11] Distinct from general damages are "special damages." Under the Florida state court rules of civil procedure: "When items of special damage are claimed, they shall be specifically stated." Fla. R. Civ. P. 1.120(g).[12] Part of such a "specific statement" in pleading is the "special damage rule," which "requires the [special damages] plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." W. Page Keeton, *et al.*, Prosser and Keeton on The Law of Torts § 128 at 971 (5th ed.1984)

Therefore, unsurprisingly, in one Florida state court case that the Defendants cite – not a defamation case -- the court ruled:

---

[10] *See also Hustler Magazine, Inc. v. Falwell*, 485 US 46, 52 (1988) ["Since *New York Times Co. v. Sullivan*, 376 U. S. 254 (1964), we have consistently ruled that a public figure may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood . . . ."]

[11] General damages are:

> Damages that the law presumes follow from the type of wrong complained of; specif., compensatory damages for harm that so frequently results from the tort for which a party has sued that the harm is reasonably expected and need not be alleged or proved. General damages do not need to be specifically claimed. - Also termed direct damages; necessary damages.

*Black's Law Dictionary* 446 (9th ed. 2011).

[12] The federal rule is worded somewhat differently. Fed. R. Civ. P. 9(g).

> In this case, appellants have claimed only that their stock declined in value. Their pleading does not reveal any "realized loss," that characteristic of "special damage" that is a crucial element of the cause of action. On remand, appellants shall be given leave to replead the injurious falsehood count.

*Salit v. Ruden, McClosky, Smith, Schuster*, 742 So. 2d 381, 388 (Fla. Ct. App. 4th Dist. 1999). Note that the court did not rule out such damages (much less rule out expert testimony on them); rather, the court merely ordered that special damages be pled properly.

*Falic v. Legg Mason Wood Walker, Inc.,* 347 F. Supp. 2d 1260 (S.D. Fla. 2004), another case cited by the Defendants, also is not a defamation case; like *Salit,* it is an "injurious falsehood" case, which is a horse of a different color under Florida law:

> The tort of injurious falsehood protects the economic interests of an injured party against pecuniary loss, in contrast to defamation, which protects the personal reputation of the injured party. Callaway Land & Cattle Co., Inc., v. Banyon Lakes C. Corp., 831 So.2d 204, 209 (Fla.App. 4th DCA 2002). The gist of injurious falsehood is the "intentional interference with another's economic relations." *Salit,* 742 So.2d at 386 (quoting Procacci v. Zacco, 402 So.2d 425, 426 (Fla. 4th DCA 1981)).

*Id.* at 1268. In "injurious falsehood" cases like *Falic* and *Salit,* unlike in defamation cases like this one, the plaintiff *must* plead special damages, and they must be "specifically stated" in that pleading.

> To survive summary judgment on their injurious falsehood claim, Plaintiffs must specifically plead special damages. *Id.* at 388. The special damage rule "requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." *Id.* (quoting PROSSER AND KEETON, § 128 at 971). Special damages are actual, out of pocket losses which must be proven by specific evidence as to the time, cause and amount; whereas, general damages encompass the more customary harms inflicted by a defamatory falsehood, such as impairment of reputation and standing in the community. Continental Cas. Co. v. Southwestern Bell Tel. Co., 860 F.2d 970, 976 (10th Cir.1988). The chief characteristic of special damages is a realized or liquidated loss. *Salit,* 742 So.2d at 387.

*Id.* Hence the *Falic* court ruled: "Plaintiffs' mere allegation that the value of their stock in Duty Free (via their interest in DFA Holdings) depreciated does not constitute a realized loss required for special damages." *Id.* at 1269. This "injurious falsehood" ruling has absolutely nothing to do with the defamation claim in this case, much less David Heller's proffered testimony on damages.

Just as *Falic* and *Salit* digress into the irrelevant elements of an "injurious falsehood" claim, the Defendants' citation to *Daniels v. HSN, Inc.,* No. 818CV3088T24JSS, 2020 WL 533927, at *7 (M.D. Fla. Feb. 3, 2020), plumbs the depths of an irrelevant claim of defamation *per quod*. The *Daniels* lawsuit was based on the following e-mail exchange:

> "Page Six" writer, Oliver Coleman . . . , emailed HSN asking if HSN wanted to comment on a story that he was writing and stated the following:
>
> We're looking into a story regarding the HSN/QVC merger. We're told that there has been substantial discord caused by an email sent by Gordie Daniels to representatives of companies who appear on HSN. In the email, Daniels laid out a "new direction" with "Dos" and Don't" [sic] for appearing on the network. A number of people who received the email responded badly to it, and . . . one said it was "condescending."
>
> (Doc. No. 40-50). In response, HSN stated that "[t]he email you referenced . . . was not authorized, reviewed or approved for distribution."

*Id.* Daniels then sued HSN (*not* 'Page Six') for defamation, regarding HSN's statement to Coleman that Daniels' e-mail "was not authorized, reviewed or approved for distribution."

The court in *Daniels* understandably could not discern how this statement by HSN regarding the Daniels e-mail was defamatory. Daniels argued that it somehow

qualified as defamation *per quod.* As the *Daniels* court explained:

> Libel *per quod* requires the statement to be put in context so as "to demonstrate [its] defamatory meaning or that the plaintiff is the subject of the statement." To allege a claim for libel *per se,* however, the plaintiff need not show any special damages because per se defamatory statements are "so obviously defamatory and damaging to [one's] reputation that they give rise to an absolute presumption both of malice and damage." . . .
>
> Thus, when a defendant's statement is *per se* defamatory, the plaintiff need not prove that he was damaged by the statement because it is presumed that the statement caused him damage. See Alan v. Wells Fargo Bank, N.A., 604 Fed. Appx. 863, 865 (11th Cir. 2015); Risk Insurance and Reinsurance Solutions v. R + V Versicherung, 2007 WL 9700868, at *7 (S.D. Fla. June 6, 2007)(stating that "[w]hen words on their face, and without the aid of extrinsic proof, are injurious, they are said to be defamatory *per se* and no proof of damages is necessary to establish liability). Conversely, a plaintiff must prove special damages when asserting a claim for defamation *per quod.* See Risk Insurance (stating that "slander *per quod* involves words not harmful on their face, and therefore requires proof that they caused special damages").

*Id.* The *Daniels* court ruled that HSN's statement to Coleman that Daniels' e-mail "was not authorized, reviewed or approved for distribution" was not "harmful on its face," and, therefore, that Daniels had to plead and prove special damages (which he had failed to do).

This case, of course, is totally different. Not only are the Defendants' attacks on Grayson "harmful on their face," but the Heller Report states that:

> These ads included accusations against Grayson which were so heinous that, in my expert opinion, few (if any) candidates for Congress could have survived them. Charges of two decades of spousal abuse and domestic violence (on a daily basis), multiple ethics violations, soliciting others while serving in Congress to invest in his Cayman Islands hedge fund, violating federal laws, and "making money off of a company in Africa that promotes slave labor" are all among the most defamatory allegations that I have seen in my thirty years of making political commercials.

Heller Report at 12. Hence no "extrinsic proof" is required to establish that the

Defendants' statements were harmful to Grayson.

For all the reasons enumerated above, the Defendants' *Daubert* motion against David Heller's expert testimony on damages is entirely meritless, and should be denied.

<<CERTIFICATE OF SERVICE ON THE FOLLOWING PAGE>>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 18, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which furnished a copy of the foregoing via electronic mail to all counsel of record.

*s/ Tucker H. Byrd*
**Tucker H. Byrd**
Florida Bar No. 381632
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Secondary Email: mmanley@ByrdCampbell.com
*Attorneys for Plaintiff*