## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ALAN GRAYSON,

          Plaintiff,

vs.

                                    CASE NO.: 6:20-cv-1824-Orl-22LRH

NO LABELS, INC.; PROGRESS TOMORROW, INC.; UNITED TOGETHER, INC.; NANCY JACOBSON, MARK PENN, and JOHN DOE(S),

          Defendants.

_____

## PLAINTIFF'S OPPOSITION TO DEFENDANT PROGRESS TOMORROW, INC.'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Alan Grayson ("Grayson"), opposes Defendant Progress Tomorrow, Inc's ("PT's")[1] Motion for Summary Judgment, on the following grounds:

PT's motion for summary judgment looks very much like one of PT's political attack ads, featuring the ritual condemnation of the opponent and his motives, specious citations to material that offers no support whatever for the proposition offered, and equal dollops of misleading argument and outright fabrication. It lacks, however, the one thing that matters, *i.e.,* "the movant show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. ("Rule") 56(a).

_____

[1] Grayson notes that since this motion was expressly filed only on behalf of PT, even if it had any merit, it would support summary judgment in favor of only that one defendant.

To prevail on a summary judgment motion, the movant must show "that there
is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v.
Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court
must "view the evidence and all factual inferences therefrom in the light most
favorable to the non-moving party, and resolve all reasonable doubts about the
facts in favor of the non-movant." *Davila v. Gladden,* 777 F.3d 1198, 1203 (11th
Cir. 2015) (quoting *Carter v. City of Melbourne,* 731 F.3d 1161, 1166 (11th Cir.
2013) (per curiam)). "An issue of fact is `material' if, under the applicable
substantive law, it might affect the outcome of the case. An issue of fact is
`genuine' if the record taken could lead a rational trier of fact to find for the
nonmoving party." *Harrison v. Culliver,* 746 F.3d 1288, 1298 (11th Cir. 2014).

*Affordable Bio Feedstock, Inc. v. U.S.,* 529 F. Supp. 3d 1298, 1302 (M.D. Fla. 2021).

Summary judgment should only be granted "[w]here the record taken as a
whole could not lead a rational trier of fact to find for the non-moving
party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587,
106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*Sos v. State Farm Mut. Auto. Ins. Co,* 396 F. Supp. 3d 1074, 1078 (M.D. Fla. 2019).[2]

## I.    <u>Chronology</u>

<u>2012</u>: Grayson elected to Congress from Orlando, in Florida District 9 (FL-9). (He had
served one earlier term.) **Ex. A.**
<u>2013</u>: Grayson's putative wife, Lolita, files for divorce. She was, however, married to
someone else at the time of their wedding, and had lied to the Government to obtain a
marriage license with Grayson. *Id.*
<u>2014</u>: Lolita's lawyer tells her that there is no valid marriage, refuses to go along with her
fabrication of evidence that there had been a divorce predating her wedding with
Grayson, and drops off the case. The next time Lolita sees Grayson, she punches him
twice in the face, in front of their children and others. She tells the police that she hit
Grayson, and he did not hit her. She then, however, fakes medical injuries, and seeks a
restraining order against Grayson. A video demonstrates, however, that she has perjured
herself, and their adult daughter provides a sworn statement that Grayson had never hit
Lolita. Lolita then withdraws the petition. She later sends Grayson a written apology,
acknowledging that he had never abused her. Despite Lolita's subsequent defamatory
attacks on Grayson, including one a week before Election Day, Grayson is reelected to
Congress by a substantial margin. *Id.*
<u>2015</u>: Lolita continues to perjure herself in the divorce proceeding, with a total of eight
lawyers withdrawing from representing her. She continues to abuse the children

---

[2] The Defendants' brief studiously avoids even acknowledging these legal standards for obtaining
summary judgment, much less satisfying them.

physically, and make false charges of assault against them, just as she had done (repeatedly) to Grayson. In one instance, she bites one of the children, and then tells him that she will have him arrested. Two of the minor children run away from home to escape Lolita's abuse, and two others refuse to return to her. Lolita refuses to undergo court-ordered psychiatric testing. Grayson takes full custody of all the children, and Lolita has no shared custody or visitation rights. (As of today, the children have not seen or spoken to Lolita for several years.) *Id.*

**2016**: Grayson runs for the Senate. Lolita continues to defame Grayson, generating some media coverage. Grayson's political opponent files spurious allegations with the Office of Congressional Ethics ("OCE"). The Defendants' own would-be "expert witness," who served as Defendant No Label's spokesperson at the time, has pointed out that OCE does not have the legal authority to make any findings, much less mete out penalties to House Members. All that OCE can do is either: (a) dismiss frivolous allegations, or (b) refers the allegations to the House Committee on Ethics (HCE). Motion Ex. 9. The OCE referred the allegations against Grayson to the HCE, generating some media coverage. The HCE found the allegations meritless, and quickly dismissed them. In the subsequent 2016 election, Grayson won the vote in FL-9, but he was not well-known outside Orlando, so Grayson lost the statewide vote. Also in 2016, No Labels groups spent hundreds of thousands of dollars of negative ads against Grayson's new wife, Dr. Dena Grayson, when she ran for Grayson's seat. **Ex. A.**

**2017**: In at least two separate No Labels meetings with its donors, No Labels touts its ability to destroy Grayson's political career. **Ex. B & C**.

**2018**: Grayson decides to run for his former seat in FL-9. The Defendants poll the race and are informed as follows: "Attached are toplines from the FL-08 Dem primary poll. A few initial takeaways: - This race offers a good opportunity for No Labels to get involved to help disqualify Alan Grayson, as he currently leads in the race and is well-regarded in the district. - Grayson currently leads by 7 points in the vote, 45% to 38%." **Ex. F**, PT180. *The Defendants poll* a smear campaign exploiting Lolita's discredited and withdrawn allegations, and the dismissed OCE referral, and find that they can use them to ruin Grayson's reputation. *Id.* Grayson's lawyer sends a cease-and-desist letter to the Defendants, specifically noting that these statements are defamatory. **Ex. D.** The Defendants ignore this letter. Shortly before the election, they publish these statements in approximately half-a-million mail pieces to Orlando voters, followed by at least half-a-million defamatory online ads, *48 hours* before the election. The Defendants succeed in wrecking Grayson's reputation, and Grayson loses the election. **Ex. A.**

## II.   PT's Motion is Woefully Lacking in Admissible Evidence[3]

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Rule 56(c); *Ekokotu v.*

---

[3] "There is no need to file a separate motion to strike" to address this issue. Rule 56, advisory committee's note to 2010 amendments; *Campbell v. Shinseki,* 546 F. App'x 874, 879 (11th Cir. 2013).

*Federal Exp. Corp.,* 408 F. Appx. 331, 335 (11th Cir. 2011). "[I]nadmissible hearsay

cannot be considered on a motion for summary judgment." *Macuba v. Deboer,* 193 F.3d

1316, 1322 (11th Cir. 1999). Controlling legal authority provides that:

> On motions for summary judgment, we may consider only that evidence which
> can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794,
> 800 (11th Cir. 2005); . . . Hearsay — an out-of-court statement offered for the
> truth of the matter asserted — is generally not admissible as evidence at trial.
> See Fed. R. Evid. 801(c), 802. . . . [T]he mere possibility that unknown
> witnesses will emerge to provide testimony is insufficient to establish that a
> hearsay statement could become admissible at trial.

*Robertson v. Interactive College of Technology,* No. 17-11152 (11th Cir. July 16, 2018).

PT heeds not the hearsay rule. Out of PT's 45 exhibits, at least thirty of them

are inadmissible hearsay. Rules 801-807. Three of the exhibits that are not hearsay are

currently facing *Daubert* challenges to exclude them from evidence. Ex. 9, 19 & 38.[4]

Even those few PT exhibits that are not entirely inadmissible hearsay are strewn with

inadmissible hearsay. For instance, of the 245 pages of the Thomas Declaration, all

but four pages are inadmissible hearsay, *and Thomas is an attorney.* Ex. 20. Similarly, of

the 280 pages of the White Declaration, all but nine are inadmissible hearsay. Ex. 4.

The Defendants make no effort whatever even to argue that any exception to the

hearsay rule applies.[5]    Faced with such evidence, this Court has ruled that:

---

[4] And, in any event, would have to be excluded under Rule 56(c)(4): "An affidavit or declaration used
to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out
facts that would be admissible in evidence, and show that the affiant or declarant is competent to
testify on the matters stated." Even if this were not the case, the Court would have to consider and
deny Grayson's *Daubert* motions before the Court could consider such evidence here. *Bellitto v. Snipes,*
302 F. Supp. 3d 1335, 1347 n.12 (S.D. Fla. 2017).
[5] And, therefore, the motion must be denied. *See, e.g., Rivera v. Palm Beach County,* No. 19-CV-81111,
slip op. at n.18 (S.D. Fla. Mar. 15, 2021) ("Mr. Rivera also has not cited a hearsay exception under
which it would be admissible. Thus, I cannot rely on it to determine whether Ms. Powell is a valid

"Inadmissible hearsay cannot be presented on a motion for summary judgment…. The statements are inadmissible hearsay." *Stolinas v. Palmer,* 512 F.Supp.3d 1264, 1267 (M.D. Fla. 2021) (Chappell, J.).[6]

Finally, the Defendants' compliance with Rule 37(e) and 56(c) is dubious, at best. For instance, the Defendants' putative expert reports (Ex. 9, 19 & 38) are inadmissible for the reasons stated in Grayson's *Daubert* motions. The Defendants attached six anti-Grayson Facebook ads to their motion (Ex. 25, 30-32, 35 & 36), but they produced only three of them during discovery. They are not "allowed to use [such] information . . . on a motion." Rule 37(c)(1).[7]

### III. PT Doesn't Even Address the Falsity of the Publications, Much Less Demonstrate "The Lack of a Genuine Factual Dispute"

PT does something that, on its face, seems remarkable, *i.e.,* submit a 25-page brief to the Court baldly claiming that "Plaintiff Cannot Establish the Falsity of the Publications" (Motion at 13) *without ever referring to the statements that it published.* As this Honorable Court has ruled:

> **The moving party bears the initial burden of** identifying those portions of the record **demonstrating a lack of a genuine factual dispute**. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Hickson Corp. v. N. Crossarm Co.,* 357 F.3d 1256, 1260 (11th Cir. 2004).

---

comparator."); *Butler v. City of Ft. Lauderdale,* Case No. 14-60003-CIV-COHN/SELTZER. (S.D. Fla. Aug. 31, 2015). ["Hagemann contends that the memorandum is inadmissible hearsay, and the Court finds this argument well-taken. See Fed. R. Civ. P. 56(c)(2)"].

[6] *Accord Nakava, LLC v. South Pacific Elixir Co.,* Case No. 19-cv-81128-SINGHAL/Matthewman. (S.D. Fla. Aug. 10, 2020) (emphasis added): "SPEC's hearsay argument is well taken. There is no doubt that Bowman's assertion of several customers' confusion is inadmissible hearsay. It is offered only to show actual evidence of customer confusion; there is no exception under which it would be admissible. **The Court cannot consider this on a motion for summary judgment.** "

[7] There are also authenticity problems, including "documents" downloaded from a website. *See Smith v. Wilkie,* Case No. 3:17-cv-1333-J-JRK., slip op. at n.24 (M.D. Fla. Sept. 27, 2019).

*Barracula, LLC v. Geico Marine Ins. Co.,* F. Supp. 3d 1264, 1266 (M.D. Fla. 2019).

Frankly, Defendants cannot credibly argue that there is no "genuine factual dispute" regarding the truth of their statements. Grayson has personal knowledge regarding every single one of the Defendants' statements, and therefore can testify that they are false. *See* Rule 602. Grayson *has* testified that they are false – in Grayson's interrogatory answers, in his deposition, and now (again) in the attached declaration. **Ex. A.** Given how summary judgment works [*see Affordable Bio*, *supra*], there is just no way for the Defendants to establish the absence of a disputed issue of fact as to "truth."

The Grayson Declaration -- contrary to the what the Defendants do – looks at the malignant statements that the Defendants published against him. Grayson then parses through these publications, identifying the false and misleading statements. But even this exceeds what the law requires to deny this motion, because the Defendants have utterly failed to carry *their* burden to prove "truth."  The Defendants attempt (and, largely, fail) to establish that *they were not the first ones* to defame Grayson, since Grayson was also defamed by Lolita going back to 2014, as if that exculpates them. Regardless, there is a wide chasm between the Defendants' actual defamatory statements and their supposed source material (*i.e.,* seven 2016 media articles, the OCE referral, and Lolita's incessant, discredited, and recanted smears).  **Ex. A.** But even if Defendants had merely quoted Lolita's false allegations, that would not make them true, much less *indisputably* true, as summary judgment requires. More fundamentally, the Defendants persistently overlook that republication of defamation is not a defense

6

to defamation, *it's defamation.* As the Florida Supreme Court has held: "[E]ach publication of the defamatory charge was considered a new wrong which gave rise to a new and distinct cause of action. The plaintiff could institute suit against each person who republished the libel." *First America Dev. Corp. v. Daytona Beach N.-J. Corp.*, 196 So. 2d 97, 101 (Fla. 1966).[8] Therefore, if anyone is entitled to summary judgment here, it's Grayson, not PT.  *See* Rule 56(e)(4).

## IV.  <u>Actual Malice</u>

The following general background record evidence shows Defendants' malice:

- Grayson attended a No Labels meeting in 2013 for Members of Congress, and exposed their overt deceptions to the attendees during the meeting. **<u>Ex. A.</u>**
- No Labels spent lavishly on deceptive ads to defeat Grayson's current wife, Dr. Dena Grayson, when she ran for Congress in 2016. *Id.*
- At two different subsequent No Labels meeting with donors, two different attendees report that No Labels touted to donors their ability to destroy Grayson's political career. **<u>Ex. B & C</u>**.
- On the day after Grayson announced his 2018 candidacy, No Labels solicited and obtained a $500,000 contribution from Rupert Murdoch's son, the CEO of Fox News. Grayson and Fox News had attacked each other for years. Although Nancy Jacobson's testimony on this subject is very vague, one can infer from it that she solicited this anti-Grayson contribution from Murdoch's wife. **<u>Ex. A.</u>**
- The Murdoch contribution was deposited into the account of Defendant United Together, Inc., and then transferred – with no "paper trail" of the transfer and no consideration – to PT. One could infer that this was done to try to conceal the source of the funds. *Id.*
- As a result of the Defendants' defamation of Grayson and other candidates whom they defamed during 2018 elections, No Labels, Inc. received $2.1 million in cash from Super PACs like PT that it controlled. More than $200,000 of this came from PT. In addition to that, Margaret White, the No Labels Executive Director, received more than $300,000 from these No Labels Super PACs through her side-entity SCR Strategies (including $60,000 from PT during and shortly after the anti-Grayson campaign). Sasha Borowsky, the No Labels Chief of Staff, siphoned off thousands of dollars to her side-entity B Strategies, including $5000 from PT during the anti-Grayson campaign. *Id.*

---

[8] *Accord Musto v. Bell South Telecommunications*, 748 So. 2d 296, 299 (Fla. Ct. App. 4th Dist. 1999); *Cohen v. Trask*, 471 So. 2d 1294, 1295 (Fla. Ct. App. 4th Dist. 1985).

Overwhelming evidence in one document alone proves Defendants' actual malice regarding the spousal abuse defamation. The Defendants possessed an anti-Grayson opposition research report (from a source that they have refused to disclose) dating from 2015-16. **Ex. D.**  Starting with the Defendants' motion to dismiss (D.E. 16), the Defendants have repeatedly represented that they relied on this research report. The research report *informed the Defendants* that:

- Grayson's marriage to Lolita Carson-Grayson had been annulled, because of Lolita's bigamy (PT 48 & 50),
- Lolita falsely represented to the Court that a Grayson "paramour" was living at a former Grayson residence (PT 55 & 82),
- Lolita falsely represented to the Court that they owned property in Falls Church, VA, which (according to the opposition researcher) had been sold a decade earlier (PT 56),
- Lolita had falsely represented on her marriage license application to the Commonwealth of Virginia that she had been divorced in 1981, when in fact she was still married, and thus had committed bigamy (which is a crime) (PT 64),
- Lolita then lied to the divorce court about her prior marriage, not only in court filings but also in sworn affidavits and deposition testimony (PT 65-66),
- Lolita falsely claimed that Grayson knew that she had not been divorced from her first husband—at the same time as she swore, under oath, that she *had* been divorced from him (PT 66),
- Lolita's own attorney informed her that she had committed bigamy (before withdrawing from the case), but Lolita then perjured herself to get around this, concocting a fake divorce decree from Guam (PT 82),
- On March 3, 2014, Lolita filed a "Petition for Injunction for Protection Against Domestic Violence," claiming that Grayson had pushed her and knocked her to the ground. She sought medical treatment and took pictures of bruises. She claimed that Grayson, "from time to time" had battered her and the children (PT 69-71). Lolita then told a police officer that Grayson had "physically abused her for the entire duration of their [r]elationship."  A Grayson spokesman called these "'frivolous accusation[s]' meant to damage his reputation."  (PT 71). The next day, video showed that *Grayson had never touched Lolita,* although Lolita did hit Grayson twice, in the face. (The opposition report provides a still photo of this.) (PT 72). Grayson's oldest child, an adult, gave a sworn statement that Grayson had never hit Lolita (PT 73). A Lolita call to police immediately after the incident was reported as follows: "When U.S. Rep. Alan Grayson's wife called 911 on March 1, a dispatcher asked her if the congressman had touched or physically hurt her. 'Um, no,' Lolita Carson-Grayson

responded. 'I pushed him . . ..'" (PT 73).[9]  Lolita then withdrew her Petition for Injunction, and it was dissolved. (PT 73 & 75).

- Lolita nevertheless then falsely claimed that Grayson had given her a stroke by punching her in the head (PT 74). According to court filings questioning Lolita's mental health and fitness as a parent, Lolita had "demonstrated volatile, aggressive, dangerous, and bizarre behavior; *filed a false Injunction for Protection against Domestic Violence*; used vulgar and profane language and assaulted Alan Grayson in front of their children; and has neglected their children." (PT 66, emphasis added)[10]. Grayson also informed the Court that Lolita "the court "should consider evidence that Ms. Grayson has committed battery against Mr. Grayson in front of the minor children and knowingly provided false and fraudulent information to the Court regarding an action for domestic violence." (PT 75)[11].

- Grayson then informed the Court (as the opposition research report recounts) of: "a pattern of bizarre, aggressive, and inappropriate behavior by Lolita Grayson including bodily blocking Alan Grayson's car while denting it and screaming profanities, falsely filing an Injunction for Protection, involving the minor children in ploys to embarrass Alan Grayson in the media, *physically assaulting the children, concocting false stories for the police and attempting to have the children arrested*, that the older children have fled the house and the children have barricaded themselves in their rooms, [Lolita] locked the children out of the house, attempted to have their 16-year-old expelled from school, made false missing child reports when the children were with Alan Grayson, failing to provide a clean and safe home, denied Alan Grayson contact with his children and assaulted Alan Grayson in front them, used child support for personal use, insisted that the 16-year-old child shop for food on her own credit card, and vandalized an automobile used to transport the children. Alan Grayson further argued that Lolita Grayson should undergo a psychological evaluation and that shared parental responsibility was not possible due to Lolita Grayson's mental instability." PT 76-77.

- Lolita fraudulently used Grayson's personal credit card without his permission, forging his signature, for $7500 of personal expenses (PT 80-81).

- Lolita fraudulently applied for public assistance when Grayson was providing $10,000 a month in support (and she told the media about it, to try to embarrass Grayson one week before Election Day in 2014) (PT 78-79).[12]

- Grayson told the Court that Lolita "has been using court proceedings to try to *'falsely, intentionally, and maliciously harm' his reputation*" in her "eighteen (18)-month crusade" with "false and perjured testimony and media appearances." (PT 66-67, emphasis added). Grayson also informed the Court that Lolita was "orchestrating a 'deliberate and malicious campaign to ruin the reputation of Respondent Alan Grayson, to force him into a financial settlement to which Lolita B. Carson Grayson would never be

---

[9] The opposition research report cites an online newspaper article where Lolita's telephone call was posted.
[10] Lolita never contested these facts in court.
[11] Lolita never contested these facts in court, either.
[12] Grayson won that election, by a wide margin, in part because the media *accurately* reported when Lolita's false charges were false, rather than defaming Grayson (as the Defendants did).

entitled, because she is a bigamist (among other reasons). . . . Unbelievably, it is clear that the litigation strategy of Mark Longwell and Lolita B. Carson Grayson, is that if they cannot win, they will simply ruin the reputation of the victim of the bigamy and defamation –Alan Grayson." (PT 83-84).[13]

- Eighteen months into the case, Lolita demanded "palimony" from Grayson (which doesn't exist in Florida) and had already had five attorneys withdraw from the case. (PT 67).
- The Court ruled that Lolita had committed bigamy, and the Court annulled the marriage (PT 68).[14]

Without question Lolita Carson-Grayson is a vicious, violent, world-class liar, and the *Defendants knew this,* from their own opposition research report.

Had Defendants updated their research on the annulment proceedings, they would have learned that because Lolita repeatedly physical abused Grayson, Grayson's mother and the five children, repeatedly engaged in other violent behavior, repeatedly made false accusations about Grayson and the children to the police and others, repeatedly faked medical issues and blamed Grayson for them, and refused a court-ordered psychiatric evaluation:

- She has no custody, no visitation rights, and no contact with any of the five children.
- She no longer has representation by counsel, who are unwilling to present her perjured testimony.[15]
- The Court awarded more than $200,000 in sanctions against Lolita for her incessant perjury and fabrication (**Ex. A**).

Defendants attempt to deflect charges of both falsity and malice by stating that

---

[13] The Defendants' opposition research report mentions twelve times that Grayson publicly accused Lolita of defamation (and she never contested or rebutted that).

[14] The Defendants' opposition research report specifically states that it had full access to all the court records for the domestic violence petition and the divorce/annulment proceeding. **Ex. F**, PT 459. In the Defendants' motion to compel production of these records, the Defendants represented (or, rather, misrepresented) that they didn't.

[15] Unlike Defendants' counsel here, who seems to have no problem soliciting and proffering more perjury from Lolita. *Cf.* Rule 11(b)(3).

each anti-Grayson ad was reviewed by an anti-Grayson opposition researcher and by counsel. These offer no such defense; regardless,, the jury can conclude that the defendants knew or should have known that their statements were false and malicious. On at least eight separate occasions, even Defendants' counsel and the opposition researcher raised objections to which the Defendants disregarded their advice. **Ex. E.**

- On Aug. 1, 2018, <u>counsel</u> wrote: "Inventing language for [Grayson] and doing the cut/paste photo stuff almost certainly would give [Grayson] a basis to claim defamation. Maybe not a successful claim of defamation, but one that probably would cost someone a lot of legal fees." He then added: "[Avoiding t]hat would reduce the risk of losing a defamation case. I'm guessing it wouldn't much reduce the risk of Grayson bringing some sort of defamation case. He'll no doubt be looking for some way to lash out." PT 315-16. The Defendants' ant-Grayson ads are nevertheless replete with "the [prohibited] cut/paste photo stuff," including superimposing Grayson against a police car siren, Motion Ex. 31, and placing his photoshopped passport inside an attaché case with $150,000 in cash, *id.* Ex. 21. They also photoshopped out, Grayson's Congressional pin, which identified him as a Member of Congress, on a mailer that said the Grayson was "Not Fit to Represent Us." SPIROS 195.
- On Aug. 10, 2018, counsel wrote: "On 'Report' it would be helpful to add 'ACCUSED' at bottom line, so it says, 'ACCUSED SERIAL ABUSER.' Same on 'Stain.' Same on 'Donald.' That removes [Grayson's] ability to claim we're making a false statement **because he can prove that all the allegations by others are false."** PT 370. The Defendants then sent out 14,871 pieces of mail with Grayson's photo and the caption "Alan Grayson. Serial Abuser." Motion Ex. 26; *see also, e.g.,* Ex. 22 & 31.
- Also on Aug. 10, 2018, regarding a script for an online ad, counsel stated: "I assume you're going to be very closely following the wording of some news article and you'll have a source listed. Be sure you're not mischarac-terizing the article and be sure to have the source listed." PT 380-381. As the Grayson Declaration (**Ex. A**) recounts in detail, virtually *everything* in the anti-Grayson ads mischaracterized the source, apart from a small handful of quotes taken out of context. For instance, one mailer said that "Alan Grayson ABUSED HIS POSITION IN CONGRESS to enrich himself," citing the OCE referral only. Motion Ex. 37. The OCE referral never even uses the terms "abused" or "enrich," or anything close to that, the OCE lacks authority for such conclusions, *and the referral was specious and dismissed.*
- On July 30, the <u>opposition researcher</u> cautioned the anti-Grayson ad team that: "The word "abuse" is never used in the ethics report." SPIROS 168-169. The Defendants continued, nevertheless with headlines like this: "Congressional Ethics Investigation Found Alan Grayson Abused His Office for Financial Gain." Motion Ex. 23.
- On July 31, the opposition researcher also informed the anti-Grayson ad team that the

House Committee on Ethics had dismissed (or, as he put it, "punted") the OCE referral. SPIROS 168. They nevertheless pressed forward with their false statements based only on spurious citations to the OCE referral.

- On Aug. 6, the opposition researcher reiterated: "My only issue here is that the first news clip suggests that House Ethics Committee said those things about Grayson, when really House Ethics just released OCE's report (which had referred the matter to House Ethics), said further review was necessary, and opted not to make an investigatory subcommittee."[16]    MISC 020. Despite this, and despite mischaracterizations of the OCE report that verge on delusional, the Defendants published the incorrect news clip, and never mentioned the House Ethics Committees' dismissal of the OCE referral.
- On July 19, the opposition researcher complained: "we make it sound like he's leaving her murdered corpse in the gutter." SPIROS 0164. That much was true; the ads did make it sound like Grayson was leaving Lolita's murdered corpse in the gutter.[17]
- On Aug. 1, the anti-Grayson ad team circulated an ad stating that Grayson had threatened to arrest a reporter. The opposition research informed them that this wasn't true, and that the statement was "too dodgy for us to use." SPIROS 459. The ad ran with this statement, anyway, as reflected in Facebook's archive. *See* Motion Ex. 35.

Disregarding such instructions does not prove the *absence* of actual malice; it constitutes evidence—strong evidence—of actual malice. And there is much more:

- Christine Dolan, a No Labels consultant, virtually pleaded with Nancy Jacobson and the entire anti-Grayson ad team, before the first anti-Grayson ad was run, not to attack Grayson on "domestic abuse, overshore, etc.," *because it would be defamatory – i.e.,* "the risk to NL [No Labels] if we get this wrong." MISC 002. On July 15th, Dolan informed them: "In 2014, Grayson's wife sought a restraining order. Judge granted it. **Grayson claimed wife was lying. Tape I sent before proved that**. No charges were filed. at one point, even Mrs. Grayson's attorney petitioned court to stop representing her. MISC 014-015 (emphasis added). The "tape" was a video *showing Lolita punching Grayson twice in the face. Id.* On July 16th, Dolan added: "Grayson's attorney had no problem stepping in publicly - not just in court - but with the press to defend him. Those lawyers released the 2014 incident on tape to the press and the court but only **because ex-wife lied**. It was to his favor. **They proved she lied**. No charges were filed. If we hit him on the accusations, I would expect not just Grayson but the lawyers to step in and say – 'No charges were filed, **she lied** about her first divorce and hence, their marriage was based upon **a lie**, and their marriage was annulled even though they were married for 25 years and had five children. . ... **Furthermore, she lied** about the 2014 altercation, but the tape proved in that incident, she was the aggressor as proven by the tape his attorneys

---

[16] The House Ethics Committee then dismissed the referral, not long after. **Ex. A.**

[17] Tellingly, the opposition researcher's preferred way to proceed was: "No change, if we can get away with it." *Id.* The anti-Grayson ad group inserted the word "broke," and kept the "murdered corpse" part. *Id.*

released to the press. MISC 013 (emphasis added). On July 19th, Dolan specifically warned, again: "Grayson may hit back with no charges for domestic abuse" (meaning that Grayson was never charged – a fact that never appeared in any anti-Grayson ad). Dolan continued: "We have to be very careful here because: 1. Grayson was never charged for domestic abuse even though we have medical and police reports - one has been disproven by the local media with a tape provided to local media by Grayson's lawyers. 2. tape in 2014 which was filmed by Grayson's mates when mirrored to the 2014 police report proves - ex-wife was aggressor - not Grayson; no charges filed." Dolan also informed Jacobson and the ad team that Grayson's adult daughter said that he had never hit Lolita. MISC 009. Dolan's advice was rejected. MISC 002.

- The Defendants' pollster then instructed the anti-Grayson ad team to use the "language" that he had "framed" in his poll (rather than accurate, factual language) – and they did. MISC 001.[18]

- Would-be expert witness Melanie Sloan, who apparently was the No Labels spokesperson at the time, says in her expert report: "the OCE's referral is specifically prohibited from containing conclusions regarding the validity of the allegation or the guilt or innocence of the person subject to the review. Final conclusions are within the sole purview of the House Committee on Ethics." Sloan Report at 5. But the anti-Grayson ads indicate the opposite. *See, e.g.,* Motion Ex. 21. 23. 27, 29, 30, 36 & 37.

- Grayson's lawyer sent the Defendants a "cease and desist" letter during the anti-Grayson campaign, informing them that their attacks were false and defamatory. MISC 007-008. There is no indication that the Defendants did anything to check (much less re-check) their facts after this.[19]

In short, this record *reeks* of actual malice.

## V.    PT Has Not Established the Absence of Any Dispute Of Material Fact Regarding Grayson's Defamation By Implication Claim

PT yet again pursues its earlier unsuccessful attack on Grayson's "defamation by implication" claim. As this Honorable Court has ruled already, however:

> The Supreme Court of Florida has held that "defamation by implication is a well-recognized species of defamation that is subsumed within the tort of defamation." *Jews for Jesus*, 997 So. 2d at 1108. . .. "defamation by implication applies in circumstances where *literally true* statements are conveyed in such a way as to create a false impression." Id. (emphasis added).

---

[18] Remaining concerned, Dolan took one more shot at this. On Aug. 6, she wrote to the anti-Grayson ad team, "we are highlighting he hit her." MISC 029.

[19] The Defendants also saw no problem in simply *making up* the charge that Grayson knew of the internal labor practices of an independent affiliate of a massive multinational company, in which Grayson's *family formerly* held a few publicly traded shares, so that they could "nail him on slave labor!" (SPIROS 053-055, exclamation in original). **Ex. F.**

D.E. 28 at 13 n.12.  As the Florida Supreme Court noted in the *Jews for Jesus* decision, 997 So. 2d at 1108, citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 116, 117 (5th ed. Supp.1988): Simply put, "if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct."

In *Jews for Jesus,* 997 So.2d at 1106, the Court notes with the approval the case of *Heekin v. CBS Broad., Inc.,* 789 So.2d 355, 358 (Fla. 2d DCA 2001), in which:

> the plaintiff alleged that a broadcast falsely portrayed him as a spouse abuser by juxtaposing an interview with his former spouse along with stories and pictures of women who had been abused and killed by domestic partners. 789 So.2d at 357 ("Heekin's complaint alleged that the specific facts about Heekin contained in the broadcast were true, but that the juxtaposition of these facts with the other stories created the false impression that Heekin had abused and battered his wife and children.").

This is *exactly* what the Defendants did here. Ex. 22, 24-26, 31-33 & 35.

PT misstates the actual legal standard to be applied here, by quoting from an appeal from dismissal of a complaint *for failure to state a claim*, not summary judgment. Even so, PT notably omits the key ruling in that case, for present purposes, *i.e.,* there is a disputed issue of fact that must go to the jury whenever: "the publication is susceptible of two reasonable interpretations, one of which is defamatory." Hallmark Builders, Inc., 733 F.2d at 1464 ; Miami Herald Publ'g Co. v. Ane, 423 So.2d 376, 389 (Fla. Dist. Ct. App. 1982). *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018). So, the question here is whether PT has shown the absence of any reasonable interpretation that "*literally true* statements are conveyed in such a way as to create a false impression," D.E.

14

28 at 13 n.12, viewing the evidence in the light most favorable to Grayson. It has not. Although Lolita filed a domestic violence complaint against Grayson, which the Defendants gleefully touted in their ads, this fact is dwarfed by the mountain of evidence showing Lolita lied on this and numerous other occasions; the allegations were discredited, recanted, and apologized for, which Defendants knew. Yet Defendants purveyed the "false impression" that Lolita's original allegations went un-recanted, un-rebutted, and remain true. *Id.* This is a textbook example of defamation by implication.[20]

### VI.    None Of Grayson's Claims Is Barred by The Statute of Limitations

The Defendants attach seventeen of their defamatory publications to their brief. Ex. 21-37. They argue that nine of them, Ex. 21-29, all mailers,[21] were published outside the two-year limitations period. Publication occurs when "the statement was in fact heard or read" by the intended recipients. *In re Standard Jury Instructions,* 575 So. 2d 194 (Fla. 1991); *accord Jenkins v. BAC Home Loan Servicing, LP,* 822 F. Supp. 2d 1369, 1379 (M.D. Ga. 2011); Restatement (Second) of Torts § 577. Since these were mailers, the issue is when the addressees received them and read them

The Defendants' argument is based exclusively on two paragraphs from the Margaret White declaration, Ex. 4 at 3 ¶¶ 13-14. For instance, she posits, in a

---

[20] PT also argues, under the *Turner* and *Dockery* cases, that *if PT had been a media publisher* (which it is not), then PT would have had no legal obligation to report *Grayson's* denial. That's not the point here at all—this is way beyond he-said-she-said, as the record evidence shows.

[21] Except for Ex. 25. This is a Facebook "landing page" to which, according to the Facebook ad archive, the Defendants directed Facebook readers only on August 27-28, 2018. **Ex. A**.

conclusory manner, that "Exhibit 1 was published on Aug. 1, 2018." *Id.* ¶ 14.[22] This is clearly inadmissible under Rule 56(c), for several reasons. First, it is obviously inadmissible hearsay, or at least speculative; there is no way that White could have observed personally when these pieces were "in fact heard or read." Second, there is no "evidence [] sufficient to support a finding that the witness has personal knowledge of" publication, *i.e.,* no foundation. Rules 56(c)(4) & 602.[23] Further, because White does not even explain what *she* means by "publication," her statement is vague and ambiguous, and therefore inadmissible under Rule 403.

White's statement defies common sense, since there is no reason to "publish" an election hit piece on August 1, 2018, for an election that will not take place until August 28, 2018. **Ex. A.** Moreover, White's statement is refuted by PT's own Federal Election Commission ("FEC") filing (**Ex. G**), which states that no more than five anti-Grayson mailers were *paid for* before August 19, 2018. After a mailer is paid for, it is printed, labeled, delivered to the Post Office, and then delivered to the public, which can take as long as two weeks. **Ex. A.** In PT's FEC filing, there are only two anti-Grayson pieces that were paid for more than two weeks before August 19, 2018. **Ex. G**. In any event, there is a disputed issue of fact as to when all the mailers were, in fact, "heard or read," and White's statement is hardly enough for the Defendants to carry their burden of showing the absence of one.

---

[22] "[C]onclusory allegations ... are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott* , 610 F.3d 701, 709–10 (11th Cir.2010).
[23] A summary judgment declaration like this one must "show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4).

Finally, the Defendants simply ignore Grayson's legal arguments on limitations. First. Grayson is protected by the "discovery rule;" he "discovered" these defamatory mailers within the limitations period. *See, e.g., Flanagan v. Wagner, Nugent,* 594 So. 2d 776, 778 (Fla. Ct. App. 4th Div. 1992) ("we follow well-established Florida authority in applying the discovery rule to the facts of the present case"). Second, since all the Defendants are out of state, the limitations period was tolled by Fla. Stat. 95.051.[24] Third, the limitations period on Grayson's civil conspiracy claim is four years, not two.[25] Therefore, PT is not entitled to summary judgment on limitations grounds.

### VII. PT Has Not Established Judgment as A Matter of Law on Grayson's Civil Conspiracy Claim

The Defendants argue, once again (*see* D.E. 30), that Grayson cannot allege defamation and civil conspiracy in the same case, citing Florida's "single publication rule." Motion at 22-23. This argument deserves no more credence on summary judgment than it did at the pleadings stage of the case.

First, according to the Defendants themselves, this is not a "single publication" case; it is a multiple publications case. Ex. 21-37. Further, the Florida Supreme Court has openly questioned whether the "single publication" rule applies in Florida at all. *First America Dev. Corp. v. Daytona Beach N.-J. Corp.*, 196 So. 2d 97, 101 (Fla. 1966). In

---

[24] ("When limitations tolled.—(1) The running of the time under any statute of limitations . . . is tolled by: (a) Absence from the state of the person to be sued.")

[25] *Canon Latin America, Inc. v. Lantech (C.R.) S.A.*, No. 08–21518–CIV, 2011 WL 240684, at * 15 (S.D. Fla. Jan. 24, 2011); *Anthony v. Perez-Abreu & Martin-Lavielle, P.A.*, 51 So. 3d 525, 527 (Fla. Dist. Ct. App. 2010).

any event, although it may be true that "a single publication gives rise to a single cause of action." *Callaway Land & Cattle Co. v. Banyan Lakes C. Corp.,* 831 So. 2d 204, 208 (Fla. 4th DCA 2002); multiple publications are not so limited. Specifically, as the U.S. Supreme Court has held, each defamatory statement can be (and is) the basis for an additional, or separate, cause of action. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770 (1984); *Musto v. Bell S. Telecomms. Corp.,* 748 So.2d 296, 297 (Fla. 4th DCA 1999).

Moreover, for the single publication rule to apply, the factual predicates for the multiple claims must be essentially the same, as in *Callaway.*[26] The factual predicates for a civil conspiracy claim, in contrast, are *nowhere near* the predicates for a defamation claim and, as this Honorable Court has ruled: "it is difficult to imagine more 'clear, positive, and specific allegations of civil conspiracy' than those set forth in the Amended Complaint." Order of Apr. 7, 2021, D.E. 34 at 14.[27]

Finally, even if the law were otherwise, the Defendants would be simply "begging the question" by *assuming* that "there is no legally viable underlying wrong, *i.e.,* defamation or defamation by implication." Motion at 23. The Defendants were wrong when they argued in their motions to dismiss that "Plaintiff's civil conspiracy

---

[26] Where the plaintiff argued that a single defamatory publication gave rise to claims for defamation, tortious interference, and abuse of process, all based on a single set of facts.

[27] *Cf. Maletta v. Woodle,* Case No: 2:20-cv-1004-JES-MRM, *16 (M.D. Fla. May. 11, 2021) (dismissing single-publication non-defamation claim "based on the same facts" as defamation claim). The other two extremely dated cases that the Defendants cite on this issue are inapposite because they refer to defamation and conspiracy claims that were *defectively pled* – arguments that this Honorable Court already has rejected. *Liappas v. Augoustis,* 47 So. 2d 582 (Fla. 1950); *Buckner v. Lower Fla. Keys Hosp. Dist.,* 403 So. 2d 1025, 1027 (Fla. 3d DCA 1981). One wonders whether such archaic pleading rules even apply in this Court. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955 (2007).

claim fails as a matter of law," and they remain wrong now.

## VIII. There Is Certainly At Least A "Disputed Issue of Fact" As To Whether Grayson Has Sustained Damages

The Defendants' final argument is that only out-of-pocket "special damages" are recoverable in a defamation action.[28] This is simply wrong. The Defendants are referring to a *pleading rule* for *product* disparagement cases, which are known in Florida as "injurious falsehood" claims. For a defamation claim, in contrast, damages are often presumed,[29] and compensatory damages are always recoverable.[30]

The Florida Supreme Court's defamation jury instruction, tracking Florida law, states:

> [I]f you find for (claimant), you should award (claimant) an amount of money that will fairly and adequately **compensate** (claimant) for such [loss] [injury] [or] [damage] as the greater weight of the evidence shows was caused by the [statement] [publication] in question, [considering] Injury to reputation or health; shame, humiliation, mental anguish, hurt feelings. **There is no exact standard for fixing the compensation to be awarded on account of such elements of damage.**

M.I. 405.10, *In re Standard Jury Inst. Civ. Cases-09-01*, 35 So. 3d 666 (Fla. 2010) (emphasis added).[31]

---

[28] The Defendants never address damages for the civil conspiracy claim, and thus they could not obtain summary judgment on damages in any event.

[29] When a defendant's statement is *per se* defamatory, the plaintiff need not prove that he was damaged by the statement because it is presumed that the statement caused him damage. *See Alan v. Wells Fargo Bank, N.A.*, 604 Fed. Appx. 863, 865 (11th Cir. 2015); *Risk Insurance and Reinsurance Solutions v. R + V Versicherung*, 2007 WL 9700868, at *7 (S.D. Fla. June 6, 2007).

[30] The Defendants made the exact same argument in their *Daubert* motion against Grayson expert witness David Heller. Grayson incorporates that part of his opposition brief (pp. 15-20) by reference.

[31] *See also Hustler Magazine, Inc. v. Falwell*, 485 US 46, 52 (1988) ["Since *New York Times Co. v. Sullivan*, 376 U. S. 254 (1964), we have consistently ruled that a public figure may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood . . .."]

Such compensatory damages are "general damages,"[32] which are distinct from "special damages." Special damages must be specifically *pled.* Fla. R. Civ. P. 1.120(g); Rule 9(g). Thus, in one case – not a defamation case -- the court ruled: "In this case, appellants have claimed only that their stock declined in value. Their **pleading** does not reveal any 'realized loss,' that characteristic of 'special damage' that is a crucial element of the cause of action. On remand, appellants shall be given leave to **replead** the injurious falsehood count." *Salit v. Ruden,* 742 So.2d 381, 388 (Fla. Ct. App. 4th Dist. 1999) (emphasis added). Similarly, *Falic v. Legg Mason Wood Walker, Inc.,* 347 F. Supp. 2d 1260 (S.D. Fla. 2004), is another "injurious falsehood" case. *Daniels v. HSN, Inc.,* No. 818CV3088T24JSS, 2020 WL 533927, at *7 (M.D. Fla. Feb. 3, 2020), plumbs the depths of an irrelevant claim of defamation *per quod.*[33] These rulings have absolutely nothing to do with the defamation claim here.

## XI. <u>Conclusion</u>

For the reasons stated, PT's motion for summary judgment must be denied.

---

[32] General damages are: "Damages that the law presumes follow from the type of wrong complained of; specif., compensatory damages for harm that so frequently results from the tort for which a party has sued that the harm is reasonably expected and need not be alleged or proved. General damages do not need to be specifically claimed. - Also termed direct damages; necessary damages." *Black's Law Dictionary* 446 (9th ed. 2011).

[33] As explained in *Daniels,* defamation *per quod* is when statements are *not* defamatory on their face. For instance, the statement at issue in *Daniels* was: "[t]he email you referenced . . . was not authorized, reviewed or approved for distribution." Daniels had to plead special damages because that statement simply doesn't look defamatory; it requires "extrinsic proof." Here, it's the opposite, as the Heller Report states: "These ads included accusations against Grayson which were so heinous that, in my expert opinion, few (if any) candidates for Congress could have survived them. . .. [They] are all among the most defamatory allegations that I have seen in my thirty years of making political commercials." Heller Report at 12. Hence no "extrinsic proof" is required to establish that the Defendants' statements were harmful to Grayson.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 18, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which furnished a copy of the foregoing via electronic mail to all counsel of record.

*s/ Tucker H. Byrd*

**Tucker H. Byrd**
Florida Bar No. 381632
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Secondary Email: mmanley@ByrdCampbell.com
*Attorneys for Plaintiff*
