UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**ALAN GRAYSON,**

      **Plaintiff,**

v.                                       Case No: 6:20-cv-1824-PGB-LHP

**NO LABELS, INC., PROGRESS TOMORROW, INC., UNITED TOGETHER, INC., NANCY JACOBSON, MARK PENN and JOHN DOES,**

      **Defendants.**

## ORDER

This cause is before the Court on the Defendants' Motion to Strike Report and Preclude Testimony of Nicholas Carroll. (Doc. 88). The Plaintiff submitted a Response in Opposition. (Doc. 108). Upon due consideration, the Defendants' *Daubert* challenge is granted.

### I.  BACKGROUND

The Plaintiff, Alan Grayson, contends in his Second Amended Complaint that the Defendants, acting through Progress Tomorrow, published false and defamatory statements which damaged him "personally, professionally, and ultimately politically." (Doc. 35, p. 1). The allegedly defamatory statements fall into three categories: (1) citation to a Congressional Ethics Investigation finding candidate Grayson had "Abused His Office for Financial Gain," including by using

"taxpayer resources to conduct his high-risk investor scheme;" (2) images of Grayson's passport photograph with dollar signs replacing his eyes, an attaché case containing $150,000, and images implying he flew to the Cayman Islands to launder the money; (3) statements relating to accusations made by Grayson's ex-wife in connection with their divorce proceedings during which she accuses him of spousal abuse. (*Id.* ¶¶ 19–24). Plaintiff Grayson sued the Defendants for Defamation (Count I), Defamation by Implication (Count II), and Civil Conspiracy (Count III). (*Id.* ¶¶ 43–73).

The Plaintiff retained Mr. Nicholas Carroll to provide expert testimony on the following topics:

> a. Editorial opinion on potential liability, and whether to refer ads to legal counsel.
>
> b. Harm to the reputation of Alan Grayson by negative political advertising.
>
> c. The costs of repairing that reputation.

(Doc. 88-1, p. 2). The Defendants seek to exclude Mr. Carroll's expert testimony for the following reasons:

> (1) he is not qualified to testify with respect to the standards for publishing political ads;
>
> (2) his testimony is unreliable insofar as it is based on nothing except his subjective, unscientific opinion that is not backed by review of any underlying facts or any studies;
>
> (3) his testimony does not assist the trier of fact, because he is testifying on matters of common sense that can readily be determined by the jury without expert testimony; and
>
> (4) he impermissibly replies (sic) on another expert's opinion.

(Doc. 88, pp. 2–3).

## II. LEGAL STANDARDS

### A. Defamation

"To state a claim of defamation, the plaintiff must allege that (1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff." *Happy Tax Franchising, LLC v. Hill*, No. 10-24539-CIV, 2021 WL 3811041, at *4 (S.D. Fla. June 7, 2021) (citing *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015)).[1] When a public official is the subject of the defamatory statements, the plaintiff must show "the actor acted with knowledge or reckless disregard as to the falsity" of the statement. *Klayman v. Judicial Watch, Inc.*, 22 F.Supp.3d 1240, 1250 (S.D. Fla. 2014). And with respect to a public official, the plaintiff must prove with clear and convincing evidence "actual malice" by the person publishing the statement, which is satisfied by showing the "disseminator of the information either knew the alleged defamatory statements were false or published them with reckless disregard despite awareness of their probable falsity." *Id.* at 1250–51. "A false statement is the sine qua non for recovery in a defamation action." *Klayman*, 22 F. Supp. 3d at 1253 (citation omitted).[2] "Under the substantial truth doctrine, a

---

[1] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

[2] "[A] defamation claim may not be actionable when the alleged defamatory statement is based on non-literal assertions of fact." *Maletta v. Woodle*, No. 2:20-cv-1004, 2021 WL 1894023, at *3 (M.D. Fla. May 11, 2021). "The Constitution also provides protection for 'rhetorical hyperbole' that 'cannot reasonably be interpreted as stating actual facts about an individual.'" *Id*. This occurs when "the language itself negates the impression that the writer was seriously

3

statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Id.* Stated differently, "[a] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 1254 (citation omitted). Defamation is *per se* where it imputes to another a felony offense or "conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office." *Id.* at 1248 (citation omitted). And "[d]efamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts." *Id.* at 1254.

### B.  *Daubert*

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court explained that Rule 702 imposes an obligation on a trial court to act as gatekeeper, to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.[3] District courts are charged

---

maintaining that the plaintiff committed the particular act forming the basis of the defamation." *Id.*

[3]  Although the expert testimony at issue in *Daubert* was scientific, the Supreme Court held in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 147–48 (1999), that the Daubert analysis and a trial judge's role as gatekeeper apply "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'otherwise specialized' knowledge."

4

with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies "expert testimony." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (2002). Thus, the party offering an expert opinion has the burden of establishing three criteria: qualification, reliability, and helpfulness. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005). First, the witness must be "qualified to testify competently regarding the matters [s]he intends to address." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Indicia of an expert's qualifications may be evidenced by education, training, work experience, publication in the pertinent field, and membership in professional societies. *See Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990).

Second, the expert witness must employ "sufficiently reliable" scientific methods or principles to form her opinions. *Rink*, 400 F.3d at 1291. The reliability of an expert's methodology can be evaluated by considering a wide range of factors, including (1) whether the expert bases her opinion on sufficient facts or data, (2) whether the expert unjustifiably extrapolates her research to reach an unfounded conclusion, (3) whether the expert considers or accounts for contradictory studies or data, (4) the extent to which the methods used rely on the expert's subjective interpretations, and (5) whether the expert is being as careful as an expert in the same field would be in conducting professional work outside the context of paid litigation. *See Daubert*, 509 U.S. at 593–94; FED. R. EVID. 702 advisory committee's note to 2000 amendment. That said, the Court notes "[p]hysical

5

testing is not an absolute prerequisite to the admission of expert testimony." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 586 (N.D. Fla. 2009). However, "an expert who conducts no testing must be prepared with 'a good explanation as to why his or her conclusion remained reliable' notwithstanding the absence of testing." *Id.* at 588 (citation omitted).

Third, the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. Expert testimony helps where it concerns matters beyond the ken of the average juror and will allow the jury to understand the evidence or to resolve a factual dispute. *See Kumho Tire*, 526 U.S. at 148–49. Conversely, there will be no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic considering the evidence and testimony presented at trial. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must hold probative value that outweighs the concerns listed in Rule 403. *Daubert*, 509 U.S. at 591. The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

6

## III. DISCUSSION

### A. The Alleged Defamatory Statements

#### a. *Qualification*

An expert can be qualified to offer an opinion concerning scientific, technical, or specialized knowledge by virtue of his or her education, training, and/or work experience. *Am. Tech. Res.*, 893 F.2d at 656. Mr. Carroll's earned his Bachelor of Science in Technology Management in 1987. (Doc. 88-1, p. 30). According to his curriculum vitae, Mr. Carrol studied information systems, ethnology, strategic planning, financials, and computer science. (*Id.*). That said, Mr. Carroll's expert report does not indicate how his university degree informs his opinions in this matter. Accordingly, the Court finds Mr. Carroll's education is not a basis to find him qualified to offer his expert opinions. Similarly, Mr. Carroll does not articulate how training he may have received during his career supports his expert opinions, and so Mr. Carroll's qualifications rest solely on his work experience.[4]

Mr. Carroll reports that he has twenty-eight years of experience as an editor with responsibility for reviewing books, articles, and web content for libel. (*Id.* at p. 4). In addition, Mr. Carroll has five years' experience as a journalist writing for several publications. (*Id.*). Mr. Carroll has provided non-legal advice over the past twenty years on libel avoidance, and currently Mr. Carroll is employed providing

---

[4] The table of contents for Mr. Carroll's expert report directs the reader to page four to find his qualifications. (Doc. 88–1, at 2). Mr. Carroll only identifies his work history in support of his qualification to offer expert opinions. *Id.*

non-legal advice to individuals and businesses on repairing reputational damage. (*Id.*). Finally, Mr. Carroll has spent nineteen years analyzing and calculating financial damage on behalf of individuals and businesses whose reputation has been damaged. (*Id.*). Accordingly, the Court finds Mr. Carroll possesses substantial professional experience in the field of identifying defamatory publications and statements and in reputational repair and the related costs.

### b.  *Reliability*

"Even if a witness is qualified as an expert regarding a particular issue, the process used by the witness in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny." *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1362 (S.D. Fla. 2009); *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003) ("[O]ne may be considered an expert but still offer unreliable testimony."). An expert must employ sufficiently reliable methodology in forming his or her opinions. *Rink*, 400 F.3d at 1291. A reliable methodology is one that includes sufficient facts or data and one wherein the expert refrains from relying on subjective interpretations to support the methodology. *Daubert*, 509 U.S. at 593–94. Herein lies the problem with Mr. Carroll's expert opinions as stated in his report.

Mr. Carroll lists four publications on libel and six on altering public opinion in the section of his report titled "Basis for Opinions." (Doc. 88-1, p. 5). That said, Mr. Carroll fails to quote any of these materials or articulate how the publications

inform and support his opinions.⁵ In his expert report, Mr. Carroll examines each political advertisement at issue, and he offers an opinion on whether the "advertiser" should have been required by the publishing company to provide additional documentation before the advertisement was published. (*Id.* at pp. 7–22). Mr. Carroll concludes this section of his report by opining that "[b]y mainstream reporting standards, the ads were written with reckless disregard for the truth, and it is unlikely the claims could have found venues willing to disseminate them other than mailhouses and online media." (*Id.* at p. 23). What is missing, however, is any discussion of what constitutes "mainstream reporting standards" and how those standards lead him to conclude that allegedly the defamatory statements were made with reckless disregard for the truth. Mr. Carroll fails to articulate a methodology and one is left to guess what constitutes "mainstream reporting standards," how those standards apply to the Defendants, how the political advertisements violate those standards, and how any hypothetical violation constituted reckless disregard for the truth.

The lack of any analysis, or methodology, tethered to recognized standards for identifying potentially defamatory statements is exacerbated by Mr. Carroll's failure to address whether any of the allegedly defamatory statements are excluded from defamation as non-literal assertions of fact or rhetorical hyperbole, which are

---

⁵ Mr. Carroll's report also identified the Second Amended Complaint, the subject political advertisements, invoices showing the cost of the political advertisements, and a report prepared by David Heller as supporting his expert opinions. (Doc. 88-1, p. 3). However, none of these materials allow one to understand Mr. Carroll's methodology in rendering his opinions on whether the subject political advertisements are defamatory.

9

non-actionable. *See Maletta*, 2021 WL 1894023, at *3. The Court's focus is on principles and methodology, and neither *Daubert* nor Rule 702 require the Court "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (citation omitted). Thus, the Court is free to exclude an opinion when there is "too great an analytical gap between the data and the opinion proffered." *Id.* at 1305–06 (citation omitted). Mr. Carroll's opinions concerning the advertisers reckless disregard for the truth of the political advertisements and his opinions concerning which advertisements should not have been published are unsupported by a reliable methodology. The gap between Mr. Carroll's opinions and the data is simply too great to allow the opinions to be presented to the jury.

        c.        *Helpfulness to the Jury*

Mr. Carroll's opinions are unhelpful to the jury for two reasons: (1) the opinions are mere *ipse dixit,* and (2) several of the proffered opinions do not require specialized knowledge. *Hartford Ins. Co. v. BellSouth Telecomms., Inc.*, No. 04-20532-CIV, 2005 WL 5955692, at *3 (S.D. Fla. Sept. 14, 2005) (stating expert testimony must not be directed "to lay matters which a jury is capable of understanding without the expert's help"). For example, Mr. Carroll opines that "for most U.S. readers" the Cayman Islands—featured in one advertisement—equates with fraud. (Doc. 88–1, at 9). Mr. Carroll fails to cite support for this proposition and fails to support his opinion that "U.S. citizens are easily shocked by 'offshore' accounts." (*Id.*). To the extent that these statements are true, the jury

10

is capable of arriving at that conclusion. Mr. Carroll also opines that the "Incident Report" advertisement, which features a red background, is suggestive of violence, because "[the] blood-red background colors subliminally suggest violence or murder." (*Id.* at p. 13). Mr. Carroll offers no support for this opinion, and a jury is equipped to assess whether the ad is suggestive of violence. Mr. Carroll's opinion—that the "We've Had Enough" advertisement should not have been run because "[i]n the climate of the Me-Too movement," the advertisement imputes criminal assault, a pattern of abuses, and invites litigation by the four models featured in the advertisement—is also free from analysis. (*Id.* at p. 15). A jury can decide for itself whether the advertisement suggests a pattern of criminal conduct.

### B.     Reputational Harm

Mr. Carroll's analysis of the harm to Mr. Grayson's reputation consists of his opinion that "[t]he two main attacks on Grayson's integrity—spousal abuse on a daily basis and corruption—move close to irreparable harm." (*Id.* at p. 24). Mr. Carroll offers no support for this opinion, such as opinion polling conducted for the Plaintiff. Notwithstanding, Mr. Carroll opines "[r]eaders/viewers tend to be more excited or titillated by negative claims, and give them more attention, so they are centerpieces of short-term memory long enough for them to be crystallized in long-term memory." (*Id.*). Opinions concerning the impact of visual messages on short-term and long-term memory fall within the field of psychology and neuro-psychology. Mr. Carroll is not an expert in either field, and he does not cite studies supporting this assertion, rendering it unreliable. Mr. Carroll continues his lay-

11

psychological analysis by opining that denial as a response to the negative advertisements is useless, because "[e]ach denial necessarily repeats the original allegation; the reader then forgets the new set of facts presented, while the original allegation is confirmed in their mind." (*Id.*). Again, this opinion is unsupported by studies or analysis and falls—at best—within the category of commonsense. As a result, Mr. Carroll's penultimate opinion that the hypothetical damage to Mr. Grayson's reputation can only be repaired by presenting a new positive image is unreliable.

### C. Cost of Repairing Reputation

Mr. Carroll concludes, without any analysis, that the cost of repairing Mr. Grayson's reputation "will be far higher than the approximately $500,000 in advertising expenses for mailers and Facebook ads as described in the PR agencies (sic) invoices and FEC filings." (Doc. 88-1, p. 25). Mr. Carroll relies on the expert report of David Heller—Plaintiff's damages expert—and opines the more than $16 million dollar estimate is "consistent with my three decades in advertising" and "is also consistent with nearly two decades of counseling defamation victims/targets on reputation repair." (*Id.*). And yet, Mr. Carroll does not cite empirical data to support his opinion which has the effect of bolstering Mr. Heller's opinion. The Defendants argue, correctly, that "an expert may not blindly rely on the conclusion of another expert and still meet the reliability requirements of Rule 702 and *Daubert.*" *See Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985); *see also La Gorce Palace Condo. Ass'n, Inc. v. BlackBoard Specialty Ins.*

12

*Co.*, No. 19-cv-24016, 2022 WL 479877, at *2 (S.D. Fla. Feb. 16, 2022) ("[M]ere recitation of the major points from [another expert's] report, without knowledge of how [the expert] put the report together in the first instance, would not pass as expert testimony."). Mr. Carroll fails to discuss how Heller arrived at his conclusions before attaching his stamp of approval. More is required of an expert witness than to act as a "ventriloquist's dummy." *Id.* at *3 (citation omitted).

## IV.  CONCLUSION

For these reasons, the Defendants' Motion to Strike Report and Preclude Testimony of Nicholas Carroll (Doc. 88) is **GRANTED,** and Mr. Carroll is prohibited from offering expert opinions in this matter.

**DONE AND ORDERED** in Orlando, Florida on April 25, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

13