## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ALAN GRAYSON,**

                    **Plaintiff,**

**v.**                                              **Case No: 6:20-cv-1824-PGB-LHP**

**NO LABELS, INC., PROGRESS
TOMORROW, INC., UNITED
TOGETHER, INC., NANCY
JACOBSON, MARK PENN and
JOHN DOES,**

                    **Defendants.**
_____/

## ORDER

This cause is before the Court on the Defendants' Motion to Strike Testimony and Report of Plaintiff's Expert David Heller and to Preclude Testimony at Trial (the "***Daubert* Motion**"). (Doc. 89). The Plaintiff has submitted a Response in Opposition. (Doc. 109). Upon due consideration, the Defendants' *Daubert* Motion is granted.

## I.    BACKGROUND

The Plaintiff, Alan Grayson, contends in his Second Amended Complaint that the Defendants, acting through Progress Tomorrow, published false and defamatory statements which damaged him "personally, professionally, and ultimately politically." (Doc. 35, p. 1). The allegedly defamatory statements fall into three categories: (1) citation to a Congressional Ethics Investigation finding

candidate Grayson had "Abused His Office for Financial Gain," including by using "taxpayer resources to conduct his high-risk investor scheme;" (2) images of Grayson's passport photograph with dollar signs replacing his eyes, an attaché case containing $150,000, and images implying he flew to the Cayman Islands to launder the money; (3) statements relating to accusations made by Grayson's ex-wife in connection with their divorce proceedings during which she accuses him of spousal abuse. (*Id.* ¶¶ 19–24). Plaintiff Grayson sued the Defendants for Defamation (Count I), Defamation by Implication (Count II), and Civil Conspiracy (Count III). (*Id.* ¶¶ 43–73).

The Plaintiff retained Mr. David Heller to offer expert testimony concerning the cost associated with repairing the Plaintiff's reputation within the 9th Congressional District. (Doc. 89–1, ¶¶ 2, 8). Mr. Heller concludes that the cost of producing and purchasing mail, television and internet advertising designed to rehabilitate Mr. Grayson's reputation within the 9th Congressional District is $16.777 million dollars. (*Id.* ¶ 8). That said, Mr. Grayson has not spent any money to date to rehabilitate his reputation in the 9th Congressional District or anywhere else.[1] Further, it is undisputed that Mr. Grayson's intention is to run for the United States Senate and not the House of Representatives. (Doc. 88-2, 64:7–17; Doc. 89-3, 138:8–10, 140:6–8). Notwithstanding this fact, Mr. Heller's opinion is limited

---

[1]   *See* Doc. 89-3, 142:14—143:21.

to the cost of rehabilitating Mr. Grayson's reputation within Florida's 9th Congressional District.[2]

## II.   LEGAL STANDARDS

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court explained that Rule 702 imposes an obligation on a trial court to act as gatekeeper to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.[3] District courts are charged with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies "expert testimony." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (2002). Thus, the party offering an expert opinion has the burden of establishing three criteria: qualification, reliability, and helpfulness. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005). First, the witness must be "qualified to testify competently regarding the matters [s]he intends to address." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Indicia of an

---

[2]   Mr. Heller does not disclose in his report any opinion on whether the statements at issue were defamatory, nor is he qualified to do so. (Doc. 89–1, ¶ 12). Therefore, the Plaintiff's reliance on Mr. Heller's characterization of the statements being "among the most defamatory allegations that I have seen in my thirty years of making political commercials" is misplaced. (Doc. 109, p. 4).

[3]   Although the expert testimony at issue in Daubert was scientific, the Supreme Court held in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 147–48 (1999), that the Daubert analysis and a trial judge's role as gatekeeper apply "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'otherwise specialized' knowledge."

expert's qualifications may be evidenced by education, training, work experience, publication in the pertinent field, and membership in professional societies. *See Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990).

Second, the expert witness must employ "sufficiently reliable" scientific methods or principles to form her opinions. *Rink*, 400 F.3d at 1291. The reliability of an expert's methodology can be evaluated by considering a wide range of factors, including (1) whether the expert bases her opinion on sufficient facts or data, (2) whether the expert unjustifiably extrapolates her research to reach an unfounded conclusion, (3) whether the expert considers or accounts for contradictory studies or data, (4) the extent to which the methods used rely on the expert's subjective interpretations, and (5) whether the expert is being as careful as an expert in the same field would be in conducting professional work outside the context of paid litigation. *See Daubert*, 509 U.S. at 593–94; FED. R. EVID. 702 advisory committee's note to 2000 amendment. That said, the Court notes "[p]hysical testing is not an absolute prerequisite to the admission of expert testimony." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 586 (N.D. Fla. 2009). However, "an expert who conducts no testing must be prepared with 'a good explanation as to why his or her conclusion remained reliable' notwithstanding the absence of testing." *Id*. at 588 (citation omitted).

Third, the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. Expert testimony helps where it concerns matters beyond the ken of the average juror and

will allow the jury to understand the evidence or to resolve a factual dispute. *See Kumho Tire*, 526 U.S. at 148–49. Conversely, there will be no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic considering the evidence and testimony presented at trial. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must hold probative value that outweighs the concerns listed in Rule 403. *Daubert*, 509 U.S. at 591. The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

## III.  DISCUSSION

The Defendants challenge Mr. Heller's expert opinion on all three prongs of the *Daubert* analysis. The Defendants contend Mr. Heller is not qualified to offer opinions on reputational repair because his experience is limited to being a political media consultant. (Doc. 89, p. 2). Next, the Defendants contend Mr. Heller's methodology is unreliable. (*Id.*). Finally, they argue Mr. Heller's opinions are not helpful to the jury because he offers a model of damages that is not cognizable as a matter of law. (*Id.*). The third prong of the *Daubert* analysis— whether the expert's testimony will assist the trier of fact to understand the evidence or to determine a fact in issue—is dispositive. But first, the Court will summarize Mr. Heller's expert opinions.

### A.     Overview of Heller's Opinions

Mr. Heller opines that the allegedly defamatory political advertisements damaged Mr. Grayson's reputation and caused him to lose a primary challenge against the incumbent Congressman Darren Soto. (Doc. 89-1, ¶ 9). Mr. Heller relies on a Democratic poll conducted in June 2018 where 504 likely Democratic primary voters for Florida's 9th Congressional District had Grayson leading Soto by a margin of 45% to 38% with a margin of error of 4%. (*Id.*). After the "anti-Grayson" ad campaign was launched, Soto received twice as many votes as Grayson and won re-election. (*Id.* ¶ 11). Mr. Heller opines that, based on his experience, negative advertising "has [a] much greater impact on voters than does positive advertising" and it is difficult to undo. (*Id.* ¶ 13(d)). Mr. Heller calculates the cost of producing and purchasing 3.5 as many mailers as were issued in the "anti-Grayson" campaign at $2,397,000. (*Id.* ¶ 13(k)–(p)). And Mr. Heller determines that, based on his experience, the Plaintiff must also purchase television ads to counter the negative ads aired on Facebook, Instagram, Twitter, "and perhaps other social media." (*Id.* ¶ 13(q)–(u)). The cost of television ads is calculated to be $4,790,000. (*Id.* ¶ 13(y)). Finally, Mr. Heller opines it will be necessary to produce "two different ads to rebut" each allegedly defamatory statement. (*Id.* ¶ 13(z)–(aa)). The grand total of the media campaign targeting the 9th Congressional District is $16,777,000. (*Id.* ¶ 13(bb)).

### B.    Damages for Defamation

"Any person having suffered injury from defamation is entitled to recover damages. Florida law recognizes two categories of compensatory damages for defamation: general and special." *Klayman v. Judicial Watch, Inc*., 22 F.Supp.3d 1240, 1253 (S.D. Fla. 2014) (citing *Krauser v. Evollution IP Holdings, Inc.*, No. 12-80977-CIV, 2013 WL 5313403, at *9 (S.D. Fla. Sept. 20, 2013)). General damages, "those which the law presumes must naturally, proximately, and necessarily result from publication of libel or slander," are allowed when the plaintiff's reputation is impaired, "although no actual pecuniary loss is demonstrated." *Army Aviation Heritage Found. & Museum, Inc. v. Buis*., 504 F. Supp. 2d 1254, 1260 (N.D. Fla. 2007) (citing *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.,* 344 So. 2d 279, 281 (Fla. 1st DCA 1977)). When it comes to general damages "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence." *Army Aviation,* 504 F. Supp. 2d at 1261. "The injured party may recover damages resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering." *Id*. Special damages, however, "do not result by implication of law," and "it is necessary for a plaintiff to show his special damages proximately resulted from the defamation." *Id*. "[T]he

chief characteristic of special damages is a realized or liquidated loss." *Anderson v. Smith*, No. 3:19-cv-222, 2020 WL 10058207, at *3 (M.D. Fla. Mar. 24, 2020).[4]

In *Daniels v. HSN, Inc.*, No. 8:18-cv-3088, 2020 WL 533927, at *3 (M.D. Fla. Feb. 3, 2020), the plaintiff's lawsuit included a claim for defamation *per se*. In discussing special damages, the Court rejected the plaintiff's argument that he could prove special damages through expert testimony concerning the cost of repairing his reputation online. *Id.* at *6. The Court held special damages are actual, out of pocket losses; that is, realized or liquidated loss. *Id.* (citations omitted). Mr. Heller's expert report does not address actual, out of pocket losses, because Grayson has not spent money to rehabilitate his reputation in the 9th Congressional District.[5] Moreover, as discussed above, Grayson has no interest in running for a seat in the 9th Congressional District, rendering Mr. Heller's opinions concerning the cost of producing and publishing positive political ads irrelevant to any issue in dispute. Grayson literally seeks costs related to securing a job he does not want. Under no construction of the law does this amount to a

---

[4]  In *Anderson,* the plaintiff alleged several causes of action, including libel *per se*, libel *per quod*, and defamation by implication after the plaintiff was accused of criminal conduct. 2020 WL 10058207, at *1.

[5]  *See, e.g*., *Thermolife International LLC v. Vital Pharmaceuticals Inc.*, No. 19-cv-61380, 2020 WL 409594, at *2 (S.D. Fla. Jan. 24, 2020)(finding that the counter-claimant had sufficiently alleged special damages by alleging that it was seeking damages in the form of "expenses incurred to counteract the disparaging effect" of the false statements); *Jameson Land Co., LLC v. Mosaic Fertilizer, LLC*, No. 8:15–cv–409, 2016 WL 7206122, at *3 (M.D. Fla. Feb. 5, 2016)(finding that the plaintiff had sufficiently alleged special damages by alleging that it had incurred expenses to counteract the false publication).

compensable damage.[6] Accordingly, Mr. Heller's expert opinions fail to satisfy the third prong of the *Daubert* analysis.

## IV.   The First and Second Prongs of *Daubert*

For the sake of completeness, the Court finds that Mr. Heller possesses the requisite technical and otherwise specialized knowledge based on his extensive employment history to offer expert opinions on the manner and means of producing and publishing favorable political advertisement and the costs associated doing so. *See Kumho Tire*, 526 U.S. at 147–48. While Mr. Heller may not have been specifically employed in the field of reputational repair, assuming such a thing exists, he has considerable experience working as a political media consultant. (Doc. 89-1, ¶ 3). The specialized knowledge acquired in this field since 1991 qualifies Mr. Heller to offer expert opinions concerning the cost of producing and publishing political advertisements. And so, the first prong of the *Daubert* analysis is satisfied.

The second prong of the *Daubert* test—a reliable methodology— presents a more challenging issue. Mr. Heller surmises that the allegedly defamatory statements produced by Progress Tomorrow and published at its direction caused Grayson to lose the primary election for Florida's 9th Congressional District. According to Mr. Heller "[t]he amount of damage done to Grayson's reputation in

---

[6]   This is not to suggest that Mr. Grayson does not have a claim for general damages, assuming the jury concludes some of the statements are defamatory—it is simply to stress that Mr. Heller's opinions do not advance that element of Grayson's claim.

this case is relatively clear." (Doc. 89-1, ¶ 9). That said, Mr. Heller relies on only two data points: (1) a survey conducted by a Democratic polling firm in 2018 in which 504 likely Democratic primary voters favored Grayson over incumbent Congressman Soto, and (2) the fact that notwithstanding his apparent lead, Grayson lost to Soto, the latter candidate receiving twice as many votes as Grayson. (*Id.*). The survey canvassed just under 1% of the eligible Democratic primary voters.[7]

Mr. Heller did not conduct, and does not cite, any surveys of eligible Democratic primary voters conducted after the August 2018 negative political ad campaign to assess whether the "anti-Grayson" ads negatively impacted the voter's opinion of Grayson and caused the voter to vote for Congressman Soto. While testing is not an absolute prerequisite to the admission of expert testimony, "an expert who conducts no testing must be prepared with a good explanation as to why his or her conclusion remained reliable notwithstanding the absence of testing." *Hendrix*, 255 F.R.D. at 586 (internal quotations and citations omitted). Mr. Heller fails to explain why he did not conduct a survey of individuals residing in the 9th Congressional District to gauge the impact, if any, of the so-called "anti-Grayson" ads. This survey could have been conducted shortly after the election while the voter's impression of the negative ads was fresh. The data from the survey could possibly have provided a basis for a statistical analysis of the impact of the

---

[7] According to Mr. Heller there were 55,114 votes cast in the 2018 Democratic primary, and 504 eligible voters were surveyed in June before the negative political ads were aired. (Doc. 89-1, ¶¶ 9, 13(a)).

allegedly defamatory statements on the election, assuming the survey was large enough and asked relevant questions using a reliable format. Even so, Mr. Heller is not qualified to interpret a survey of this kind and could not offer an opinion as to the reliability of the data collected and its impact on the election. Simply put, the record before the Court does not identify a single voter who was otherwise inclined to vote for Grayson but did not do so because of the negative ads. *See Peer v. Lewis*, No. 06-60146-CIV, 2008 WL 2047978, at *10 (S.D. Fla. May 13, 2008), aff'd No. 08-13465, 2009 WL 323104 (11th Cir. Feb. 10, 2009).

The Court is therefore left to consider whether a poll taken of 1% of the eligible Democratic voters (conducted before the negative ad campaign began) coupled with Grayson's loss is a reliable methodology upon which to find a causal connection between the negative political ads and the outcome of the election. While it may be commonsense that negative political advertisements do not help a candidate, they are a fixture of American politics and candidates win elections even when confronted with a blitzkrieg of negative ads. A single poll conducted before an election and focused on a thin slice of the eligible electorate, combined with an election loss, is not a methodology. Mr. Heller does not cite any studies where such meager data was used to accurately predict the outcome of an election, and the Plaintiff cites no caselaw holding the methodology, or even a similar methodology, carries the day.

As a final point, the Court finds that Mr. Heller's opinion that positive advertising must be produced and published at a ratio of 3.5 to 1 to repair

Grayson's reputation in the 9th Congressional District is entirely unsupported. While Mr. Heller has extensive experience as a political media consultant, he does not cite to any prior campaigns where he was involved in rebutting negative advertisements and found a ratio of 3.5 to 1 positive over negative advertisement reversed the impact of the negative ads. As Mr. Heller conceded at deposition, he cannot identify a basis for this ratio. (Doc. 89-2, 71:11—72:4). Mr. Heller also admitted he had not conducted any studies to arrive at this multiplier. (*Id.* at 71:13—16).

Accordingly, Mr. Heller's opinions that the allegedly defamatory statements caused Grayson to lose the election are not supported by a reliable methodology, nor is his opinion that a multiplier of 3.5 to 1 is necessary to repair Grayson's reputation.

## V.   CONCLUSION

For these reasons, the Defendants' *Daubert* Motion (Doc. 89) is **GRANTED**.

**DONE AND ORDERED** in Orlando, Florida on April 28, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties