**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ALAN GRAYSON,**

        **Plaintiff,**

**v.**                                **Case No: 6:20-cv-1824-PGB-LHP**

**NO LABELS, INC., PROGRESS**
**TOMORROW, INC., UNITED**
**TOGETHER, INC., NANCY**
**JACOBSON, MARK PENN and**
**JOHN DOES,**

        **Defendants.**

_____/

**<u>ORDER</u>**

This cause is before the Court on Plaintiff's *Daubert* Motion to Exclude Testimony of Melanie Sloan. (Doc. 90 (the "**Motion**")). Defendants submitted a response in opposition. (Doc. 106). Upon due consideration Plaintiff's Motion is granted.

## I.    BACKGROUND

Plaintiff Alan Grayson contends in his Second Amended Complaint that Defendants, acting through Progress Tomorrow, published false and defamatory statements which damaged him "personally, professionally, and ultimately politically." (Doc. 35, p. 1). The allegedly defamatory statements fall into three categories: (1) citation to a Congressional Ethics Investigation finding candidate Grayson had "Abused His Office for Financial Gain," including by using "taxpayer

resources to conduct his high-risk investor scheme;" (2) images of Grayson's passport photograph with dollar signs replacing his eyes, an attaché case containing $150,000, and images implying he flew to the Cayman Islands to launder the money; (3) statements relating to accusations made by Grayson's ex-wife in connection with their divorce proceedings, during which she accuses him of spousal abuse. (*Id.* ¶¶ 19–24). Plaintiff sued Defendants for Defamation (Count I), Defamation by Implication (Count II), and Civil Conspiracy (Count III). (*Id.* ¶¶ 43–73). Defendants retained Melanie Sloan to offer opinions as an expert in "congressional ethics." (Doc. 90-1, ¶¶ 2–3).

## II.   LEGAL STANDARDS

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion. In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court explained that Rule 702 imposes an obligation on a trial court to act as a gatekeeper to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.[1] District courts are charged with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies "expert testimony." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (2002).

---

[1]   Although the expert testimony at issue in *Daubert* was scientific, the Supreme Court held in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147–48 (1999), that the *Daubert* analysis and a trial judge's role as gatekeeper apply "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'otherwise specialized' knowledge."

Thus, the party offering an expert opinion has the burden of establishing three criteria: qualification, reliability, and helpfulness. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005). First, the witness must be "qualified to testify competently regarding the matters [s]he intends to address." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Indicia of an expert's qualifications may be evidenced by education, training, work experience, publication in the pertinent field, and membership in professional societies. *See Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990).

Second, the expert witness must employ "sufficiently reliable" scientific methods or principles to form her opinions. *Rink*, 400 F.3d at 1291. The reliability of an expert's methodology can be evaluated by considering a wide range of factors, including (1) whether the expert bases her opinion on sufficient facts or data, (2) whether the expert unjustifiably extrapolates her research to reach an unfounded conclusion, (3) whether the expert considers or accounts for contradictory studies or data, (4) the extent to which the methods used rely on the expert's subjective interpretations, and (5) whether the expert is being as careful as an expert in the same field would be in conducting professional work outside the context of paid litigation. *See Daubert*, 509 U.S. at 593–94; FED. R. EVID. 702 advisory committee's note to 2000 amendment.

Third, the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. Expert testimony helps where it concerns matters beyond the ken of the average juror and

will allow the jury to understand the evidence or to resolve a factual dispute. *See Kumho Tire*, 526 U.S. at 148–49. Conversely, there will be no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic considering the evidence and testimony presented at trial. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must hold probative value that outweighs the concerns listed in Rule 403. *Daubert*, 509 U.S. at 591. The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

Finally, in determining the admissibility of expert evidence, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfield v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation marks omitted). Indeed, cross examination, contrary evidence, and instruction on the burden of proof are the proper tools for challenging questionable expert evidence. *Id.*

## III.   DISCUSSION

### A.   Overview

Ms. Sloan's opinion concerns how a complaint against a member of Congress is reviewed by the United States House of Representatives' Office of Congressional Ethics ("**OCE**"), the composition of the OCE, the two phases of review by the OCE, and possible referral to the House Committee on Ethics. (*Id.* at

¶¶ 10–15). Ms. Sloan's report also sets forth her opinion that it is "commonly known that the House ethics committee rarely takes any action against members of Congress, [hence] the Washington political establishment and press corps regard and rely upon OCE reports as tantamount to an official finding that a member of Congress engaged in misconduct." (*Id.* ¶ 30).

Plaintiff challenges the admissibility of Ms. Sloan's expert opinions, arguing that none of the standards set forth in *Daubert* have been satisfied. (Doc. 90, p. 2). The Court has carefully reviewed Ms. Sloan's expert report and agrees that Ms. Sloan is unqualified to offer opinions as an expert witness. Further, even assuming she possessed the requisite qualifications, Ms. Sloan's opinions are not based on a reliable methodology and largely amount to no more than personal opinions and conjecture. Finally, expert testimony is not necessary to assist the jury in understanding how a complaint progresses through the OCE because the rules governing the OCE clearly explain the process.[2]

## B.    Qualifications

An expert can be qualified to offer an opinion concerning scientific, technical, or specialized knowledge by virtue of his or her education, training, and/or work experience. *Am. Tech. Res.*, 893 F.2d at 656. Ms. Sloan cites her work

---

[2] The Court has disqualified two experts retained by Plaintiff and now disqualifies Ms. Sloan. The Court is not in the business of determining whether the jury will ultimately believe an expert and limits its analysis to the *Daubert* factors. Plaintiff retained two experts who possessed the requisite qualifications but whose methodology was flawed, and, here, Defendants retained an expert who is unqualified and whose opinions lack a reliable methodology. The parties should be more circumspect in retaining experts going forward.

as the executive director of a "watchdog" group she founded in 2003, called Citizens for Responsibility and Ethics in Washington, and her work as a senior advisor to another watchdog organization, American Oversight, as a basis for her expertise in congressional ethics. (Doc. 90-1, ¶ 3). Ms. Sloan also attests that she worked with Congress to establish the OCE in 2008 and has filed "numerous" ethics complaints with the OCE against members of the House of Representatives. (*Id.*). According to Ms. Sloan, she is regularly called upon by members of the media to explain the congressional ethics process and to comment on "various issues" related to congressional ethics. (*Id.*). Moreover, Ms. Sloan has published numerous opinion pieces related to congressional ethics. (*Id.*).

That said, Ms. Sloan fails to identify what Citizens for Responsibility and Ethics in Washington and American Oversight do, aside from their self-proclaimed titles of "watchdog" groups. This does not help the Court in assessing whether Ms. Sloan's work with either organization qualifies her, by virtue of her knowledge, skill, experience, training, or education, to offer the opinions expressed in her report. Similarly, Ms. Sloan's reference to having worked with Congress to establish the OCE in 2008 is too vague to be of assistance in assessing her expertise. The Court must speculate as to Ms. Sloan's role in the establishment of the OCE, and the Court cannot fill in this gap by assuming her work was instrumental as opposed to ministerial. Similarly, filing ethics complaints does not make one an expert on the inner workings of the OCE, just as filing an ethics

complaint with the Florida Bar does not qualify one to offer opinions on how the claims are evaluated and advanced.

That Ms. Sloan is regularly called upon by members of the media to explain the congressional ethics process and to comment on "various issues" related to congressional ethics is also not helpful. The OCE rules (Doc. 90-4) spell out precisely how a complaint moves through the investigation and review process, and Ms. Sloan does not elaborate on whether her media interviews provide insight that is greater than what anyone can discern from reading the OCE rules. Ms. Sloan does, however, list her publications, and they appear to be opinion pieces, as opposed to scholarly critiques of the operations of the OCE and House Ethics Committee. (Doc. 90-1, pp. 12–13).

Next, Ms. Sloan lists her experience as an Assistant U.S. Attorney for the District of Colombia for an unspecified term, her work as counsel to the Committee on the Judiciary in the House of Representatives, and as nominations counsel to the Committee on the Judiciary in the United States Senate. (*Id.* ¶ 5). While these posts are certainly impressive, there is no indication that they relate to congressional ethics.

Finally, and somewhat oddly, Ms. Sloan lists *Ms. Magazine* calling her "The Most Feared Woman in Washington," which Ms. Sloan claims was due to her work on congressional ethics, alluding, presumably, to her watchdog group complaints against members of Congress. (*Id.* ¶ 4). Ms. Sloan also cites her title as one of "Washington's Most Influential Lobbyists," given to her by *The Hill* for five

consecutive years. (*Id.*). Being a lobbyist is—hopefully—unrelated to being a watchdog and, accordingly, is of no assistance to the Court. Similarly, Ms. Sloan lists publications that referred to her as one of "Washington's Most Influential Women Lawyers," one of "100 Agents of Change," and as one of the "Year's Greatest Mavericks," the latter two being conferred by *Rolling Stone*, which is not a peer-reviewed publication. (*Id.*). None of these recognitions qualify one as an expert in congressional ethics. While the Court could *assume* that Ms. Sloan has substantial experience identifying politicians whose conduct is called into question and initiating a complaint with the OCE, that is not the same as being qualified to offer opinions on the inner workings and deliberative process of the OCE, which is the core of Ms. Sloan's opinions.

This is not to say that a properly qualified expert witness can never offer opinions concerning a governmental agency and how its regulations relate to the subject of the litigation. In *Ford v. Gen. Motors LLC*, No. 1:17-cv-209, 2019 WL 3483171, at *10 (N.D. Ga. Feb. 4, 2019), the court found Allan Kam, a former NHTSA employee, was qualified to testify as an "expert regarding NHTSA and applicable federal regulations relating to the subject" rollover accident. Mr. Kam was permitted to opine that meeting the requirements of the FMVSS does not mean the vehicle is without defect. *Id.* Importantly, Mr. Kam was not offering an opinion of law; that is, whether the subject vehicle was defective. *Id.* Here, by contrast, Ms. Sloan's opinions are not confined to how the OCE processes an ethics complaint. Ms. Sloan's ultimate opinion is that the OCE referral to the House

Ethics Committee is "*tantamount*" to an official finding that a member of Congress engaged in misconduct because every insider in Washington knows the House Ethics Committee protects its members and, therefore, its failure to act is not a vindication of the member. (*Id*. ¶ 30). Ms. Sloan, therefore, commits three sins: (1) her opinion usurps the role of the jury in determining the weight to afford the OCE referral; (2) Sloan fails to demonstrate that she possesses the requisite specialized knowledge to render this opinion; and (3) she offers a legal opinion that while the OCE is expressly prohibited from offering conclusions regarding the validity of the complaint or the guilt or innocence of the person subject to review,[3] its report is, in reality, an official finding of misconduct. (*Id*.). For these reasons, Ms. Sloan lacks the necessary qualifications to testify as an expert witness.[4]

### C.    Reliability and Helpfulness

First, Ms. Sloan summarizes the creation of the OCE as a response to a series of congressional ethics scandals. (*Id*. ¶¶ 10–11). While the history leading up to the creation of the OCE is interesting, it is not relevant to any issue or fact in dispute. That is, Plaintiff sued Defendants for publishing political advertisements, including one depicting a beach scene and stating: "**A CONGRESSIONAL**

---

[3]    Even when an ethics complaint advances to the second-phase review, the OCE's finding that probable cause exists to believe the allegation occurred "does not constitute a finding the violation has actually occurred." (Doc. 90-4, pp. 15–16). Ms. Sloan's opinion is contrary to the OCE rules and is, therefore, a legal opinion—albeit incorrect and entirely speculative.

[4]    The Court rejects Defendants' argument that Ms. Sloan is merely testifying regarding industry practices; she goes further by advancing opinions contrary to the express limits of the OCE's powers. (Doc. 106, p. 10). Ms. Sloan lacks any expressed qualifications to opine what an OCE referral *really* means.

**ETHICS INVESTIGATION** found evidence that Alan Grayson **ABUSED HIS POSITION IN CONGRESS** to enrich himself." (Doc. 90-6). The issues in a defamation action are whether the advertisement is "(1) a statement of fact, (2) which was false, and (3) [was] made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Shiver v. Apalachee Pub. Co.*, 425 So.2d 1173, 1175 (Fla. 1st DCA 1983). The events leading up to the creation of the OCE are not relevant to any of these issues.

Next, Ms. Sloan dedicates four paragraphs to an explanation of the composition of the OCE Board of Directors, the OCE's authority to conduct a two-stage review (investigation) of ethics complaints and make recommendations, the burdens of proof attached to each stage of the review, and the OCE's written report to the House Ethics Committee when a complaint reaches the second stage. (Doc. 90-1, ¶¶ 12–15). Ms. Sloan's summary of the Rules of the Office of Congressional Ethics (Doc. 90-4) is accurate. That said, the Court can take judicial notice of the Rules, which are written in plain English, and the jury can use its common sense and collective wisdom to evaluate the rules in context with other evidence admitted at trial. Thus, expert testimony is not required to explain the two-stage review process.

In paragraph 16 of her report, Ms. Sloan explains that on January 6, 2016, the OCE referred Alan Grayson to the House Committee on Ethics and identifies the six subject areas for which the committee found "'substantial reasons' to believe Representative Grayson had violated federal law and House rules." (*Id.* ¶

16). Ms. Sloan cites the OCE Report on Representative Grayson in her expert report, and the report is the best evidence of what the committee found. (*Id.* at p. 5, n. 15). While Ms. Sloan characterizes the OCE Report as finding substantial evidence Grayson *had* violated federal law and House rules, the official report contradicts this characterization. On the first page of the Report, the OCE summarizes the nature of the "alleged violation" and unequivocally states that Representative Grayson *may have* violated federal law, House rules, and standards of conduct. One need only review the table of contents of the report to see it is replete with the qualifier "may have" and not "had" as Ms. Sloan attests. (*Id.*). The OCE's report conforms to the Rules prohibiting the committee from offering conclusions regarding the validity of the allegations. Ms. Sloan recasts the Report and represents the OCE concluded, based on substantial evidence, that the allegations were true. This goes too far. Ms. Sloan has never testified as an expert before, but she is an attorney and should know that an expert witness has a duty to the objective truth and not mere advocacy.

Next Ms. Sloan notes that on April 6, 2016, the House Committee on Ethics voted to extend its investigation of Representative Grayson, citing the Statement of the Chairman and Ranking Member of the Committee on Ethics. (*Id.* at p. 6, n. 17). Ms. Sloan goes on to state the committee "could have, but notably did not, dismiss the complaint against Representative Grayson." (*Id.* ¶ 17). This is not so much an opinion as an argument, and it is notable that Ms. Sloan fails to cite authority for this proposition.

Ms. Sloan's analysis, however, loses all traction starting at paragraph 19 of her report. Ms. Sloan shifts away from a recitation of the Rules governing the OCE to her opinion that the "House Ethics Committee typically attempts to avoid finding any member of the House has violated House Rules if it can find a colorable way to do so." (*Id.* ¶ 19). Ms. Sloan supports this explosive premise by arguing that only two members of Congress were reprimanded or recommended for reprimand between 2012 and 2020. (*Id.*). Two data points does not constitute a methodology. While Ms. Sloan, whose life work has largely been with a watchdog group, may believe more members deserve reprimands, the mere fact that only two were reprimanded, or recommended for reprimand, during this period does not mean the House Ethics Committee has abandoned its duty.

Ms. Sloan next opines that the House Ethics Committee "frequently pauses or delays its own investigation if there is a pending investigation by another agency, such as the Justice Department, or if a member may soon retire, resign, or run for higher office." (*Id.* ¶¶ 20, 24–25). Ms. Sloan cites a report by another non-profit watchdog, Issue One, stating that the House Ethics Committee punished 12 members over the course of 10 years, describing the punishment in 10 cases as a "slap on the wrist." (*Id.*). Assuming Issue One is correct, it is unclear how these statistics support Ms. Sloan's opinion that the House Ethics Committee frequently pauses or delays its own investigation. The statistics entirely lack context. Moreover, although Ms. Sloan may hold a personal opinion that the Committee should never pause its investigation, common sense compels the opposite

conclusion. Why should the House Ethics Committee expend its resources to pursue an investigation when it will lose jurisdiction once the member retires, resigns, or runs for higher office? And why should the House Ethics Committee not defer to the Department of Justice, with its access to a grand jury and with the preclusive effect of a conviction? Simply put, Ms. Sloan's opinion, or premise, that the House Ethics Committee *improperly* pauses or delays its investigations is not supported by a reliable methodology. Citation to findings by Issue One concerning the number of completed investigations—regardless of the sanction imposed—is not evidence of improperly pausing or delaying other investigations.

Ms. Sloan further contends that because "more than 21,000 individuals *either* requested information about ethics issues or submitted allegations of misconduct" and the "OCE initiated a preliminary review in only 182 matters and referred just 74 to the House Committee on Ethics," the committee must be compromised. (*Id.* ¶ 21). Once again, Ms. Sloan reaches her opinion without a reliable methodology. First, did 20,000 individuals make complaints and 1,000 request information, or the reverse? And Ms. Sloan presents no analysis of the complaints filed versus the 182 preliminary reviews or the merits of the complaints that did not advance to a review. Merely stating numbers without context or meaningful analysis is not a reliable methodology.[5]

---

[5] This point should not be lost on Defendants, since they argued Plaintiff's expert, Mr. Carroll, should be excluded because his opinions were not supported by a study or empirical data. (Doc. 88, p. 11). And Defendants successfully moved to exclude Mr. Heller—an expert on the cost of reputational repair—where he did not measure Grayson's reputation before and after the negative ads. (Doc. 89, pp. 10–11).

Ms. Sloan continues her assault on the House Ethics Committee by citing Issue One's report, which criticized the failure to empanel a subcommittee ("doing so in only 15 out of more than 190 investigative matters between 2009 and 2018"), opting instead to gather information under Rule 18(a). (*Id.* ¶ 22). Assuming Issue One's report is correct, the relevance of the committee's decision to use Rule 18(a) to Ms. Sloan's opinions is obscure. Rule 18(a) allows the committee to "interview witnesses, request documents, issue subpoenas and take other investigative action, but the committee's work remains confidential." (*Id.*). Since Rule 18(a) provides expansive investigative powers, Ms. Sloan must be citing confidentiality as the problem. Even assuming confidentiality is undesirable—a very debatable point— the fact that the committee elects to proceed via Rule 18(a) does not support Ms. Sloan's opinion that the House Ethics Committee is a paper tiger which leads the "Washington political establishment" and "press corps" to rely on the OCE as the de facto arbiter of a member's guilt or innocence, notwithstanding the Rules prohibiting a finding on the ultimate issue.[6]

Ms. Sloan turns to Representative Grayson's decision to amend his 2009 and 2012 financial disclosure forms following the OCE referral as proof that the OCE findings were validated. (*Id.* ¶ 27). Once again, Ms. Sloan commits the sin of

---

[6] Ms. Sloan opines that because the House Ethics Committee had an "incentive" to maintain jurisdiction under Rule 18(a) because it knew Grayson's term in the House would be ending given his run for a Senate seat. (*Id.* ¶ 26). Having an incentive to maintain an investigation when the committee's jurisdiction was dwindling is not evidence that the House Ethics Committee acted inappropriately. This is no more than Ms. Sloan's disagreement with the committee's exercise of its discretion.

usurping the role of the jury by offering an opinion that is solely within its providence. Worse, Ms. Sloan offers a legal opinion, and expert witnesses are prohibited from doing so.

The jury will be tasked with considering the political advertisement which proclaimed that the OCE "found" evidence that Grayson enriched himself while in Congress. Since the OCE does not pass on the credibility of allegations, Ms. Sloan attempts to cast the House Ethics Committee as colluding to protect its members and thereby elevates the OCE's referral to a factual finding—a conviction of sorts. Ms. Sloan uses scatter-shot statistics and anecdotes, coupled with an unvetted report issued by a third party, to support her characterization of the House Ethics Committee. All of which is necessary to give support to Ms. Sloan's opinion that the "Washington political establishment"—whatever that is—and the "press corps"—however that is defined—rely upon the OCE reports as "tantamount" to an official finding of misconduct.

If allowed, Ms. Sloan's opinions would inform the jury to disregard the Rules governing the OCE, which prevents that body from commenting on the veracity of the allegations or the guilt of the member, and to trust her that the Washington political establishment, in a rare moment of national unity, rely on the OCE, as does the press, no matter how far right or left the outlet may be. And the jury would have to do so based on Ms. Sloan's *ipse dixit*. This type of opinion testimony is precisely what *Daubert* was designed to prevent.

IV.     **CONCLUSION**

For these reasons, the Plaintiff's *Daubert* Motion to Exclude Testimony of

Melanie Sloan (Doc. 90) is **GRANTED**.

**DONE AND ORDERED** in Orlando, Florida on May 4, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties