# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**ALAN GRAYSON,**

      **Plaintiff,**

v.                              Case No: 6:20-cv-1824-PGB-LHP

**NO LABELS, INC., PROGRESS TOMORROW, INC., UNITED TOGETHER, INC., NANCY JACOBSON, MARK PENN and JOHN DOES,**

      **Defendants.**

_____/

## **ORDER**

This case arises from the August 28, 2018, Democratic Party Primary Election for a seat in the United States House of Representatives for Florida's Ninth Congressional District, in which Darren Soto defeated former Congressman Plaintiff Alan Grayson. (Docs. 136, 137). In his Second Amended Complaint,[1] Plaintiff sues Defendants Progress Tomorrow, Inc. (a now-defunct political action committee), United Together, Inc. (another now-defunct political action committee), No Labels, Inc. (a nonprofit organization), Nancy Jacobson (the president and founder of No Labels, Inc.), and Mark Penn (Nancy Jacobson's

---

[1] Plaintiff originally initiated this action in state court, which Defendants removed to this Court on October 2, 2020. (Doc. 1). Plaintiff filed his Second Amended Complaint on April 21, 2021. (Doc. 35).

husband) for defamation (Count I),[2] defamation by implication (Count II),[3] and civil conspiracy to commit the allegedly defamatory acts (Count III).[4] (Docs. 35, 136, 137). Specifically, Plaintiff claims that Defendants, "acting through" Progress Tomorrow, Inc., published defamatory statements on various platforms that ruined his reputation and caused him to lose the 2018 congressional campaign. (Doc. 35, ¶ 1).

Now before the Court are Defendants' respective Motions for Summary Judgment (Docs. 94, 95),[5] Plaintiff's responses in opposition (Docs. 110, 111), and

---

[2]  "Federal courts sitting in diversity apply the substantive law of the forum state." *Grange Mut. Cas. Co. v. Woodard*, 826 F.3d 1289, 1295 (11th Cir. 2016). "Defamation under Florida law has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official . . . ; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

[3]  "[D]efamation by implication is a well-recognized species of defamation that is subsumed within the tort of defamation," and it "turns on whether the 'gist' of the publication is false." *Jews for Jesus*, 997 So. 2d at 1108; *Turner*, 879 F.3d at 1269 (collecting Florida case law).

[4]  Under Florida law, a civil conspiracy claim has four elements: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008)).

[5]  United Together, Inc., No Labels, Inc., Nancy Jacobson, and Mark Penn argue that only Progress Tomorrow, Inc., published the allegedly defamatory statements. (Doc. 95). Therefore, Progress Tomorrow, Inc., moves for summary judgment separately (Doc. 94), and the other Defendants' brief focuses solely on the publication element of the defamation claims (Doc. 95). However, the other Defendants' brief incorporates by reference the arguments advanced by Progress Tomorrow, Inc., as to the other elements of the defamation claims. (Doc. 95, p. 20). Accordingly, even though the Court refers exclusively to Progress Tomorrow, Inc.'s Motion for Summary Judgment for the purposes of this Order, the Court refers to Defendants collectively.

Defendants' replies thereto (Docs. 113, 114). Upon consideration, the Motions for Summary Judgment are due to be granted.

**I.     STANDARD OF REVIEW**

To prevail on a motion for summary judgment under Federal Rule of Civil Procedure 56, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (internal quotations omitted).

The Court must "view the evidence and all factual inferences therefrom in the light most favorable to the [nonmoving] party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

Importantly, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating*

3

the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis in original). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* (internal quotations omitted). "Such a motion, whether or not accompanied by affidavits, will be made and supported as provided in this rule, and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted).

## II. GOVERNING LAW: DEFAMATION & THE FIRST AMENDMENT[6]

The seminal case on the intersection between the tort of defamation and the protections of the First Amendment, *New York Times Co. v. Sullivan*, emphasizes the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. 254, 270 (1964). Given the importance of the First Amendment's "guarantees," a public figure cannot prevail in a defamation lawsuit unless he demonstrates, by clear and convincing proof, that the defendants published the allegedly defamatory statements with "actual malice," meaning

---

[6] Florida law governs the merits of the instant defamation causes of action, but the "standards for public figures and 'actual malice' derive from the First Amendment and thus . . . are matters of federal law." *Berisha v. Lawson*, 973 F.3d 1304, 1314 n.6 (11th Cir. 2020).

4

"with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–80; *Harte-Hanks Commc'ns., Inc. v. Connaughton*, 491 U.S. 657, 659 (1989).

"That is, he must be able to show—well beyond a preponderance of the evidence—that the defendants published a defamatory statement either with actual knowledge of its falsity or with a 'high degree of awareness' of its 'probable falsity.'" *Berisha*, 973 F.3d at 1312 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). The actual malice standard "is a subjective test, which asks whether the [defendants] '*in fact* entertained serious doubts as to the truth of [their] publication[s].'" *Id.* (emphasis in original) (quoting *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1498 (11th Cir. 1988)).

Certain circumstantial evidence, such as the defendants' motivations or lack of diligence, bears on the existence of actual malice:

> Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant[s], is the product of [their] imagination[s], or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the [] allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). However, "courts must be careful not to place too much reliance on such [circumstantial evidence]" as "the actual

5

malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks*, 491 U.S. at 667–68.

Furthermore, "[e]ven an 'extreme departure from professional publishing standards' does not necessarily rise to the level of actual malice." *Berisha*, 973 F.3d at 1312 (quoting *Harte-Hanks*, 491 U.S. at 665); *see St. Amant*, 390 U.S. at 731 ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."). "Thus, a failure to investigate, standing on its own, does not indicate the presence of actual malice. Rather, there must be some showing that the defendant[s] purposefully avoided further investigation with the intent to avoid the truth." *Michel*, 816 F.3d at 703 (internal citations omitted).

The inverse is also true: the defendants' reasonable reliance on previously published reports from independent, reputable sources "defeat[s] any claim of actual malice." *Berisha*, 973 F.3d at 1313. Likewise, "[w]here [the defendants] give[] readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the [defendants themselves have]," and rebuts the presence of actual malice. *Michel*, 816 F.3d at 703; *see also Klayman v. City Pages*, 650 F. App'x 744, 751 (11th Cir. 2016) ("Evidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice. . . . [I]f the defendants actually had been highly aware of the

6

publications' falsity, it is unlikely they would have included source information that refuted any defamatory claims or implications.").

### III. ANALYSIS

There are two categories of allegedly defamatory statements at issue. The Court examines these categories in turn and ultimately concludes that summary judgment in favor of Defendants is proper because there is no clear and convincing proof of actual malice.

#### A. The First Category: Plaintiff's Conduct as a Former Congressman

First, the Second Amended Complaint contests two print advertisements, or "mailers," containing the following statements: "Congressional Ethics Investigation Found Alan Grayson Abused His Office for Financial Gain"; "A Congressional Ethics Investigation found evidence that Alan Grayson Abused His Position in Congress to enrich himself"; "as a congressman, he . . . [h]id income on his public disclosures" and "[u]sed taxpayer resources to conduct his high-risk investor scheme"; "Alan Grayson Used His [Congressional] Office For His Own Financial Gain." (Doc. 35, ¶¶ 19–22). The Second Amended Complaint describes the first mailer as a picture of Plaintiff lounging on the beach in the Cayman Islands with a cocktail. (*Id.* ¶ 21). It describes the front of the second mailer as a picture of a figure striding towards a jet bound for the Cayman Islands, an attaché case in hand. (*Id.* ¶ 22). On the back, the open attaché case reveals stacks of cash and

7

Plaintiff's passport photograph, with dollar signs replacing his eyes. (*Id.*).[7] The Second Amended Complaint also alleges that the same content appeared online, alongside other statements that Plaintiff: "used international government travel to drum up business for his hedge fund"; "used Congressional staff to work for the fund" (omitting the fact that the staffer worked for the fund when Plaintiff was not a member of Congress); and called for a reporter's arrest after the reporter asked Plaintiff some questions (omitting the fact that Plaintiff called for the reporter's arrest because the reporter repeatedly chest-bumped him in an ambush interview). (*Id.* ¶¶ 30–31, 33 n.13, 35–36, 57).[8]

Interestingly, the Second Amended Complaint does not attach the contested mailers or the allegedly defamatory online content. However, Defendants attach the described mailers to their brief,[9] and, notably, the Second Amended Complaint leaves out a few details. Both mailers cite to a December 18, 2015, report by the

---

[7] In a footnote, the Second Amended Complaint describes a third mailer as a picture of a Cayman Islands beach with the caption, "Where Alan Grayson Made Congress Work For Him." (*Id.* ¶ 21 n.2). It is not clear whether this mailer forms part of the basis of Plaintiff's lawsuit, particularly as the parties do not discuss it in their briefs; regardless, the logic herein applies to the footnoted mailer with equal force.

[8] In another footnote, the Second Amended Complaint mentions that Defendants made another defamatory statement, "Grayson pushed reporter." (*Id.* ¶ 23 n.6). Again, it is not clear whether this statement forms part of the basis of Plaintiff's lawsuit, particularly as the parties do not discuss it in their briefs; regardless, the logic herein applies to the footnoted statement with equal force.

[9] In their brief, Defendants state that Plaintiff's Amended Answers to Interrogatories alleged that all publications produced by Defendants during discovery are also defamatory. (Doc. 94, p. 11 n.1). Thus, "in an abundance of caution," Defendants attach all publications produced during discovery. (*Id.*). However, the Court limits its review to those allegedly defamatory publications specified in the Second Amended Complaint; Plaintiff cannot further amend his pleading through his Amended Answers to Interrogatories. *See* FED. R. CIV. P. 15(a).

8

Office of Congressional Ethics ("**OCE**") and encourage readers to review it themselves and "check the facts" in three different places. (Docs. 94-21, 94-23). As is relevant here, the nearly 1,000-page OCE report, also attached to Defendants' brief, finds "substantial reason to believe" that: Plaintiff "improperly allowed the use of his name by four entities connected to [his] hedge fund," including entities in the Cayman Islands, "and received compensation through management fees"; Plaintiff "improperly omitted information related to his assets, unearned and earned income, reportable agreements and positions from his [annual financial] disclosure statements"; and "[Plaintiff's] congressional staffer improperly used official resources for unofficial purposes, including the use of staff time and resources to perform work for [his] hedge fund." (Doc. 94-8, pp. 2, 11–25, 39–59, 73).

In addition to the OCE report, one of the mailers cites to a June 30, 2015, *Politico* article, "Grayson hedge funds skirt ethics rule," and Defendants attach the article—which they assert has not been retracted and remains available online—to their brief. (Docs. 94-11, 94-21). In it, *Politico* reports that Plaintiff managed "hedge funds that use his name in their title[s]," "two of which are based in the Cayman Islands," "a practice prohibited by congressional ethics rules designed to prevent members from using their elected post for financial gain." (Doc. 94-11, p. 1). Defendants also attach a February 11, 2016, *New York Times* article, "Alan Grayson's Double Life: Congressman and Hedge Fund Manager," to their brief, again asserting that it has not been retracted and remains available online:

9

> This highly unusual dual role—a sitting House lawmaker running a hedge fund, which until recently had operations in the Cayman Islands—has led to an investigation of Mr. Grayson by the House Committee on Ethics. The inquiry has become public, but emails and marketing documents obtained by [*The New York Times*] show the extent to which Mr. Grayson's roles as a hedge fund manager and a member of Congress were intertwined, and how he promoted his international travels, some with congressional delegations, to solicit business.

(Doc. 94-10, p. 1). As to their statements regarding the incident between Plaintiff and the reporter, Defendants attach July 2016 articles by *Politico*,[10] *The Washington Post*,[11] *Orlando Weekly*,[12] and *Vanity Fair*,[13] to their brief, once more asserting that these reports have not been retracted and remain available online. (Docs. 95-15, 94-16, 94-17, 94-18).

---

[10] "Rep. Alan Grayson threatened to have a POLITCO reporter arrested . . ., alleging that the reporter assaulted him as he attempted to question the congressman about allegations of domestic abuse." (Doc. 94-15, p. 1).

[11] "There is no perfectly right way to handle allegations of domestic violence, but Rep. Alan Grayson (D-Fla.) just demonstrated the totally wrong way. At an event hosted by Politico in Philadelphia, site of the Democratic National Convention, Grayson . . . got in the face of—and made contact with—Edward-Isaac Dovere, a reporter for Politico, which earlier in the day published claims of abuse by the congressman's ex-wife." (Doc. 94-16, p. 2).

[12] "U.S. Rep. Alan Grayson was caught on video threatening to call police on a Politico reporter who was asking him questions about a report where his ex-wife Lolita [Carson-Grayson] says she repeatedly went to law enforcement officials accusing the congressman of alleged domestic abuse over a two-decade period. . . . Grayson appears to push past Dovere . . . After they both accused each other of pushing, Dovere says there's evidence of who started it on video. Grayson tells him, 'Well that's right and it's a good thing. I'll be handing it over to the Capitol police, my friend.' After some more arguing, Grayson tells Dovere, 'You know, I hope somebody comes here and arrests you.'" (Doc. 94-17, pp. 1–2).

[13] "Mere hours after Politico revealed 20 years' worth of claims of domestic abuse filed against the congressman by his ex-wife, Lolita [Carson-Grayson], the politician lashed out at a reporter from the outlet, Edward-Isaac Dovere, whom he threatened to have arrested. The altercation, which occurred at a Politico event in Philadelphia, was caught on tape. In the footage, Grayson can be heard saying, 'You're assaulting a member of Congress,' and, 'You know, I'm hoping someone comes here and arrests you,' after Dovere asks for a comment on the alleged domestic abuse." (Doc. 94-18, p. 2).

Thus, Defendants correctly contend that their reasonable reliance on previously published reports from these independent, reputable sources for all their advertisements, as well as their citation to some of these sources in the mailers, rebuts the presence of actual malice. *See Berisha*, 973 F.3d at 1313; *Michel*, 816 F.3d at 703.

Perplexingly, Plaintiff's response brief[14] raises a vague hearsay objection to all of Defendants' attached exhibits. (Doc. 110, pp. 3–5). Because Plaintiff does not define the basis for his hearsay objection, and therefore "decline[s] to put forth any argument on the issue or provide legal authority in support of [his] position," the objection is overruled. *Nephron Pharms. Corp. v. Hulsey*, No. 6:18-cv-1573, 2020 WL 7137992, at *3 (M.D. Fla. Dec. 7, 2020) (citing *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007)).

Even setting aside this glaring defect, Plaintiff's hearsay objection is clearly baseless. The attached mailers are not hearsay; they are not offered for the truth of the matter but rather to show the legally operative facts at issue (*i.e.*, the allegedly defamatory words in the full context in which they were published). FED. R. EVID. 801(c).[15] Likewise, the attached reports are not hearsay; they are not offered for the truth of the matter but rather to show the effect of those reports on Defendants,

---

[14] Most of Plaintiff's response brief is in single-spaced, bullet-pointed, 12-point font. (Doc. 110). Normally, the Court would strike this filing as a blatant violation of Local Rules 1.08 and 3.01, but it suffers through this headache-inducing format in the interests of judicial efficiency.

[15] This applies to the mailers identified in the Second Amended Complaint as well as all the other allegedly defamatory publications attached to Defendants' brief, *supra* note 9. (*See* Docs. 94-21, 94-22, 94-23, 94-24, 94-25, 94-26, 94-27, 94-28, 94-29, 94-30, 94-31, 94-32, 94-33, 94-34, 94-35, 94-36, 94-37).

and the OCE report is also admissible as a public record. FED. R. EVID. 803(8).[16] The Court does not need to consider the evidence subject to *Daubert* challenges for the purposes of this Order; Plaintiff's broad authenticity objection to any documents downloaded from a website is foundationless, FED. R. EVID. 902(5)–(6); and Plaintiff's objection that some of the attached publications were not produced during discovery is unsupported.[17]

Plaintiff then disingenuously contends that "this record *reeks* of actual malice." (Doc. 110, p. 13). Plaintiff conveniently ignores his Spoliation Motion, filed on January 3, 2022, which concedes "there is an incomplete record as to the extent that the Defendants knew or should have known that their anti-Grayson screeds were false (*i.e.*, malice)." (Doc. 96, p. 9).

Moreover, the purported "proof" of actual malice consists of:

- No Labels, Inc.'s boast to donors that it could destroy Plaintiff's political career.

- An overview of the donations received by and the transfers among Defendants during the 2018 election, accompanied by

---

[16] (*See* Docs. 94-8, 94-10, 94-11, 94-12, 94-15, 94-16, 94-17, 94-18). This also applies to the attached police reports and medical records of spousal abuse by Lolita Carson-Grayson against Plaintiff, discussed in more detail below (Doc. 94-13), and to the attached 2016 and 2018 election results by the Federal Election Commission (Docs. 94-2, 94-3).

[17] Plaintiff's attached deposition is admissible as an opposing party's statement, FED. R. EVID. 801(d)(2), and the various declarations in support of Defendants' brief can be reduced to an admissible form at trial by calling the declarants to testify, FED. R. EVID. 601, or, if they are unavailable, by offering their previously sworn testimonies at trial, FED. R. EVID. 804(b)(1). *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form); (Docs. 94-1, 94-4, 94-5, 94-6, 94-7, 94-9, 94-14, 94-19, 94-20, 94-38, 94-39, 94-42, 94-43, 94-45). Additionally, the attached pleading by Plaintiff against Thomas Ubl (Doc. 94-39) is subject to judicial notice "for the limited purpose of recognizing . . . the subject matter of the litigation." *U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); FED. R. EVID. 201.

> Plaintiff's speculations that Defendants used this money to publish the allegedly defamatory statements against him.

- Plaintiff's observation that he and one of Defendants' major donors, Fox News, "had attacked each other for years."

- Emails from Defendants' counsel and opposition researcher evaluating various advertisements for potential defamation liability, most of which advise the qualification of certain statements and the accurate quotation of source materials, and Plaintiff's commentary that Defendants failed to heed this advice in numerous allegedly defamatory publications.

- Plaintiff's statement that although Defendants were aware that the OCE report does not contain final conclusions regarding his guilt or innocence of the ethical violations alleged against him, their allegedly defamatory publications "indicate the opposite."

- Plaintiff's counsel's cease and desist letter to Defendants, "informing them that their attacks were false and defamatory," and Plaintiff's remark that "[t]here is no indication that the Defendants did anything to check . . . their facts after this."

(Doc. 110, pp. 3, 7, 11–13). As a preliminary matter, Plaintiff's various theories and conjectures regarding Defendants' liability are insufficient at the summary judgment stage of this proceeding to carry his case, and Plaintiff's counsel's cease and desist letter characterizing Defendants' publications as defamatory does not make them so. And, as to the actual pieces of evidence referenced, Plaintiff's disorderly citation to the record makes it impossible for the Court to locate them. The Court is under no obligation to sift through the record and, in fact, doing so would be improper, as the Court cannot remediate haphazard advocacy.[18]

---

[18] Another example of carelessness, Plaintiff's brief sporadically mentions allegedly defamatory statements that are not challenged in the Second Amended Complaint. (*See, e.g.*, Doc. 110, p. 13 n.19). Plaintiff never moved to further amend his pleading, and therefore the Court cannot and will not consider such information. *See Gimour v. Gates, McDonald & Co.*, 382 F.3d 1312,

But, even accepting Plaintiff's professions at face value, this is far from a demonstration of actual malice. At most, this "evidence" merely shows ill will in the ordinary sense of the term and, perhaps, a deviation from professional publishing standards. *See Harte-Hanks*, 491 U.S. at 667–68.[19] Thus, there is no clear and convincing proof that Defendants published the first category of allegedly defamatory statements with actual malice, and summary judgment in favor of Defendants as to these publications is proper.

### B. The Second Category: Allegations of Abuse Against Plaintiff by Lolita Carson-Grayson, His Ex-Wife

Next, the Second Amended Complaint generally alleges that Defendants knew Lolita Carson-Grayson's charges of abuse against Plaintiff were false and, nonetheless, published her statements, omitting her recantation of those allegations. (Doc. 35, ¶¶ 23, 32, 36, 57). However, the Second Amended Complaint does not state what allegations of abuse were recanted by Lolita Carson-Grayson, attach the challenged publications, or otherwise describe the allegedly defamatory statements at issue with any specificity.

In their brief, Defendants list the allegedly defamatory statements (apparently) at issue and attach the (supposedly) challenged publications: "Her

---

1314–15 (11th Cir. 2004) ("[T]he Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a). This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. . . . At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Rule] 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

[19] Actually, the fact that Defendants vetted their advertisements through counsel and their opposition researcher could further undermine the presence of actual malice.

14

husband came up behind her and hit her on the back of the head with a large book"; "Mr. Grayson . . . hit her in the back of her head . . . and told her 'I'm gonna kill you'"; "Alan Grayson's ex-wife repeatedly reported Grayson to police for verbally and physically abusing her over two decades"; "Alan Grayson, serial abuser"; "Two decades of reported abuse. Alan Grayson: enough is enough." (Doc. 94, p. 10; Docs. 94-22, 94-24, 94-25, 94-26, 94-28, 94-31, 94-32, 94-33, 94-34). Again, many of the challenged publications cite to articles by independent, reputable sources and encourage readers to review these sources themselves and "check the facts." (Doc. 94, p. 11; Docs. 94-22, 94-24, 94-26, 94-28, 94-33). And, again, Defendants assert that they reasonably relied on these previously published reports of Lolita Carson-Grayson's allegations against Plaintiff, particularly a July 26, 2016, *Politico* article titled "Grayson's ex-wife claimed domestic abuse over two decades." (Doc. 94, pp. 5–6; Doc. 94-12). As part of the article, *Politico* published police reports and medical records provided by Lolita Carson-Grayson that seem to corroborate her allegations. (Doc. 94, pp. 5–6; Doc. 94-13).

In response, Plaintiff again raises the same vague hearsay objections, which, again, are baseless for the reasons stated above. (Doc. 110, pp. 3–5). Plaintiff then provides a completely irrelevant narrative of the tumultuous annulment proceedings between him and his ex-wife, announcing that "[w]ithout question Lolita Carson-Grayson is a vicious, violent, world-class liar." (*Id*. at pp. 2–3, 8–10). Plaintiff's opinion of his ex-wife's veracity is immaterial to the question of

15

Defendants' state of mind when publishing this undefined category of allegedly defamatory statements.

As evidence that Defendants knew Lolita Carson-Grayson is a "liar," Plaintiff cites to an opposition research report and an email exchange between Christine Dolan, a consultant for No Labels, Inc., and Nancy Jacobson. (*Id.* at pp. 8–10, 12–13). Once again, Plaintiff's citations to the record are incorrect and incoherent. Even so, the highlighted excerpts from this "evidence" in Plaintiff's brief only discusses an altercation in 2014 between Plaintiff and Lolita Carson-Grayson in which a video proved that she was the aggressor. Thus, at most, Plaintiff's "evidence" shows that Defendants were aware that Lolita Carson-Grayson instigated the domestic violence incident in 2014 and lied about her role in the event; it does not show that Defendants were aware she was the aggressor in *every* domestic violence incident between herself and Plaintiff or that she lied about *all* allegations of abuse.

Defendants' reply highlights this point. They argue that Plaintiff's response brief relies on an outdated September 2015 opposition research report. (Doc. 114, pp. 5–6). They also state that they based the challenged publications on the 2016 *Politico* article, which included police reports and medical records spanning over 20 years, some of which seem to corroborate Lolita Carson-Grayson's allegations of abuse. (Doc. 114, pp. 5–6; *see* Docs. 94-12, 94-13). This position adds some clarity to Plaintiff's comment that, "[h]ad Defendants *updated* their research on the annulment proceedings, they would have learned" of Lolita Carson-Grayson's

16

allegedly incessant deception. (Doc. 110, p. 10) (emphasis added). However, there is no indication that Defendants "purposefully avoided further investigation with the intent to avoid the truth," and "a failure to investigate, standing on its own, does not indicate the presence of actual malice." *Michel*, 816 F.3d at 703 (internal citations omitted). Thus, there is no clear and convincing proof that Defendants published this amorphous second category of allegedly defamatory statements with actual malice, and summary judgment as to these publications is proper.

## IV.   CONCLUSION

For these reasons, even viewing the record in the light most favorable to Plaintiff, there is not even a scintilla of evidence showing—much less clear and convincing proof of—actual malice.[20] Thus, summary judgment in favor of Defendants on Counts I and II is proper. Furthermore, because the defamation claims are not viable, the civil conspiracy claim also fails, and summary judgment in favor of Defendants is proper on Count III. *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (first citing *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997), and then citing *Kee v. Nat'l Rsrv. Life Ins. Co.*, 918 F.2d 1538, 1541–42 (11th Cir. 1990)) (holding that a civil conspiracy must be based on

---

[20] Consequently, the Court does not need to address the other arguments advanced in Defendants' briefs. (Docs. 94, 95). And, logically, because defamation by implication is merely a subset of defamation, the same actual malice standard applies. *See Jews for Jesus*, 997 So. 2d at 1108. That is, a defamation by implication claim cannot stand independently of a defamation claim here; defamation by implication simply recognizes a different type of false statement. Thus, because the defamation claim fails, the defamation by implication claim must also fail.

"an underlying illegal act or tort"); *Liappas v. Augoustis*, 47 So. 2d 582, 582–83 (Fla. 1950) (same).

Accordingly, it is **ORDERED** and **ADJUDGED** that Defendants' Motions for Summary Judgment (Docs. 94, 95) are **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff and to thereafter close the file.

**DONE AND ORDERED** in Orlando, Florida on May 20, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties